UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | | |
|---|---|---|
| STEVEN C. FUSTOLO, | ) | Chapter 7 |
| | ) | Case No. 13-12692-JNF |
| Debtor. | ) | |
| | ) | |
| 50 THOMAS PATTON DRIVE, LLC, and | ) | |
| THE PATRIOT GROUP, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | Adversary Proceeding |
| | ) | No. 14-_____-JNF |
| v. | ) | |
| | ) | |
| STEVEN C. FUSTOLO, | ) | |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

50 Thomas Patton Drive, LLC ("Patton Drive") and The Patriot Group, LLC ("Patriot," and together with Patton, the "Plaintiffs"), by way of complaint against Steven C. Fustolo (the "Debtor"), hereby allege as follows:

### *Parties*

1.     Patton Drive is a Massachusetts limited liability company with a place of business located at 10 Turnpike Road, Southborough, Massachusetts 01772.  Patton Drive is a creditor of the Debtor with standing to assert the claims set forth herein.

2.     Patriot is a Delaware limited liability company with a place of business located at 1120 Post Road, Darien, Connecticut 06820.  Patriot is a creditor of the Debtor with standing to assert the claims set forth herein.

JS#496197v5

3.      Upon information and belief, the Debtor is an individual residing at 110 Church Street, Winchester, Massachusetts 01890.  Upon information and belief, the Debtor has been to married his wife Elisa Fustolo ("Elisa") since 1994.

### Jurisdiction and Venue

4.      On May 6, 2013 (the "Petition Date") the Plaintiffs and another creditor filed an involuntary petition for an order for relief against the Debtor under Chapter 7 of the Title 11 of the United States Code.

5.      On December 12, 2013 (the "Order Date") the Court entered an order for relief adjudicating the Debtor a bankruptcy debtor as of the Petition Date (the "Order for Relief").

6.      This Court has jurisdiction to hear and determine the merits of, and the issues raised in this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  The statutory predicates for the relief demanded herein are 11 U.S.C. §§ 727 and 523.

7.      Venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

### Allegations Applicable to All Counts

**A.  The Debtor's Education and Professional Background**

8.      The Debtor holds a bachelor's of science in accounting awarded by Bentley College in 1980.  The Debtor also holds a masters of business administration by Babson College awarded in 1982 or 1983.  At all times relevant to the claims asserted herein, the Debtor was and is a certified public accountant.

9.      Since the early 1980s the Debtor has been employed by, and/or a principal of James J. Fox & Company where he practices with his partners Costanzo Fustolo ("Costanzo") and Steven E. Robinson ("Robinson") as a certified public accountant and/or a professional tax advisor.  In

2

addition, at all times relevant to the claims asserted herein, the Debtor held one or more commercial and residential real estate properties both for income, and for speculation and development. The Debtor has been a party to, or otherwise involved in the identification of sources of, and the negotiation and the closing of numerous commercial real estate and other finance transactions.

10.     At all times relevant to the claims asserted herein, the Debtor was and is a published author and a paid speaker and lecturer to accountants, attorneys, and other tax professionals on the subjects of, *inter alia*, tax, accounting, and compliance issues, and legislative and regulatory mandates concerning tax and financial reporting by business concerns.

### B.  The Debtor's Estate

11.     The commencement of the Debtor's case on the Petition Date created a bankruptcy estate comprised of the legal and equitable rights and property of the Debtor as provided by applicable state and federal law that existed on and as of the Petition Date ("Estate Property").

12.     This Court has never entered an order authorizing the Debtor to use, acquire, or dispose of Estate Property on or before the Order Date.

13.     On and after the Order Date the Debtor did not have the right to use, acquire, or dispose of Estate Property.

14.     This Court has never entered an order authorizing the Debtor to use, sell, or lease Estate Property.

### C.  The Debtor's Fraudulent Transactions and Actions as to Patriot

15.     The Debtor signed a personal guaranty (the "Patriot Guaranty") for the full and timely repayment of certain indebtedness to Patriot advanced as loans for the development and improvement of real property located at 145 rear Revere Beach Boulevard, 147 rear Revere Beach Boulevard, 546 Revere Beach Boulevard, 527 Revere Beach Boulevard, 530 Revere Beach

JS#496197v5

Boulevard, 532-534 Revere Beach Boulevard, 536 Revere Beach Boulevard, 538-540 Revere Beach Boulevard, 542-544 Revere Beach Boulevard, and 543-546 Revere Beach Boulevard (collectively the "Revere Beach Property"). The indebtedness underlying the Patriot Guaranty was secured by a mortgage in and a lien upon the Revere Beach Property.

16.    The Debtor defaulted on the Patriot Guaranty, and failed or otherwise refused to surrender the Revere Beach Property to Patriot in mitigation of the indebtedness underlying the Patriot Guaranty, despite Patriot's offer to return the Patriot Guaranty to the Debtor unenforced in exchange for such cooperation.

17.    Patriot ultimately initiated a civil action against the Debtor to collect the Patriot Guaranty, of which the Debtor had actual knowledge.

18.    On May 27, 2011 the Massachusetts Superior Court for Middlesex County entered a judgment for Patriot against the Debtor establishing his liability to Patriot in an amount exceeding $20 million (the "Patriot Judgment").

19.    On October 4, 2011 and February 14, 2012 Patriot, by and through its counsel, took the deposition of the Debtor in furtherance of Patriot's efforts to investigate the Debtor's assets and to collect the Patriot Judgment.

20.    On or before October 4, 2011 the Debtor had actual knowledge (i) of the Patriot Judgment, and (ii) that Patriot was undertaking efforts to investigate his assets in order to collect the Patriot Judgment.

21.    On November 16, 2011 and December 6, 2011 Patriot, by and through its counsel, took the deposition of Robinson in furtherance of Patriot's efforts to investigate the Debtor's assets and to collect the Patriot Judgment. The Debtor had actual knowledge of Patriot's deposition of Robinson.

4

22.     On February 9, 2012 Patriot, by and through its counsel, took the deposition of Costanzo, the Debtor's father, in furtherance of Patriot's efforts to investigate the Debtor's assets and to collect the Patriot Judgment.  The Debtor had actual knowledge of Patriot's deposition of Costanzo.

23.     On February 16, 2012 Patriot, by and through its counsel, took the deposition of Elisa in furtherance of Patriot's efforts to investigate the Debtor's assets and to collect the Patriot Judgment.  The Debtor had actual knowledge of Patriot's deposition of Elisa.

24.     In addition, the Debtor engaged in what was a failed, yet clandestine effort to recover the Revere Beach Property that was Patriot's collateral in order to extinguish the Patriot mortgage in the Revere Beach Property at a deeply depressed price.

25.     On April 30, 2010 Patriot conducted a public auction foreclosure sale (the "Foreclosure Sale") of the Revere Beach Property in order to recover some or all of the Debtor's indebtedness to Patriot.  At that Foreclosure Sale, Affinity Investments, LLC ("Affinity") appeared through Attorney Paul Seyffert and submitted the high bid of $5,200,000.00 for the Revere Beach Property.  On April 30, 2010 Affinity tendered the required $50,000.00 deposit and executed a Sale Agreement, pursuant to which Affinity was to buy the Revere Beach Property.

26.     The Sale Agreement provided that Affinity would pay the $470,000.00 deposit balance within ten days, and pay the remaining purchase price balance within thirty days.

27.     Affinity made no further payments to Patriot and defaulted on the Sale Agreement.

28.     Unbeknownst to Patriot at the time of the Foreclosure Sale were the facts that (a) Affinity was a straw of the Debtor, (b) Affinity's manager and registered agent, Martin Nahigian, was the Debtor's close associate, (c) the Debtor solely owned and/or controlled Affinity, and (d) the Debtor, and not Affinity or Nahigian funded the $50,000.00 Foreclosure Sale deposit payment

5

from a deposit account held in Elisa's name.  It was only after the Debtor filed his bankruptcy schedules and statements which disclosed his interests in Affinity, and after Plaintiff's counsel obtained the deposit account records for Elisa's accounts, that Patriot discovered the Debtor's fraudulent scheme as to the Foreclosure Sale.

29.     The Debtor directed and/or caused Affinity to submit a bid at the Foreclosure Sale and enter the Sale Agreement with no intention of actually purchasing the Revere Beach Property. Instead, the Debtor acted with the sole intent to interfering with the Foreclosure Sale and ensuring that Patriot did not sell the Revere Beach Property to a bona fide purchaser.

30.     Still unaware of the Debtor's involvement in Affinity, on July 30, 2010 Patriot initiated a civil action in the Suffolk Superior Court against Affinity for breach of contract.

31.     Affinity failed to plead or otherwise defend the action and on January 20, 2011 a default judgment was entered against it in favor of Patriot in the amount of $5,150,000.00 plus $363,933.32 in interest.

32.     Upon information and belief, and under all the facts and circumstances now known to Patriot, the Debtor executed the Patriot Guaranty without any intention to ever honor the obligations and duties to Patriot arising thereunder.

**D.  The Debtor's Fraudulent Transactions and Actions as to Patton Drive**

33.     In or about the summer of 2008 the Debtor through an individual named Robert Anderson approached Cliff Schorer ("Schorer") in his capacity as Manager of 50 Thomas Patton Drive LLC about purchasing property located at 50 Thomas Patton Drive LLC for $4.25 million.

34.     The Debtor arranged for primary financing of $3 million from Stoneham Bank and Patton Drive agreed to take a second mortgage for $1.25 million to cover the balance of the purchase price.  The Debtor never disclosed the existence of Patton Drive's second mortgage to

6

the bank.  The Debtor provided Patton Drive with a personal financial statement on which Schorer relied.   The personal financial statement contained multiple and serious misstatements which served to inflate Fustolo's net worth.

35.     Just prior to closing the Debtor told Schorer that a previously undisclosed $250,000 referral fee was owed to a third party called Big Vision Consulting Group, LLC ("Big Vision"). Schorer refused to pay the referral fee.  The Debtor suggested that the referral fee and a broker fee of $130,500 be paid by raising the purchase price from $4.25 to $4.6 million and increasing the bank financing from $3 million to $3.45 million.

36.     The Debtor did not disclose that Big Vision was an entity he created and was owned by his Aunt, or that Big Vision did not work in connection with the purchase and sale of 50 Thomas Patton Drive.  The $250,000 referral fee was immediately transferred to a bank account held by the Debtor's wife.  But for a couple hundred dollars the Debtor paid to his Aunt, the entre $250,000 was used by the Debtor for his benefit.

37.     On July 17, 2008 the sale of 50 Thomas Patton Drive closed.  As part of the sale the Debtor personally guaranteed the $1.25 million in total indebtedness owed to Patton Drive.

38.     In or about late August, early September, 2008 the Debtor approached Schorer to inform him that he was having difficulty closing a $160 million construction loan on the Revere Beach Project.  The Debtor told Schorer that he needed a $1.1 million escrowed equity contribution to close the loan with his construction lender Prosperity International ("Prosperity").

39.     At the time of this original proposal and thereafter, the Debtor repeatedly represented both orally and in writing that the $1.1 million equity contribution would be placed in a "blocked cash" or alternatively, an "escrow" account, to be held solely for the purpose of meeting the underwriting requirements of the construction lender, Prosperity.

7

40.     Schorer and the Debtor discussed at some length the requirement that the $1.1 million equity contribution remain in escrow in a "blocked cash account," and not be withdrawn or removed for any reason until Patton Drive was paid in full for all sums outstanding.  The Debtor also represented, both orally and in writing, that Patton Drive's funds would be housed in a federally insured bank.

41.     Two days before closing, the Debtor announced to Schorer that he needed an additional $400,000 in financing, and encouraged Patton Drive to add to the $1.1 million in financing by promising a substantially greater interest rate return.  The Debtor again represented orally and in writing that the loaned funds would be placed in an escrow account, and that the Prosperity construction loan closing was imminent.   Patton Drive relied upon these representations, and agreed to increase its financing commitment to $1.5 million.

42.     The finalized Use of Funds Letter for the transaction confirmed that the funds being provided by Schorer "will be used to fund the acquisition of a blocked cash account which is to be provided by Revere Beach Holdings, LLC to Prosperity or its designated beneficiary as a condition of the Prosperity Loan in accordance with the Prosperity Loan Agreement."  Patton Drive relied upon this letter in lending the $1.5 million.  Revere Beach Holdings, LLC ("Revere Beach") is an entity that at all times relevant to the claims asserted herein was and is wholly owned, directly or indirectly, and controlled by the Debtor.

43.     In reliance on the written and oral representations made by Fustolo and his legal advisors, Schorer, on behalf of Patton Drive, wired $1.5 million to Mintz Levin on September 22, 2009.  Schorer believed and understood, based upon the representations of the Debtor, that the escrow funds would remain in a blocked account in the United States, held by Mintz Levin pending the Prosperity construction loan closing.

8

JS#496197v5

44.     On September 25, 2008 Mintz Levin wired the $1.5 million to Fidelity National Title Insurance Company ("Fidelity Title").  Pursuant to an escrow agreement between Fidelity Title and Revere Beach, Fidelity Title would hold the $1.5 million until certain enumerated escrow conditions had been met, after which the entire $1.5 million would be released to Apogee Financial Consultants, Inc. ("Apogee").

45.     The Debtor never disclosed to Schorer the existence of Fidelity Title, the Fidelity Title escrow agreement, Apogee, or what Apogee intended to do with the loaned monies.

46.     Revere Beach's first agreement with Apogee, dated September 23, 2008, contemplated Apogee would arrange for a sub-account to be opened "at a Prime World Bank" in the amount of $100 million, and in the name of Revere Beach.  The "fee" charged by Apogee for acquiring this bank account was Schorer's $1.5 million.  Although an account was to be set up in the name of Revere Beach, the Debtor could not access the account at any time or for any purpose. After sixty (60) days, the account would no longer be in the name of Revere Beach.

47.     The Debtor intended to present evidence of the $100 million bank account to cause Prosperity to fund the $160 million construction loan.  The Debtor was "leasing" a bank account for (60) days for the price of $1.5 million.  The Debtor never disclosed any of these facts to Schorer. By late October 2008 it became clear to the Debtor that Apogee could not deliver proof that it had acquired a leased bank account in the amount of $100 million.

48.     The Prosperity loan, by its terms, contemplated satisfaction of the escrow conditions by mid-October, 2008.  Revere Beach did not and could not meet the conditions.  From late October, 2008 forward, the Prosperity loan was no longer viable, but the Debtor failed to disclose this fact to Schorer or his attorney.

9

49.     In late October 2008 the Debtor began negotiating a new construction loan with Money Market International Funding Group, LLC ("Money Market International"), through a new corporation he set up called Ocean GP, LLC ("Ocean GP").  The Debtor never informed Schorer that he intended to use Schorer's funds for a different loan, through a different entity with whom Schorer had no documented connection.

50.     On November 6, 2008 the Debtor, through Ocean GP, entered into a contract with Bright Dominion, LLC ("Bright Dominion"), which contemplated that Bright Dominion would obtain a $100 million bank account in the name of Ocean GP on or before November 12, 2008. The bank account would be in the name of Ocean GP for sixty (60) days, during which time Ocean GP could not access, move or withdraw the funds.

51.     On November 6, 2008 the Debtor directed Fidelity Title to wire $514,000 to Bright Dominion as a fee for obtaining a proof of funds letter for Ocean GP, to present to Money Market International.  Bright Dominion provided the Debtor a proof of funds letter, which Money Market International rejected as fraudulent and refused to fund the construction loan.  Bright Dominion advised the Debtor that it did not intend to return the $514,000 fee, due to the Debtor's documented misconduct.

52.     Through Ocean GP, in early November 2008, the Debtor wired $100,000 of Patton Drive's funds to pay a broker fee to an individual in Florida who assisted the Debtor in identifying and locating Money Market International.  The Debtor did not provide Schorer notice of this transfer.

53.     Fustolo used an additional $150,000 in Patton Drive's funds to fund his other business operations, unrelated to the Revere Beach Project and without disclosing the same to Schorer.

10

JS#496197v5

54.     Through another one of his entities, 162 Salem Street, LLC ("162 Salem"), which had no relationship to Schorer or the Revere Beach Project, the Debtor wired $500,000 of Patton Drive's funds to Alexander Trading Company ("Alexander Trading").  The funds were paid to Alexander Trading to be used as an equity participation fee to lease a Certificate of Deposit with a face amount of $500 million.  According to the Debtor, this "investment" was designed to ultimately pay 162 Salem the sum of $11.457 million.

55.     The Debtor then claimed that in January 2009 that Alexander Trading agreed to loan $10 million to 162 Salem by February 9, 2009, which proceeds would be used to pay a contractor to begin construction at another of the Debtor's development projects at 162 Salem Street.  The loan was never made and the funds for the equity participation fee were never returned to the Debtor or 162 Salem.

56.     Meanwhile, on or about November 18, 2008, Ocean GP wired $250,000 of Patton Drive's funds from Fidelity Title to Uni-Vest, LLC ("Uni-Vest") for the purposes of making a loan to Uni-Vest, pursuant to which Uni-Vest would repay Ocean GP the sum of $2.75 million within six days.  The parties then amended the loan agreement to provide that Uni-Vest would repay the Debtor $9.75 million by December 1, 2008.  In the event the loan was not repaid by December 1, 2008, additional interest in the amount of $1 million per day would accrue on the balance.  One final amendment provided that by January 16, 2009, Ocean GP would receive a $60 million loan from Uni-Vest which would immediately be forgiven. Without disclosing the details, the Debtor represented to Schorer during early 2009, that this contemplated loan was "real."  Uni-Vest has never repaid Ocean GP the $250,000 loan or met any of the other purported contractual obligations.

57.     Patton Drive ultimately initiated a civil action against the Debtor and various related entities in August 2009.  Upon information and belief, at all times on and after September 1, 2009 the Debtor had actual knowledge of the Patton Drive civil action against him.

58.     On September 28, 2011 the Massachusetts Superior Court for Suffolk County entered a judgment for Patton Drive against the Debtor establishing his liability to Patton Drive in an amount exceeding of $6.7 million (the "Patton Drive Judgment").

59.     At all times on and after October 1, 2011 the Debtor had actual knowledge of the Patton Drive Judgment.

**E.   The Debtor Creates a Deliberately Complex Corporate Web to Conceal his Fraudulent Activities**

60.     Prior to the Petition Date, and at all times since the entry of the Order for Relief, the Debtor had intentionally established and continued to utilize a multi-layered conglomeration of juridical entities and trusts that in relationship to the Debtor's past and present business activities is unnecessarily complex and, upon information belief, intentionally established and utilized to assist the Debtor in concealing his assets from creditors.

61.     Despite the existence of myriad juridical entities and trusts, all, or substantially all of the equity interests of numerous affiliates of the Debtor are held by a nominee trust called 32 Park Vale Avenue Trust (the "Nominee Trust") of which the Debtor is both the trustee and the sole beneficiary.  Put simply, all, or substantially all financial roads lead to the Nominee Trust.

62.     In addition to other property, including the equity interests the Nominee Trust holds in various affiliates, the Nominee Trust has, both before and after the Petition Date, held one or more deposit accounts in its own name.

63.     Property Trust Corporation ("Property Trust") is a Massachusetts corporation with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all,

12

or substantially all of Property Trust's equity interest, and all officer and director positions are held by the Debtor.

64.     Huntington Properties, Inc. ("Huntington Properties") is a Massachusetts corporation with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of the equity interest in Huntington Properties are held by the Debtor, and all officer and director positions are held by Property Trust.  In addition to other property, Huntington Properties has, both before and after the Petition Date, held one or more deposit accounts in its own name.

65.     CPE Meetings, Inc. ("CPE Meetings") is a Massachusetts corporation with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of CPE Meetings' equity interest and all officer and director positions are held by the Debtor.  In addition to other property, CPE Meetings has, both before and after the Petition Date, held one or more deposit accounts in its own name, one or more of which are denominated as payroll accounts.  Upon information and belief, CPE Meetings ceased business operations in 2012 and has not had any employees since mid to late 2011.

66.     National Tax Institute, Inc. ("National Tax") is a Massachusetts corporation with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of National Tax's equity interest and all officer and director positions are held by the Debtor.  In addition to other property, National Tax has, both before and after the Petition Date, held one or more deposit accounts in its own name.

67.     Revere Beach Properties, Inc. ("Revere Properties") is a Massachusetts corporation with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief,

13

all, or substantially all of Revere Properties' equity interest are owned by Huntington Properties and all officer and director positions are held by the Debtor.

68.     5 High Street, LLC ("5 High") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of 5 High Street equity interest are owned by the Nominee Trust, and its managers are Property Trust and the Debtor.  In addition to other property, 5 High has, both before and after the Petition Date, held one or more deposit accounts in its own name.

69.     65 North Margin Street LLC ("65 North Margin") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of 65 North Margin 's equity interests are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, 65 North Margin has, both before and after the Petition Date, held one or more deposit accounts in its own name.

70.     115 Salem Street Realty LLC ("115 Salem") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of 115 Salem's equity interests are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, 115 Salem has, both before and after the Petition Date, held one or more deposit accounts in its own name.

71.     135-137 Salem Street LLC ("135-137 Salem") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of 135-137 Salem's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, 135-137 Salem has, both before and after the Petition Date, held one or more deposit accounts in its own name.

14

72.     162 Salem Street LLC ("162 Salem") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of 162 Salem's equity interest are owned by the Nominee Trust, and its manager is Property Trust.

73.     Fustolo Development LLC ("Fustolo Development") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of Fustolo Development's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, Fustolo Development has, both before and after the Petition Date, held one or more deposit accounts in its own name.

74.     Fustolo Properties LLC ("Fustolo Properties") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of Fustolo Properties' equity interest are owned by the Nominee Trust, and its manager is Property Trust.

75.     New Sheafe Street Realty, LLC ("New Sheafe Realty") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of New Sheafe Realty's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, New Sheafe Realty has, both before and after the Petition Date, held one or more deposit accounts in its own name.

76.     North Margin Street Development, LLC ("North Margin Development") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington,

JS#496197v5

MA 01803.  Upon information and belief, all, or substantially all of North Margin Development's equity interest are owned by Nominee Trust, and its manager is Property Trust.

77.    The Ocean Club Condominium, LLC ("Ocean Club") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of Ocean Club's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, Ocean Club has, both before and after the Petition Date, held one or more deposit accounts in its own name.

78.    Ocean GP, LLC ("Ocean GP") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of Ocean GP's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, Ocean GP has, both before and after the Petition Date, held one or more deposit accounts in its own name.

79.    Revere Beach is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington, MA 01803.  Upon information and belief, all, or substantially all of Revere Beach's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, Revere Beach has, both before and after the Petition Date, held one or more deposit accounts in its own name.

80.    Affinity is a Massachusetts limited liability company with an address of 200 Jefferson Road, Suite 207, Wilmington, MA 01887.  Upon information and belief, all, or substantially all of Affinity's equity interest are owned by the Nominee Trust, and its manager is Martin Nahigian.

81.    Huntington Properties Holding Company, LLC ("Huntington Holding") is a Massachusetts limited liability company with an address of 87 Terrace Hall Avenue, Burlington,

JS#496197v5

MA 01803.  Upon information and belief, all, or substantially all of Huntington Holding's equity interest are owned by the Nominee Trust, and its manager is Property Trust.  In addition to other property, Huntington Holding has, both before and after the Petition Date, held one or more deposit accounts in its own name.

82.     NTI, LLC is a limited liability company wholly owned and controlled by the Debtor.  In addition to other property, NTI has, both before and after the Petition Date, held one or more deposit accounts in its own name.

83.     At all times relevant to the claims asserted herein, each and all of the juridical entities and trusts described or referred to in Paragraphs 60 through 82 of this Complaint (the "Affiliates ") were insiders and affiliates of the Debtor.

84.     At all times relevant to the claims asserted herein, the Debtor exercised complete and pervasive control over each and all of the Affiliates and their property.

85.     At all times relevant to the claims asserted herein, the Debtor intentionally caused a confused intermingling of his assets with those of one or more of the Affiliates.

86.     At all times relevant to the claims asserted herein, the Debtor intentionally caused an actual or the appearance of a thin capitalization of himself by using one or more of the Affiliates to conceal his assets.

87.     Upon information and belief, at all times relevant to the claims asserted herein there was a non-observance of corporate and other formalities appropriate to the Affiliates.

88.     Upon information and belief, at all times relevant to the claims asserted herein there was the absence of corporate and other records appropriate to the Affiliates

89.     At all times relevant to the claims asserted herein, the Debtor intentionally caused a siphoning away of his assets to one or more of the Affiliates to conceal his assets from creditors.

17

90.    At all times relevant to the claims asserted herein, the Debtor intentionally used one or more of the Affiliates for his own transactions.

91.    At all times relevant to the claims asserted herein, the Debtor intentionally used one or more of the Affiliates in promoting a fraud.

92.    At all times relevant to the claims asserted herein, each and all of the Affiliates were mere instrumentalities and/or alter egos of the Debtor.

93.    At all times relevant to the claims asserted herein, the property of each and all of the Affiliates was that of the Debtor, including, without limitation that property intentionally transferred by the Debtor or otherwise intentionally concealed by the Debtor in and under the names of one or more of the Affiliates.

**F.  The Debtor's Nefarious Prepetition Transfers**

***i.  The Debtor's Substantial Transfers to Elisa and His Constructive Ownership of Her Deposit Accounts***

**a.  Century Bank Account**

94.    The Debtor has disclosed that during the one year before the Petition Date Elisa had only only $12,000.00 in earnings, and sustained losses from certain real estate investment property.

95.    The Debtor and Elisa's joint tax returns for 2011 disclosed that Elisa had only only $2,500.00 in earnings to that tax year.

96.    Upon information and belief, Elisa had no earnings of her own in 2009 or in 2010.

97.    Upon information and belief, Elisa has no other means of financial support other than the Debtor.

98.    On, before, and after the Petition Date Elisa held a deposit account at Century Bank in her name alone (the "Century Bank Account").

18

99.     Upon information and belief, on or about June 17, 2011 the Debtor transferred $3,300.00 of his property in cash to Elisa by deposit into the Century Bank Account.

100.    Upon information and belief, on or about July 12, 2011 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Century Bank Account.

101.    Upon information and belief, on or about July 21, 2011 the Debtor transferred $6,000.00 of his property in cash to Elisa by deposit into the Century Bank Account.

102.    Upon information and belief, on or about September 14, 2011 the Debtor transferred $2,200.00 of his property in cash to Elisa by deposit into the Century Bank Account.

103.    Upon information and belief, on or about January 9, 2012 the Debtor transferred $4,800.00 of his property in cash to Elisa by deposit into the Century Bank Account.

104.    Upon information and belief, on or about May 4, 2012 the Debtor transferred $2,500.00 of his property in cash to Elisa by deposit into the Century Bank Account.

105.    Upon information and belief, on or about February 12, 2013 the Debtor transferred $14,838.99 of his property in cash to Elisa by deposit into the Century Bank Account.

106.    Upon information and belief, on or about February 12, 2013 the Debtor transferred $16,500.00 of his property in cash to Elisa by deposit into the Century Bank Account.

107.    Upon information and belief, on or about February 14, 2013 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Century Bank Account.

108.    Upon information and belief, on or about February 27, 2013 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Century Bank Account.

109.    Upon information and belief, in addition to the foregoing transfers described or referred to in Paragraphs 99 through 108 of this Complaint, the Debtor made numerous other

JS#496197v5

transfers of his property in individual amounts under $2,000.00 to Elisa by deposit to the Century Bank Account (collectively, the "Century Bank Transfers").

110.    Based on the facts and circumstances of the funding and use of the Century Bank Account, Elisa's lack of income in relationship to the deposits made into the Century Bank Account, and the Debtor's clear and unequivocal use of the Century Bank Account with Elisa's clear and unequivocal consent and participation, the Century Bank Account was property of the Debtor before, on, and after the Petition Date.

**b.  Citizens Bank Account**

111.    On, before, and after the Petition Date Elisa held a deposit account at Citizens Bank in her name alone (the " Citizens Bank Account").

112.    Upon information and belief, on or about July 13, 2011 the Debtor transferred $7,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

113.    Upon information and belief, on or about July 14, 2011 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

114.    Upon information and belief, on or about July 25, 2011 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

115.    Upon information and belief, on or about September 13, 2011 the Debtor transferred $4,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

116.    Upon information and belief, on or about October 3, 2011 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

117.    Upon information and belief, on or about November 3, 2011 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

JS#496197v5

118.    Upon information and belief, on or about November 14, 2011 the Debtor transferred $8,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

119.    Upon information and belief, on or about November 16, 2011 the Debtor transferred $4,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

120.    Upon information and belief, on or about November 23, 2011 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

121.    Upon information and belief, on or about December 6, 2011 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

122.    Upon information and belief, on or about December 22, 2011 the Debtor transferred $3,700.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

123.    Upon information and belief, on or about December 27, 2011 the Debtor transferred $3,300.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

124.    Upon information and belief, on or about January 13, 2012 the Debtor transferred $4,100.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

125.    Upon information and belief, on or about February 10, 2012 the Debtor transferred $2,600.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

126.    Upon information and belief, on or about February 16, 2012 the Debtor transferred $4,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

127.    Upon information and belief, on or about March 7, 2012 the Debtor transferred $2,600.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

128.    Upon information and belief, on or about March 12, 2012 the Debtor transferred $2,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

JS#496197v5

129.     Upon information and belief, on or about March 16, 2012 the Debtor transferred $4,450.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

130.     Upon information and belief, on or about March 30, 2012 the Debtor transferred $2,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

131.     Upon information and belief, on or about April 13, 2012 the Debtor transferred $4,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

132.     Upon information and belief, on or about April 16, 2012 the Debtor transferred $3,300.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

133.     Upon information and belief, on or about May 8, 2012 the Debtor transferred $2,300.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

134.     Upon information and belief, on or about May 9, 2012 the Debtor transferred $2,300.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

135.     Upon information and belief, on or about May 14, 2012 the Debtor transferred $3,400.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

136.     Upon information and belief, on or about June 7, 2012 the Debtor transferred $6,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

137.     Upon information and belief, on or about June 12, 2012 the Debtor transferred $10,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

138.     Upon information and belief, on or about June 12, 2012 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

139.     Upon information and belief, on or about June 20, 2012 the Debtor transferred $2,900.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

JS#496197v5

140.    Upon information and belief, on or about July 9, 2012 the Debtor transferred $2,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

141.    Upon information and belief, on or about July 13, 2012 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

142.    Upon information and belief, on or about July 18, 2012 the Debtor transferred $2,900.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

143.    Upon information and belief, on or about August 9, 2012 the Debtor transferred $4,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

144.    Upon information and belief, on or about August 31, 2012 the Debtor transferred $3,500.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

145.    Upon information and belief, on or about September 10, 2012 the Debtor transferred $6,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

146.    Upon information and belief, on or about September 10, 2012 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

147.    Upon information and belief, on or about October 11, 2012 the Debtor transferred $6,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

148.    Upon information and belief, on or about October 31, 2012 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

149.    Upon information and belief, on or about November 2, 2012 the Debtor transferred $5,200.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

150.    Upon information and belief, on or about November 7, 2012 the Debtor transferred $2,100.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

23

151.    Upon information and belief, on or about November 21, 2012 the Debtor transferred $2,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

152.    Upon information and belief, on or about December 3, 2012 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

153.    Upon information and belief, on or about December 11, 2012 the Debtor transferred $5,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

154.    Upon information and belief, on or about January 8, 2013 the Debtor transferred $5,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

155.    Upon information and belief, on or about January 28, 2013 the Debtor transferred $3,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

156.    Upon information and belief, on or about February 7, 2013 the Debtor transferred $4,000.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

157.    Upon information and belief, on or about March 12, 2013 the Debtor transferred $4,300.00 of his property in cash to Elisa by deposit into the Citizens Bank Account.

158.    On or about April 8, 2013 the Debtor transferred $10,000.00 of his property to Elisa by deposit into the Citizens Bank Account.

159.    Upon information and belief, in addition to the foregoing transfers described or referred to in Paragraphs 112 through 158 of this Complaint, the Debtor made numerous other transfers of his property in individual amounts under $2,000.00 to Elisa by deposit to the Citizens Bank Account (collectively, the "Citizens Bank Transfers," and together with the Century Bank Transfers, the "Elisa Transfers").

160.    Based on the facts and circumstances of the funding and use of the Citizens Bank Account, Elisa's lack of income in relationship to the deposits made into the Citizens Bank

24

Account, and the Debtor's clear and unequivocal use of the Citizens Bank Account with Elisa's clear and unequivocal consent and participation, the Citizens Bank Account was property of the Debtor before, on, and after the Petition Date.

161.    The Debtor made the Elisa Transfers to an insider.

162.    The Debtor retained actual and/or constructive possession of the Elisa Transfers after the Elisa Transfers occurred.

163.    The Debtor did not disclose the Elisa Transfers to any of the Debtor's creditors.

164.    The Debtor did not in any way disclose some or all of the Elisa Transfers to this Court or to the Trustee.

165.    By surreptitiously making the Elisa Transfers in cash and cash equivalents and utilizing the deposit accounts standing in the name of Elisa alone, the Debtor intentionally concealed the Elisa Transfers from his creditors.

166.    By surreptitiously making the Elisa Transfers in cash and cash equivalents and utilizing the deposit accounts standing in the name of Elisa alone, the Debtor intentionally concealed the Elisa Transfers from this Court and the Trustee.

167.    Prior to and at the time of his making the Elisa Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective judgments against him.

168.    Prior to and at the time of his making the Elisa Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective efforts to investigate his assets and liabilities and to collect their judgments against him.

169.    The Elisa Transfers constitutes an actual and/or constructive removal or concealment of the Debtor's property.

JS#496197v5

170.     The Debtor was or claimed to be insolvent at the time he made the Elisa Transfers, and/or caused those transfers to be made.

171.     The Debtor was or claimed to be insolvent shortly after he made the Elisa Transfers, and/or caused those transfers to be made.

172.     The Debtor made the Elisa Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs took their respective judgments against him.

173.     The Debtor made the Elisa Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs undertook efforts to collect their judgments against him.

174.     The Debtor made some or all of the Elisa Transfers, and/or caused those transfers to be made, with actual knowledge that a valid and enforceable injunction issued by a court of competent jurisdiction existed that prohibited the Debtor from making or otherwise permitting the Elisa Transfers to be made.

175.     At all times relevant to the claims asserted herein, the Debtor exercised, directly or indirectly through Elisa, complete and pervasive control over the Century Bank Account and the Citizens Bank Account.

176.     At all times relevant to the claims asserted herein, the Debtor intentionally caused, directly or indirectly through Elisa, an actual or the appearance of a thin capitalization of the Debtor by using the Century Bank Account and the Citizens Bank Account to conceal his assets.

177.     At all times relevant to the claims asserted herein, the Debtor intentionally caused, directly or indirectly through Elisa, a siphoning away of his assets to the Century Bank Account and the Citizens Bank Account to conceal his assets from creditors.

26

JS#496197v5

178.    At all times relevant to the claims asserted herein, the Debtor, directly or indirectly through Elisa, intentionally used the Century Bank Account and the Citizens Bank Account for his own transactions.

179.    At all times relevant to the claims asserted herein, the Debtor, directly or indirectly through Elisa, intentionally used the Century Bank Account and the Citizens Bank Account in promoting a fraud.

### *ii.     The Debtor's Unexplained Cash Transactions Within One Year of the Petition Date*

180.    On August 20, 2012 the Debtor withdrew $3,900.00 in cash from a CPE Meetings account.

181.    On October 16, 2012 the Debtor withdrew $2,500.00 in cash from a National Tax account.

182.    On October 17, 2012 the Debtor withdrew $5,000.00 in cash from a National Tax account.

183.    On October 19, 2012 the Debtor withdrew $5,000.00 in cash from a National Tax account.

184.    On October 24, 2012 the Debtor withdrew $2,000.00 in cash from a National Tax account.

185.    On October 30, 2012 the Debtor withdrew $2,000.00 in cash from a National Tax account.

186.    On October 20, 2012 the Debtor withdrew $12,060.00 in cash from a 135-137 Salem account.

187.    On May 16, 2012 the Debtor withdrew $2,000.00 in cash from his own account.

188.    On June 20, 2012 the Debtor withdrew $6,500.00 in cash from his own account.

189.    On June 25, 2012 the Debtor withdrew $2,000.00 in cash from his own account.

190.    On June 28, 2012 the Debtor withdrew $2,000.00 in cash from his own account.

191.    On June 25, 2012 the Debtor withdrew $2,000.00 in cash from his own account.

192.    On December 3, 2012 the Debtor withdrew $12,066.00 in cash from his own account.

193.    On December 18, 2012 the Debtor withdrew $2,500.00 in cash from his own account.

194.    On December 18, 2012 the Debtor withdrew $37,561.50 in cash from his own account.

195.    On December 19, 2012 the Debtor withdrew $2,000.00 in cash from his own account.

196.    On February 28, 2013 the Debtor withdrew $2,000.00 in cash from a 135-137 Salem account.

197.    On January 23, 2013 the Debtor wired $48,000.00 to G D Humanitarian Foundation for his personal benefit from a Nominee Trust account.

198.    On January 23, 2013 the Debtor wired $42,000.00 to G D Humanitarian Foundation for his personal benefit from a CPE Meetings account.

199.    On March 22, 2013 the Debtor withdrew $2,000.00 in cash from a CPE Meetings account.

200.    On February 21, 2013 the Debtor withdrew $2,500.00 in cash from a National Tax account.

201.    Upon information and belief, in addition to the foregoing cash withdrawals described or referred to in Paragraphs 180 through 200of this Complaint, the Debtor made

28

numerous other cash withdrawals in individual amounts under $2,000.00 (the "Cash Transactions").

202.   The Debtor has neither disclosed nor explained the sources or uses of the Cash Transactions.

### *iii.*   *The Debtor's Substantial Transfers to Other Insiders and Affiliates*

**a.  Cash Transfers**

203.   On August 20, 2012 the Debtor transferred $12,060.00 of his property in cash to 135-137 Salem.

204.   On September 7, 2012 the Debtor transferred $2,925.00 of his property in cash to National Tax.

205.   On September 11, 2012 the Debtor transferred $3,000.00 of his property in cash to 115 Salem.

206.   On October 11, 2012 the Debtor transferred $2,000.00 of his property in cash to 115 Salem.

207.   On October 17, 2012 the Debtor transferred $2,200.00 of his property to New Sheafe Realty.

208.   On October 19, 2012 the Debtor transferred $5,000.00 of his property in cash to National Tax.

209.   On November  5, 2012 the Debtor transferred $2,500.00 of his property in cash to 115 Salem.

210.   On November 21, 2012 the Debtor transferred $3,210.00 of his property in cash to National Tax.

JS#496197v5

211.    On December 3, 2012 the Debtor transferred $3,500.00 of his property in cash to National Tax.

212.    On or about December 9, 2012 the Debtor transferred $10,000.00 of his property to National Tax Institute.

213.    On January 8, 2013 the Debtor transferred $2,000.00 of his property in cash to 115 Salem.

214.    On January 22, 2013 the Debtor transferred $5,709.78 of his property in cash to National Tax.

215.    On or about January 23, 2013 the Debtor transferred $25,000.00 of his property to National Tax.

216.    On January 25, 2013 the Debtor transferred $8,000.00 of his property to National Tax.

217.    On January 31, 2013 the Debtor transferred $20,000.00 of his property to CPE Meetings.

218.    On February 4, 2013 the Debtor transferred $4,789.00 of his property in cash to National Tax.

219.    On April 29, 2013 the Debtor transferred $3,000.00 of his property in cash to 115 Salem.

**b.  Transfers to and from CPE Meetings "Payroll Account"**

220.    During the one year period prior to the Petition Date, the Debtor intentionally delayed, hindered and defrauded his creditors, by among other things, repeatedly transferring money into and out of a CPE Meeting's account at Citizens Bank denominated as a "Payroll Account" despite CPE Meetings not having any employees during that period.

30

221.    On or about August 1, 2012 the Debtor transferred $7,103.00 from a CPE Meeting's deposit account to CPE Meeting's payroll account.

222.    On or about August 7, 2012 the Debtor transferred $6,500.00 from CPE Meeting's payroll account to CPE Meeting's deposit account.

223.    On or about August 7, 2012 the Debtor transferred $6,500.00 from a CPE Meeting's deposit account to CPE Meeting's payroll account.

224.    On or about August 7, 2012 the Debtor transferred $6,500.00 from CPE Meeting's payroll account to CPE Meeting's deposit account.

**c.  Transfers to NTI, LLC Account in the Name of Martin Nahigian**

225.    During the one year period prior to the Petition Date, the Debtor intentionally delayed, hindered and defrauded his creditors, by among other things, transferring money into a deposit account at Belmont Savings Bank in the name of NTI, LLC for which Martin C. Nahigian was the signatory.  Notwithstanding that fact, Martin Nahigian acted as the Debtor's agent and/or the Debtor retained primary control and custody of the account at all relevant times.

226.    On or about January 11, 2013 the Debtor transferred $10,000.00 from CPE Meetings to NTI, LLC.

227.    On or about February 21, 2013 the Debtor transferred $40,000.00 from CPE Meetings to NTI, LLC.

228.    On or about April 16, 2013 the Debtor transferred $25,000.00 from CPE Meetings to NTI, LLC.

229.    On or about April 29, 2013 the Debtor transferred $10,000.00 from CPE Meetings to NTI, LLC.

JS#496197v5

**d.  Transfers To and From Dormant Entities**

230.    During the one year period prior to the Petition Date, the Debtor intentionally delayed, hindered and defrauded his creditors, by among other things, transferring money into and out of deposit accounts in the names one or more Affiliates that had no business operations during that period.

231.    Upon information and belief, in addition to the foregoing transfers described or referred to in Paragraphs 203 through 230 of this Complaint, the Debtor made numerous other like transfers in individ2al amounts under $2,000.00 (the "Affiliate Transfers").

232.    Each of the Affiliates Transfers was made to one or more insiders.

233.    The Debtor retained actual and/or constructive possession of some or all of the Affiliate Transfers after those transfers occurred.

234.    The Debtor did not disclose some or all of the Affiliate Transfers to any of the Debtor's creditors.

235.    The Debtor did not disclose some or all of the Affiliate Transfers to this Court or to the Trustee.

236.    By his intentional creation and use of the multitude of the Affiliates, and his intentional creation and use of a multitude of deposit accounts standing in the name of those Affiliates and in the names of other insiders, the Debtor intentionally concealed the Affiliate Transfers from his creditors.

237.    By his intentional creation and use of the multitude of the Affiliates, and his intentional creation and use of a multitude of deposit accounts standing in the name of those Affiliates and in the names of other insiders, the Debtor intentionally concealed the Affiliate Transfers from this Court and the Trustee.

32

238.    Prior to and at the time of his making the Affiliate Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective judgments against him.

239.    Prior to and at the time of his making the Affiliate Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective efforts to investigate his assets and liabilities and to collect their judgments against him.

240.    The Affiliate Transfers constitutes an actual and/or constructive removal or concealment of the Debtor's property.

241.    The Debtor was or claimed to be insolvent at the time he made the Affiliate Transfers, and/or caused those transfers to be made.

242.    The Debtor was or claimed to be insolvent shortly after he made the Affiliate Transfers, and/or caused those transfers to be made.

243.    The Debtor made the Affiliate Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs took their respective judgments against him.

244.    The Debtor made the Affiliate Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs undertook efforts to collect their judgments against him.

245.    The Debtor made some or all of the Affiliate Transfers, and/or caused some or all of those transfers to be made, with actual knowledge that a valid and enforceable injunction issued by a court of competent jurisdiction existed that prohibited the Debtor from making or otherwise permitting the Affiliate Transfers to be made.

JS#496197v5

### *iv.  The Debtor Conceals and Siphons Royalty Payments*

246.    On the Petition Date the Debtor was entitled to receive royalties and writing fees from one or more publishers of educational materials for accountants and tax professionals for the Debtor's authorship of educational materials purchased by various educational materials publishers for inclusion as content in their published educational materials.  The educational materials publishers include, but are not necessarily limited to Stuart Shough Seminars LLC, WebCE, Inc., Thomson Reuters, Spidell Publishing, Inc., CPE Link, Professional Scholastics, Inc., and Professional Educational Services, LP.

247.    The Debtor is solely entitled to the payments made by the educational publishers for the Debtor's written work, and none of his insiders or affiliated companies have any right, title, claim, or interest to or in the payments made by the educational publishers for the Debtor's written work.

248.    The Debtor's right and entitlement to received payments from educational publishers for his written work authored and submitted to educational publishers under express or implied agreements in existence as of the Petition Date are Estate Property.

249.    Prior to the Petition Date the Debtor instructed CPE Solutions LLC to make payments due to the Debtor for his written educational material content payable to National Tax Institute.

250.    On or about January 15, 2013 CPE Solutions LLC made a payment to National Tax Institute in the amount of $5,709.78, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

251.    The combination of the Debtor's instruction to CPE Solutions LLC to make payments due to the Debtor for his written educational material content payable to National Tax

34

Institute, and the Debtor's acceptance of the CPE Solutions LLC January 15, 2013 payment to National Tax Institute constitutes a transfer or concealment of property of the Debtor within one year before the Petition Date.

252.    Prior to the Petition Date the Debtor instructed Accounting Tools LLC to make payments due to the Debtor for his written educational material content payable to the Nominee Trust.

253.    On or about April 1, 2013 Accounting Tools LLC made a payment to the Nominee Trust in the amount of $26.60, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

254.    The combination of the Debtor's instruction to Accounting Tools LLC to make payments due to the Debtor for his written educational material content payable to the Nominee Trust, and the Debtor's acceptance of the Accounting Solutions LLC April 1, 2013 payment to the Nominee Trust constitutes a transfer or concealment of property of the Debtor within one year before the Petition Date.

255.    On or about October 1, 2013 Accounting Tools LLC made a payment to the Nominee Trust in the amount of $72.60, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

256.    The combination of the Debtor's instruction to Accounting Tools LLC to make payments due to the Debtor for his written educational material content payable to the Nominee Trust, and the Debtor's acceptance of the Accounting Tools LLC October 1, 2013 payment to the Nominee Trust constitutes a transfer or concealment of Estate Property.  .

35

257.   Upon information and belief, prior to the Petition Date the Debtor instructed Accountants Education Group to make payments due to the Debtor for his written educational material content payable to the Nominee Trust.

258.   On or about June 17, 2013 Accountants Education Group made a payment to the Nominee Trust in the amount of $11,000.00, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

259.   Upon information and belief, the combination of the Debtor's instruction to Accountants Education Group to make payments due to the Debtor for his written educational material content payable to the Nominee Trust, and the Debtor's acceptance of the Accountants Education Group June 17, 2013 payment to the Nominee Trust constitutes a transfer or concealment of property of the Debtor within one year before the Petition Date.

260.   Upon information and belief, the combination of the Debtor's instruction to Accountants Education Group to make payments due to the Debtor for his written educational material content payable to the Nominee Trust, and the Debtor's acceptance of the Accountants Education Group 17, 2013 payment to the Nominee Trust constitutes a transfer or concealment of Estate Property.

261.   Upon information and belief, prior to the Petition Date the Debtor instructed Stuart Shough Seminars LLC and Stuart Shough to make payments due to the Debtor for his written educational material content payable to the Nominee Trust.

262.   On or about November 19, 2013 Stuart Shough Seminars LLC made a payment to the Nominee Trust in the amount of $402.00, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

36

263.    On or about May 5, 2014 Stuart Shough made a payment to the Nominee Trust in the amount of $195.20, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

264.    On or about June 9, 2014 Stuart Shough made a payment to the Nominee Trust in the amount of $275.80, and in accordance with the Debtor's instructions, for amounts due to the Debtor for his written educational material content.

265.    Upon information and belief, the combination of the Debtor's instruction to Stuart Shough Seminars LLC and Stuart Shough to make payments due to the Debtor for his written educational material content payable to the Nominee Trust, and the Debtor's acceptance of the Stuart Shough Seminars LLC and Stuart Shough payments to the Nominee Trust constitute transfers or concealment of Estate Property after the Petition Date.

266.    The Debtor made the transfers set forth in Paragraphs 316 through 335 of this Complaint (the "Royalties Transfers") to one or more insiders and/or affiliates.

267.    The Debtor retained actual and/or constructive possession of the Royalties Transfers after the Royalties Transfers occurred.

268.    The Debtor did not disclose some or all of the Royalties Transfers to any of the Debtor's creditors.

269.    The Debtor did not disclose some or all of the Royalties Transfers to this Court or to the Trustee.

270.    By surreptitiously instructing the various educational publishers to make the Debtor's payments payable to his insiders and affiliates who and that were not entitled to receive those payments, and by accepting those payments in a form payable to an insider or an affiliate, the Debtor intentionally concealed the Royalties Transfers from his creditors.

JS#496197v5

271.    By surreptitiously instructing the various educational publishers to make the Debtor's payments payable to his insiders and affiliates who and that were not entitled to receive those payments, and by accepting those payments in a form payable to an insider or an affiliate, the Debtor intentionally concealed the Royalties Transfers from this Court and the Trustee.

272.    Prior to and at the time of his making the Royalties Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective judgments against him.

273.    Prior to and at the time of his making the Royalties Transfers, and/or causing those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' respective efforts to investigate his assets and liabilities and to collect their judgments against him.

274.    The Royalties Transfers constitutes an actual and/or constructive removal or concealment of the Debtor's property.

275.    The Debtor was or claimed to be insolvent at the time he made the Royalties Transfers, and/or caused those transfers to be made.

276.    The Debtor was or claimed to be insolvent shortly after he made the Royalties Transfers, and/or caused those transfers to be made.

277.    The Debtor made the Royalties Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs took their respective judgments against him.

278.    The Debtor made the Royalties Transfers, and/or caused those transfers to be made, shortly before and/or shortly after the one or more of the Plaintiffs undertook efforts to collect their judgments against him.

279.     The Debtor made some or all of the Royalties Transfers, and/or caused those transfers to be made, with actual knowledge that a valid and enforceable injunction issued by a court of competent jurisdiction existed that prohibited the Debtor from making or otherwise permitting the Royalties Transfers to be made.

### G.  The Debtor's Unauthorized and Nefarious Postpetition Transfers

280.     Upon information and belief, on June 24, 2013 the Debtor transferred $3,000.00 in cash to Elisa by deposit into the Century Bank Account.

281.     Upon information and belief, on June 26, 2013 the Debtor transferred $3,000.00 in cash to Elisa by deposit into the Century Bank Account.

282.     Upon information and belief, on July 24, 2013 the Debtor transferred $3,000.00 in cash to Elisa by deposit into the Century Bank Account.

283.     Upon information and belief, on August 15, 2013 the Debtor transferred $15,000.00 in cash to Elisa by deposit into the Century Bank Account.

284.     Upon information and belief, on September 10, 2013 the Debtor transferred $2,900.00 in cash to Elisa by deposit into the Century Bank Account.

285.     Upon information and belief, on September 10, 2013 the Debtor transferred $2,900.00 in cash to Elisa by deposit into the Century Bank Account.

286.     Upon information and belief, on September 13, 2013 the Debtor transferred $2,900.00 in cash to Elisa by deposit into the Century Bank Account.

287.     Upon information and belief, on February 18, 2014 the Debtor transferred $2,000.00 in cash to Elisa by deposit into the Century Bank Account.

288.     Upon information and belief, on May 13, 2013 the Debtor transferred $3,400.00 in cash to Elisa by deposit into the Citizens Bank Account.

289.    On or about May 23, 2013 the Debtor transferred $7,000.00 to Elisa by deposit into the Citizens Bank Account.

290.    Upon information and belief, on June 13, 2013 the Debtor transferred $3,500.00 in cash to Elisa by deposit into the Citizens Bank Account.

291.    Upon information and belief, on July 9, 2013 the Debtor transferred $2,900.00 in cash to Elisa by deposit into the Citizens Bank Account.

292.    Upon information and belief, on July 12, 2013 the Debtor transferred $3,300.00 in cash to Elisa by deposit into the Citizens Bank Account.

293.    Upon information and belief, on July 15, 2013 the Debtor transferred $2,300.00 in cash to Elisa by deposit into the Citizens Bank Account.

294.    Upon information and belief, on July 22, 2013 the Debtor transferred $6,600.00 in cash to Elisa by deposit into the Citizens Bank Account.

295.    Upon information and belief, on August 12, 2013 the Debtor transferred $3,400.00 in cash to Elisa by deposit into the Citizens Bank Account.

296.    Upon information and belief, on August 12, 2013 the Debtor transferred $2,500.00 in cash to Elisa by deposit into the Citizens Bank Account.

297.    Upon information and belief, on August 12, 2013 the Debtor transferred $2,200.00 in cash to Elisa by deposit into the Citizens Bank Account.

298.    Upon information and belief, on November 12, 2013 the Debtor transferred $2,800.00 in cash to Elisa by deposit into the Citizens Bank Account.

299.    Upon information and belief, on December 9, 2013 the Debtor transferred $3,000.00 in cash to Elisa by deposit into the Citizens Bank Account.

JS#496197v5

300.    Upon information and belief, in addition to the foregoing transfers described or referred to in Paragraphs 280 through 299 of this Complaint, the Debtor made numerous other transfers of his property in individual amounts under $2,000.00 to Elisa by deposit to the Century Bank Account and the Citizens Bank Account (the "Postpetition Transfers").

301.    Upon information and belief, one or more of the Postpetition Transfers were transfers of Estate Property.

302.    The Debtor made the Postpetition Transfers to one or more insiders.

303.    The Debtor retained actual and/or constructive possession of the Postpetition Transfers after those transfers occurred.

304.    The Debtor did not disclose the Postpetition Transfers to any of the Debtor's creditors.

305.    The Debtor did not in any way disclose some or all of the Postpetition Transfers to this Court or to the Trustee.

306.    By his intentional creation and use of deposit accounts standing in the names of Elisa, Affiliates and other insiders, the Debtor intentionally concealed the Postpetition Transfers from his creditors.

307.    By his intentional creation and use of deposit accounts standing in the names of Elisa, Affiliates and other insiders, the Debtor intentionally concealed the Postpetition Transfers from this Court and the Trustee.

308.    Prior to and at the time of his making one or more of the Prepetition Transfers, and/or causing one or more of those transfers to be made, the Debtor had actual knowledge of the Plaintiffs' petition for an order for relief against the Debtor.

JS#496197v5

309.    Prior to and at the time of his making one or more of the Prepetition Transfers, and/or causing one or more of those transfers to be made, the Debtor had actual knowledge of the entry of the Order for Relief.

**H.  The Unexplained Lack of Records Concerning Assets, Debts, and Business Affairs**

310.    Despite the issuance and proper service of process commanding its production, the Debtor has failed, or otherwise refused to produce a copy of any written agreement between the Debtor and CPE Solutions LLC concerning the payments to be made to the Debtor for his written educational material content.

311.    The Debtor's only explanation for the lack of a business record or agreement with CPE Solutions LLC is that the arrangement has spanned several years.

312.    The Debtor does not maintain any records to account for the payments are due from, or that he receives from CPE Solutions LLC.

313.    The Debtor has no explanation for the lack of any records to account for the payments are due from, or that he receives from CPE Solutions LLC.

314.    Despite the issuance and proper service of process commanding its production, the Debtor has failed, or otherwise refused to produce a copy of any written agreement between the Debtor and Accounting Tools LLC concerning the payments to be made to the Debtor for his written educational material content.

315.    The Debtor's only explanation for the lack of a business record or agreement with Accounting Tools LLC is that the arrangement has spanned several years.

316.    The Debtor does not maintain any records to account for the payments are due from, or that he receives from Accounting Tools LLC.

42

317.    The Debtor has no explanation for the lack of any records to account for the payments are due from, or that he receives from Accounting Tools LLC.

318.    Despite the issuance and proper service of process commanding its production, the Debtor has failed, or otherwise refused to produce a copy of any written agreement between the Debtor and Accounting Solutions LLC concerning the payments to be made to the Debtor for his written educational material content.

319.    The Debtor's only explanation for the lack of a business record or agreement with Accounting Solutions LLC is that the arrangement has spanned several years.

320.    The Debtor does not maintain any records to or account for the payments are due from, or that he receives from Accounting Solutions LLC.

321.    The Debtor has no explanation for the lack of any records to account for the payments are due from, or that he receives from Accounting Solutions LLC.

322.    Despite the issuance and proper service of process commanding its production, the Debtor has failed, or otherwise refused to produce a copy of any written agreement between the Debtor and Stuart Shough Seminars LLC or Stuart Shough concerning the payments to be made to the Debtor for his written educational material content.

323.    The Debtor's only explanation for the lack of a business record or agreement with Stuart Shough Seminars LLC or Stuart Shough is that the arrangement has spanned several years.

324.    The Debtor does not maintain any records to account for the payments are due from, or that he receives from Stuart Shough Seminars LLC or Stuart Shough.

325.    The Debtor has no explanation for the lack of any records to account for the payments are due from, or that he receives from Stuart Shough Seminars LLC or Stuart Shough.

JS#496197v5

326.     Despite the issuance and proper service of process commanding its production, the Debtor has failed, or otherwise refused to produce a copy of any written agreement between the Debtor and WebCE, LLC concerning the payments to be made to the Debtor for his written educational material content.

327.     The Debtor's only explanation for the lack of a business record or agreement with WebCE, LLC is that the arrangement has spanned several years.

328.     The Debtor does not maintain any records to account for the payments are due from, or that he receives from WebCE, LLC.

329.     The Debtor has no explanation for the lack of any records to account for the payments are due from, or that he receives from WebCE, LLC.

330.     The absence of, *inter alia*, the foregoing records concerning the Debtor's assets, debts, and business affairs impedes the ability of creditors to determine the existence and location of assets, and to extent those assets do or may form the basis for a recovery by the Debtor's estate.

331.     The absence of, *inter alia*, the foregoing records concerning the Debtor's assets, debts, and business affairs is not objectively or subjectively reasonable under the totality of the circumstances, including, among other factors, the Debtor's past and continuing professional education, past and continuing professional training, past and present professions and vocation, and past and present sophistication in business matters and record keeping conventions.

## I. The Debtor's False Statements and Oaths During Bankruptcy

332.     The Debtor executed each and all of his statements and schedules filed with the Court in this case under the pains and penalties of perjury.

JS#496197v5

page

333.     In each instance in which the Debtor gave oral testimony in this case, he gave that testimony under an oath duly administered by an officer authorized to administer oaths either by federal law or by the law in the place of examination.

334.     The Debtor did not disclose to this Court or to the Trustee his right and entitlement to receive payments from educational publishers for his written work authored and submitted to educational publishers under express or implied agreements in existence as of the Petition Date are Estate Property.  The Debtor's failure or refusal to disclose the foregoing Estate Property is an intentional and material non-disclosure that constitutes a false statement and a false oath.

335.     The Debtor did not disclose to this Court or to the Trustee any of the Elisa Transfers. The Debtor's failure or refusal to disclose the foregoing is an intentional and material non-disclosure that constitutes a false statement and a false oath.

336.     The Debtor did not disclose to this Court or to the Trustee the existence of, or his substantial interest in the Century Bank Account.  The Debtor's failure or refusal to disclose the foregoing is an intentional and material non-disclosure that constitutes a false statement and a false oath.

337.     The Debtor did not disclose to this Court or to the Trustee any transfers from the Century Bank Account.  The Debtor's failure or refusal to disclose the foregoing is an intentional and material non-disclosure that constitutes a false statement and a false oath.

338.     The Debtor did not disclose to this Court or to the Trustee the existence of, or his substantial interest in the Citizens Bank Account.  The Debtor's failure or refusal to disclose the foregoing is an intentional and material non-disclosure that constitutes a false statement and a false oath.

JS#496197v5

339.    The Debtor did not disclose to this Court or to the Trustee any transfers from the Citizens Bank Account.  The Debtor's failure or refusal to disclose the foregoing is an intentional and material non-disclosure that constitutes a false statement and a false oath.

**J.  The Debtor's Failure to Explain a Substantial Dissipation of Assets**

340.    During the one year before the Petition Date a substantial number of cash transactions occurred in the Century Bank Account for which the Debtor has no explanation.

341.    During the one year before the Petition Date there were cash deposits into the Century Bank Account during a time when the Debtor and Elisa had no disclosed sources of income sufficient to support those cash deposits.

342.    During the one year before the Petition Date a substantial number of cash transactions occurred in the Citizens Bank Account for which the Debtor has no explanation.

343.    During the one year before the Petition Date there were cash deposits into the Citizens Bank Account during a time when the Debtor and Elisa had no disclosed sources of income sufficient to support those cash deposits.

344.    In or about January 2013 the Debtor paid $100,000.00 for stones that he admits are worthless (the "Stones Transaction").   The Debtor has retained no meaningful records or documents concerning the stones' value, or the details of the Stones Transaction, the other party to which appears to be in Croatia.  The Debtor has failed, or otherwise refused to provide the names or contact information for any of the alleged brokers involved with this speculative Stones Transaction for which he received nothing of value.   The Debtor's only comments to date concerning these stones are that one or both of partners, Costanzo and Robinson, might offer the Trustee "short money" for his interest.

JS#496197v5

345.    The Debtor has failed, or otherwise refused to produce documents showing the ultimate recipient of the payment the Debtor made for the stones.  No satisfactory explanation has been given for this substantial dissipation of assets.

### Count I
### Objection to Discharge
### 11 U.S.C. § 727(a)(2)(A)

346.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 345 as if the same were fully set forth at length herein.

347.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Elisa Transfers to be made while the Debtor was indebted to one or more of his creditors.

348.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Elisa Transfers to be made while a valid and enforceable injunction issued by a court of competent jurisdiction prohibited the Debtor from making or otherwise permitting the Elisa Transfers to be made.

349.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Prepetition Transfers to be made while the Debtor was indebted to one or more of his creditors.

47

350.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Prepetition Transfers to be made while a valid and enforceable injunction issued by a court of competent jurisdiction prohibited the Debtor from making or otherwise permitting the Prepetition Transfers to be made.

351.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Royalties Transfers to be made while the Debtor was indebted to one or more of his creditors.

352.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed property of the Debtor, *to wit*, by making or permitting some or all of the Royalties Transfers to be made while a valid and enforceable injunction issued by a court of competent jurisdiction prohibited the Debtor from making or otherwise permitting the Royalties Transfers to be made.

353.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated,

JS#496197v5

or concealed property of the Debtor, *to wit*, by engaging in the Stones Transaction and causing financial waste while the Debtor was indebted to one or more of his creditors.

354.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, the Debtor intentionally utilized, *inter alia*, numerous Affiliates as artifices to conceal from the Debtor's creditors his property and his many transfers of that property for the purpose of evading the payment of his debts.

355.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, the Debtor intentionally utilized, *inter alia*, deposit accounts standing in the names of Elisa, the Affiliates, and other insiders as artifices to conceal from the Debtor's creditors his property and his many transfers of that property for the purpose of evading the payment of his debts.

356.    During the one year before the Petition Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors, the Debtor, *inter alia*, intentionally transferred his property to Elisa and to deposit accounts standing in her name as means to conceal from the Debtor's creditors his property and his many transfers of that property for the purpose of evading the payment of his debts.

357.    Based upon the foregoing facts and the prevailing and controlling law, the Debtor is not entitled to a discharge in bankruptcy.

### Count II
### Objection to Discharge
### 11 U.S.C. § 727(a)(2)(B)

358.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 357 as if the same were fully set forth at length herein.

359.    On and after the Order Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors and an officer of the estate charged with custody of Estate Property, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed Estate Property, *to wit*, by making or permitting some or all of the Elisa Transfers without the authority of this Court, the Bankruptcy Code, or the consent of the Trustee.

360.    On and after the Order Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors and an officer of the estate charged with custody of Estate Property, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed Estate Property, *to wit*, by making or permitting some or all of the Postpetition Transfers without the authority of this Court, the Bankruptcy Code, or the consent of the Trustee.

361.    On and after the Order Date the Debtor, with the intent to hinder, delay, or defraud one or more of the Plaintiffs and/or his other creditors and an officer of the estate charged with custody of Estate Property, transferred, removed, destroyed, mutilated, or concealed, or permitted to be transferred, removed, destroyed, mutilated, or concealed Estate Property, *to wit*, by making or permitting some or all of the Royalties Transfers without the authority of this Court, the Bankruptcy Code, or the consent of the Trustee.

362.    Based upon the foregoing facts and the prevailing and controlling law, the Debtor is not entitled to a discharge in bankruptcy.

### Count III
### Objection to Discharge
### 11 U.S.C. § 727(a)(3)

363.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 362 as if the same were fully set forth at length herein.

50

364.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with CPE Solutions LLC, and/or any records concerning the payments that are due from, or that he is to or has received from CPE Solutions LLC.

365.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with Accounting Tools LLC, and/or any records concerning the payments that are due from, or that he is to or has received from Accounting Tools LLC.

366.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with Accounting Solutions LLC, and/or any records concerning the payments that are due from, or that he is to or has received from Accounting Solutions LLC.

367.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with Stuart Shough

Seminars LLC or Stuart Shough, and/or any records concerning the payments that are due from, or that he is to or has received from Stuart Shough Seminars LLC or Stuart Shough.

368.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with WebCE, LLC, and/or any records concerning the payments that are due from, or that he is to or has received from WebCE, LLC.

369.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve his written agreement with any other publishers of the Debtor's written materials and/or any records concerning the payments that are due from, or that he is to or has received from any other publishers of the Debtor's written materials.

370.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve any corroborating documents or concerning the Stones Transaction.

371.    The Debtor has unjustifiably concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers from which the Debtor's financial condition or business transactions might be ascertained, by, *inter alia*, concealing, destroying, or failing to keep or preserve any corroborating documents or

JS#496197v5

corroborating information concerning the claims that the Debtor alleges he holds against the Plaintiffs that he contends constitute Estate Property.

372.     The absence of, *inter alia*, the foregoing records concerning the Debtor's assets, debts, and business affairs impedes the ability of creditors to determine the existence and location of assets, and to extent those assets do or may form the basis for a recovery by the Debtor's estate.

373.     Based upon the foregoing facts and the prevailing and controlling law, the Debtor is not entitled to a discharge in bankruptcy.

### Count IV
### Objection to Discharge
### 11 U.S.C. § 727(a)(4)

374.     The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 373 as if the same were fully set forth at length herein.

375.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of his rights and entitlements to receive payments from educational publishers for his written work is a false oath or account.

376.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of the Elisa Transfers is a false oath or account.

377.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of the existence of the Century Bank Account is a false oath or account.

378.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of transfers from the Century Bank Account is a false oath or account.

379.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of the existence of the Citizens Bank Account is a false oath or account.

380.     The Debtor's knowing and fraudulent omission of disclosure in his bankruptcy case of transfers from the Citizens Bank Account is a false oath or account.

JS#496197v5

381.    The Debtor knowing and fraudulent disclosure in his bankruptcy case of the Stone Transaction as a worthless asset after paying substantial sums for the same is a false oath or account.

382.    The Debtor knowing and fraudulent disclosure in his bankruptcy case of alleged claims against the Plaintiffs as Estate Property, without possessing or producing to the Plaintiffs or to the Trustee any corroborating documents or corroborating information, and without being able to articulate any corroborating facts on examination under oath, is a false oath or account account.

383.    Based upon the foregoing facts and the prevailing and controlling law, the Debtor is not entitled to a discharge in bankruptcy.

## Count V
### Objection to Discharge
### 11 U.S.C. § 727(a)(5)

384.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 383 as if the same were fully set forth at length herein.

385.    The Debtor has engaged in substantial cash transactions without any satisfactory explanation as to the sources of those cash transactions, nor as to the ultimate disposition of that cash that could be or could have been used to meet the Debtor's liabilities.

386.    The Debtor and Elisa have engaged in substantial cash transactions without any satisfactory explanation as to the sources of those cash transactions, nor as to the ultimate disposition of that cash that could be or could have been used to meet the Debtor's liabilities.

387.    The Debtor and Elisa have engaged in substantial transactions involving the Elisa Transfers without any satisfactory explanation as to the ultimate disposition of the Elisa Transfers that could be or could have been used to meet the Debtor's liabilities.

54

388.    The Debtor and Elisa, the Affiliates, and other insiders have engaged in substantial cash transactions without any satisfactory explanation as to the sources of those cash transactions, nor as to the ultimate disposition of that cash that could be or could have been used to meet the Debtor's liabilities.

389.    The Debtor and Elisa, the Affiliates, and other insiders have engaged in substantial transactions involving the Prepetition Transfers without any satisfactory explanation as to the ultimate disposition of the Prepetition Transfers that could be or could have been used to meet the Debtor's liabilities.

390.    The Debtor and one or more of the Affiliates have engaged in substantial transactions involving the Royalties Transfers without any satisfactory explanation as to the ultimate disposition of the Royalties Transfers that could be or could have been used to meet the Debtor's liabilities.

391.    Based upon the foregoing facts and the prevailing and controlling law, the Debtor is not entitled to a discharge in bankruptcy.

### *Count VI*
### *Non-Dischargeability of Patton Drive Claim*
### *11 U.S.C. § 523(a)(4)*

392.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 391 as if the same were fully set forth at length herein.

393.    The Debtor, while placed by Patton Drive in a position of trust or confidence, was entrusted with possession of personal property belonging Patton Drive, *to wit*, by requesting and receiving loan advances from Patton Drive totaling $1.5 million under the Debtor's representation that the loan proceeds would be held in escrow, and by accepting those loan proceeds subject to one or more restrictions Patton Drive imposed on their use.

55

394.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, *to wit*, by transferring some of the restricted Patton Drive loan proceeds to Bright Dominion without seeking or obtaining Patton Drive's consent.

395.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, *to wit*, by transferring some of the restricted Patton Drive loan proceeds to the broker for Money Market International without seeking or obtaining Patton Drive's consent.

396.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, *to wit*, by transferring some of the restricted Patton Drive loan proceeds to the Revere Beach Project without seeking or obtaining Patton Drive's consent.

397.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, *to wit*, by transferring some of the restricted Patton Drive loan proceeds to Alexander Trading without seeking or obtaining Patton Drive's consent.

398.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, *to wit*, by transferring some of the restricted Patton Drive loan proceeds to Uni-Vest without seeking or obtaining Patton Drive's consent.

399.    While entrusted with the property of Patton Drive, the Debtor took that property and/or converted that property to his own use, or otherwise allowed another to take that property and/or convert that property to the use of another, in either case without the consent of Patton Drive and did so with the intent to deprive Patton Drive of its property permanently.

JS#496197v5

400.    Some or all of the debt of the Debtor to Patton Drive is a debt for the Debtor's embezzlement of Patton Drive loan proceeds, which debt is therefore non-dischargeable in bankruptcy.

### Count VII
### Non-Dischargeability of Patton Drive Claim
### 11 U.S.C. § 523(a)(6)

401.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 400 as if the same were fully set forth at length herein.

402.    The Debtor accepted loan advances from Patton Drive totaling $1.5 million under one or more restrictions Patton Drive imposed on their use.

403.    The Debtor deliberately and intentionally disregarded the restrictions Patton Drive imposed on the loan advances made to the Debtor, and in spite of the same used, or otherwise caused them to be used to make substantial payments to Bright Dominion in derogation of the rights of Patton Drive.

404.    The Debtor's making of, or causing of impermissible payments to be made to Bright Dominion from Patton Dive loan proceeds caused substantial harm and damage to both Patton Drive and to its property that the Debtor intended to cause.

405.    The Debtor deliberately and intentionally disregarded the restrictions Patton Drive imposed on the loan advances made to the Debtor, and in spite of the same used, or otherwise caused them to be used to make substantial payments to the broker for Money Market International in derogation of the rights of Patton Drive.

406.    The Debtor's making of, or causing of impermissible payments to be made to the broker for Money Market International from Patton Dive loan proceeds caused substantial harm and damage to both Patton Drive and to its property that the Debtor intended to cause.

57

407.    The Debtor deliberately and intentionally disregarded the restrictions Patton Drive imposed on the loan advances made to the Debtor, and in spite of the same used, or otherwise caused them to be used to make substantial payments to the Revere Beach Project in derogation of the rights of Patton Drive.

408.    The Debtor's making of, or causing of impermissible payments to be made to the Revere Beach Project from Patton Dive loan proceeds caused substantial harm and damage to both Patton Drive and to its property that the Debtor intended to cause.

409.    The Debtor deliberately and intentionally disregarded the restrictions Patton Drive imposed on the loan advances made to the Debtor, and in spite of the same used, or otherwise caused them to be used to make substantial payments to Alexander Trading in derogation of the rights of Patton Drive.

410.    The Debtor's making of, or causing of impermissible payments to be made to Alexander Trading from Patton Dive loan proceeds caused substantial harm and damage to both Patton Drive and to its property that the Debtor intended to cause.

411.    The Debtor deliberately and intentionally disregarded the restrictions Patton Drive imposed on the loan advances made to the Debtor, and in spite of the same used, or otherwise caused them to be used to make substantial payments to Uni-Vest in derogation of the rights of Patton Drive.

412.    The Debtor's making of, or causing of impermissible payments to be made to Uni-Vest from Patton Dive loan proceeds caused substantial harm and damage to both Patton Drive and to its property that the Debtor intended to cause.

JS#496197v5

413.     Some or all of the Debtor's debt to Patton Drive is for the Debtor's willful and malicious injury to Patton Drive and to its property, which debt is therefore non-dischargeable in bankruptcy.

### Count VIII
### Non-Dischargeability of Patriot Claim
### 11 U.S.C. § 523(a)(2)

414.     The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 413 as if the same were fully set forth at length herein.

415.     At no time after the maturity of the debt underlying the Patriot Judgment did the Debtor offer to make any full or compromise payment to Patriot of his personal obligations under the Patriot Guaranty.

416.     At no time after the maturity of the debt underlying the Patriot Judgment did the Debtor offer to voluntarily tender to or turn over to Patriot its collateral.

417.     At all times after the maturity of the debt underlying the Patriot Judgment, the Debtor took affirmative steps to prevent Patriot from obtaining control of its collateral.

418.     At all times after the maturity of the debt underlying the Patriot Judgment, the Debtor took affirmative steps to avoid making any payment at all to Patriot on account of the Patriot Guaranty.

419.     At no time after the maturity of the debt underlying the Patriot Judgment did the Debtor cooperate with, or assist Patriot with the disposition of its collateral in mitigation of his personal obligations under the Patriot Guaranty.

420.     At no time after the default of the debt underlying the Patriot Judgment did the Debtor offer to make any full or compromise payment to Patriot of his personal obligations under the Patriot Guaranty.

JS#496197v5

421.    At no time after the default of the debt underlying the Patriot Judgment did the Debtor offer to voluntarily tender to or turn over to Patriot its collateral.

422.    At all times after the default of the debt underlying the Patriot Judgment, the Debtor took affirmative steps to prevent Patriot from obtaining control of its collateral.

423.    At all times after the default of the debt underlying the Patriot Judgment, the Debtor took affirmative steps to avoid making any payment at all to Patriot on account of the Patriot Guaranty.

424.    At no time after the default of the debt underlying the Patriot Judgment did the Debtor cooperate with, or assist Patriot with the disposition of its collateral in mitigation of his personal obligations under the Patriot Guaranty.

425.    At no time after the entry of the Patriot Judgment did the Debtor offer to make any full or compromise payment to Patriot in full or partial satisfaction of the Patriot Judgment.

426.    At no time after the entry of the Patriot Judgment did the Debtor offer to voluntarily tender to or turn over to Patriot its collateral.

427.    At all times after the entry of the Patriot Judgment, the Debtor took affirmative steps to prevent Patriot from obtaining control of its collateral.

428.    At all times after the entry of the Patriot Judgment, the Debtor took affirmative steps to avoid making any payment at all to Patriot on account of the Patriot Guaranty.

429.    At no time after the entry of the Patriot Judgment did the Debtor cooperate with, or assist Patriot with the disposition of its collateral in mitigation of his personal obligations under the Patriot Guaranty.

430.    The Debtor's debt to Patriot was for money, or the extension, renewal, or the refinancing of credit obtained by false pretenses, a false representation, or actual fraud, *to wit*, at

60

JS#496197v5

the time that the Debtor executed the Patriot Guaranty he never intended to honor his personal obligation for the debt underlying the Patriot Judgment.

431. Some or all of the Debtor's debt to Patriot was for money, or the extension, renewal, or the refinancing of credit obtained by false pretenses, a false representation, or actual fraud, which debt is therefore non-dischargeable in bankruptcy.

**WHEREFORE,** the Plaintiffs demand judgment against the Debtor and in their favor as follows:

i. denying the Debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2)(A);

ii. denying the Debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(2)(B);

iii. denying the Debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(3);

iv. denying the Debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(4);

v. denying the Debtor a discharge in bankruptcy pursuant to 11 U.S.C. § 727(a)(5);

vi. declaring the Debtor's debt to Patton Drive non-dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2);

vii. declaring the Debtor's debt to Patton Drive non-dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(4);

viii. declaring the Debtor's debt to Patriot non-dischargeable in bankruptcy pursuant to 11 U.S.C. § 523(a)(2);

ix. awarding to the Plaintiffs all costs incurred in connection with this adversary proceeding, including, without limitation, their reasonable attorneys' fees; and

x. granting to the Plaintiffs such other and further relief as the court deems proper and just.

JS#496197v5

50 THOMAS PATTON DRIVE, LLC and
THE PATRIOT GROUP, LLC,

By their attorneys,

/s/ Michael J. Fencer

_____
Michael J. Fencer (BBO No. 648288)
Jonathan M. Horne (BBO No. 673098)
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts  02111
T:  617-951-0500
F:  617-951-2414
E:  mfencer@jagersmith.com

Dated:  September 30, 2014

JS#496197v5