### UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF MASSACHUSETTS - BOSTON

===============================

| | |
|---|---|
| IN THE MATTER OF: | . Case #13-12692 |
| | . |
| STEVEN C. FUSTOLO | . Boston, Massachusetts |
| | . **February 20, 2015** |
| Debtor. | . 1:50 P.M. |

===============================

| | |
|---|---|
| 50 THOMAS PATTON DRIVE, LLC, | . |
| *et al.,* | . |
| | . |
| Plaintiffs, | . |
| | . |
| v. | . AP #14-01193 |
| | . |
| FUSTOLO, *et al.,* | . |
| | . |
| Defendants. | . |

===============================

### TRANSCRIPT OF HEARING RE:
### [#16] MOTION OF PLAINTIFFS 50 THOMAS PATTON DRIVE, LLC,
### THE PATRIOT GROUP, LLC TO COMPEL DISCOVERY
### RESPONSES (JONATHAN HORNE);
### [#17] OBJECTION OF DEFENDANT STEVEN C. FUSTOLO (DAVID NICKLESS);
### [#20] REPLY OF PLAINTIFFS 50 THOMAS PATTON DRIVE, LLC,
### THE PATRIOT GROUP, LLC TO #17 (JONATHAN HORNE)
### BEFORE THE HONORABLE JUDGE JOAN N. FEENEY, J.U.S.B.C.

**APPEARANCES:**

For The Patriot Group, LLC:             JONATHAN HORNE, ESQ.
                                        Jaeger Smith, P.C.
                                        One Financial Center, 4th Floor
                                        Boston, Massachusetts  02111

                Electronic Sound Recording Operator:  Stefanie Landry

**Proceedings Recorded by FTR Gold Digital Recording**
**Transcript Produced by Certified Transcription Service**

## CASCADE HILLS TRANSCRIPTION, INC.
**8095 Darling Street SE**
**Salem, Oregon  97317-9074**
**(503) 371-8858 ~ Email: hagerruthann@aol.com**

*Page 2*
*#13-12692*
*AP #15-01015*
*February 22, 2015*

**APPEARANCES (CONTINUED):**

For Debtor/Defendant Steven C. Fustolo:       DAVID M. NICKLESS, ESQ.
                                              Nickless, Phillips and O'Connor
                                              623 Main Street
                                              Fitchburg, Massachusetts  01420

Electronic Sound Recording Operator:  Stefanie Landry

**Proceedings Recorded by FTR Gold Digital Recording
Transcript Produced by Certified Transcription Service**

CASCADE HILLS TRANSCRIPTION, INC.
**8095 Darling Street SE
Salem, Oregon  97317-9074
(503) 371-8858 ~ Email:  hagerruthann@aol.com**

1  (At 1:50 p.m)

2          THE COURT:  The plaintiffs in adversary proceeding

3  14-1193 have filed a motion to compel discovery responses.

4  Mr. Fustolo has filed an objection and the plaintiffs have

5  filed a reply.

6          MR. HORNE:  Good afternoon, Your Honor.  Jonathan

7  Horne on behalf of the plaintiffs.

8          MR. NICKLESS:  I'm David Nickless for Steven Fustolo.

9  And my apologies to the Court.  Between the drive and the lack

10  of parking, it took well over two hours to get here.

11          THE COURT:  We had another matter to commence, so we

12  used the time efficiently.

13          MR. NICKLESS:  I appreciate that.  Thank you.

14          THE COURT:  Let me just switch gears and get my notes

15  on the discovery dispute.

16          All right.  I'm ready.  Go ahead, please.

17          MR. HORNE:  Thank you, Your Honor.  At the time we

18  filed the original motion to compel, the debtor had not

19  responded at all to the plaintiffs' document requests and first

20  set of interrogatories.  Since the motion has been filed, we

21  have been provided responses; however, we don't feel that the

22  responses resolve the issue raised in the motion for a couple

23  of reasons.  One --

24          THE COURT:  Well, what have you received since the

25  filing of your motion?

1          MR. HORNE:  We received -- and they are attached to

2    the reply.  We received responses to the first set of document

3    requests and we received responses to the first set of

4    interrogatories.  I'm informed by Mr. Nickless that he has a

5    copy of the initial disclosures with him today or he was going

6    to bring one.  And to the extent the debtor's document

7    responses indicate that he is going to produce certain

8    categories of documents, I am told that those will be provided.

9    I think the --

10          THE COURT:  Well, there were several responses in the

11   nature of -- I've already given these to you in this adversary

12   or in the context of some other litigation between the parties.

13   Is that correct?

14          MR. HORNE:  Several of the responses did indicate

15   that some documents have been produced and one issue that we

16   have is that several of the responses are vague.  One says,

17   we've given you documents -- or documents have been produced in

18   litigation.

19          THE COURT:  Let's take them one at a time because the

20   responses are different.  And with respect to number one,

21   Mr. Fustolo said all documents have already been supplied. Is

22   that correct?   And if so, why should he have to produce them

23   again?

24          MR. HORNE:  We're not asking Mr. Fustolo to reproduce

25   any documents that he's already produced.  One of the issues is

1  that the description is vague.  He says it's been produced in

2  litigation.  He doesn't say who's been produced to and it

3  doesn't say what documents have been produced.  He's also said

4  that he's produced documents to the Chapter 7 Trustee or to

5  Jaeger Smith or to Tyler & Weil or to Riemer & Braunstein.  He

6  does not specify what documents were produced to whom.

7          But more importantly, I think one of the major issues

8  or documents that Mr. Fustolo claims that he did not retain or

9  does not have, Your Honor may recall there was an issue raised

10  earlier in this case that Mr. Fustolo has received certain

11  royalty payments during the post-petition period for writings

12  that he submitted to publishers prepetition.  We --

13          THE COURT:  What request is that, please?  What

14  number?

15          MR. HORNE:  Requests 24 through 30 of the document

16  requests.  And with respect to those requests Mr. Fustolo has

17  responded either --

18          THE COURT:  For the purposes of my analysis on this

19  motion, what -- could you define the request period again,

20  please?

21          MR. HORNE:  The request period, I believe, was

22  January 1st of 2008 through December 31st of 2014.  Let me just

23  confirm that.  Yes, the document requests January 1 --

24          THE COURT:  So with respect to number 24 and 25, 26,

25  27, Mr. Fustolo says he hasn't retained the documents and

1  suggests that you go to the publishers to get -- have you done

2  that?

3          MR. HORNE:  We have -- well, we've subpoenaed many of

4  the publishers.  There are -- I think are about 15 to 20

5  publishers altogether.  We have subpoenaed, I would say, the

6  vast majority of them.  One issue that we would raise is that

7  our ability to subpoena documents for the publisher does not

8  relieve Mr. Fustolo from producing documents that he has in his

9  own possession.

10         THE COURT:  He says he doesn't have them.  Do you

11 dispute the veracity of that statement?

12         MR. HORNE:  I do, Your Honor.  We've seen --

13         THE COURT:  What is your basis for disputing the

14 veracity?

15         MR. HORNE:  From some of the third-party productions

16 from the publishers.  Mr. Fustolo has continuous and ongoing

17 relationships with these publishers to this day.  He's been

18 paid royalties prepetition, post-petition, and continuing.  The

19 fact that he had not retained any documents whatsoever relating

20 to these relationships which pay him upwards of $200,000 or

21 more per year is not believable, in our opinion.  We do

22 challenge the veracity of that statement.

23         Secondarily, the documents that we have obtained

24 indicate that anywhere between $75,000 and $140,000 of post-

25 petition royalties are actually property of the estate that was

1  paid to Mr. Fustolo post-petition for writings that were

2  written and submitted to publishers during the prepetition

3  period.  Mr. Fustolo has to some degree said that there may be

4  some royalties that are property of the estate.  He has not

5  cooperated, to my knowledge, with the Trustee or any other

6  party to help determine how much of those royalties are

7  rightfully state property.  And it seems to be his position

8  that the burden is on the Trustee or on the plaintiffs to --

9            THE COURT:  Well, if he says he doesn't have the

10  documents that you request, wouldn't it be an appropriate

11  remedy for the Court to bar him from introducing contrary

12  evidence at trial in accordance with Rule 37?

13            MR. HORNE:  That may be one appropriate remedy, Your

14  Honor.  Another appropriate remedy would be a finding that

15  Mr. Fustolo has not maintained business records in the regular

16  course of business sufficient to determine his --

17            THE COURT:  Well, that's one of the counts of your

18  complaint, correct?

19            MR. HORNE:  Correct, Your Honor.

20            THE COURT:  Um-hum.  Well, today you're moving to

21  compel production of documents.  How can a court enter an order

22  to compel documents on a motion where the party who has been

23  requested says, "I don't have the documents"?

24            MR. HORNE:  Your Honor, I believe -- as I said, we

25  challenged the veracity of the statement that Mr. Fustolo has

1   no documents responsive to the request in his possession.  We

2   would seek an order compelling him to produce what he has and

3   if he continues to not produce anything, then we would seek

4   additional remedy at that time.

5        THE COURT:  What have you done to pursue the

6   individual publishers for the documents?

7        MR. HORNE:  We have sent them subpoenas for all of

8   the records with their dealings with Mr. Fustolo, including any

9   agreements they've had to pay royalties.  From just seven

10  publishers we're showing that in the one year following

11  petition date, he's received approximately $140,000 of

12  royalties.

13       THE COURT:  Can you get the accounting with the dates

14  from the publishers?

15       MR. HORNE:  We have accounting from some of the

16  publishers.  We -- not every publisher has kept a detailed

17  accounting, but we do have the ones that have supplied them.

18  And there are also issues -- Mr. Fustolo has raised the issue

19  that at some point during the post-petition period, he updated

20  the material halfway through the year due to some change in

21  accounting standards that he claims.  We haven't -- I have not

22  seen any indication that he has submitted any updates.  He has

23  not provided any documents indicating that he's updated any of

24  the publications midway through the year and we would just seek

25  an order compelling him to produce.

1          THE COURT:  Well, how would the income from royalties

2    for post-petition services be property of the estate?

3          MR. HORNE:  That's the issue, Your Honor, and we're

4    not claiming that they would be.  The issue is that Mr. Fustolo

5    submitted the writings --

6          THE COURT:  You're trying to allocate to prepetition

7    versus post-petition?

8          MR. HORNE:  He's -- correct.  He has raised an issue

9    that he has made -- he had made certain revisions midway

10   through I guess 2013 which were during the post-petition

11   period.

12         THE COURT:  Have you conducted a deposition of him

13   at -- in connection with the adversary proceeding?

14         MR. HORNE:  Not in connection with the adversary

15   proceeding.  We had deposed him under Rule 2004 in the main

16   case.  I believe his testimony was that he did not retain any

17   of the agreements with the providers, that he doesn't recall

18   the specifics of any of his agreements with them.  Some of them

19   pay him royalties monthly, some of them quarterly, some are

20   flat fee arrangements.  Other than that, he has not provided

21   much in the way of detail regarding --

22         THE COURT:  How many prepetition contracts does he

23   have?

24         MR. HORNE:  It's hard to say, but I think there's at

25   least 15 publishers.  We have I believe subpoenaed about 12 of

1   them and we've gotten some of the contracts.  I don't -- I

2   can't say with certainty that we've gotten every contract that

3   he has.  He has not produced any to us or to the Trustee, to my

4   knowledge, during the case.

5          We've also asked in the interrogatories for him to

6   state the details of his arrangements with each of the

7   providers which he has not done.  His response was a general

8   assertion that he, you know, has -- his arrangements are

9   different with the publishers and he has not provided any

10  specifics.

11         However, today presumably to this day he's still

12  getting paid from these publishers and the fact that he doesn't

13  know what his arrangements are with them is simply

14  unbelievable, in my opinion.

15         THE COURT:  But you haven't questioned him about what

16  he knows at a deposition.  You've simply requested documents at

17  this point?

18         MR. HORNE:  Documents and interrogatories and he was

19  asked about the royalty issue.  This was before we had gotten

20  documents from third-party publishers, but that was before we

21  asked --

22         THE COURT:  Um-hum.  Under the current rules, I don't

23  see the interrogatories.  Do you have a copy for me, please,

24  and his responses to them?  Where are they in this record?

25         MR. HORNE:  Yes.  The interrogatories are attached

1  as -- attached to the original motion.  I believe it's Exhibit

2  B and his responses are attached to --

3              THE COURT:  I have the interrogatories.

4              MR. HORNE:  Okay.  And the response --

5              THE COURT:  Where did you ask him about the

6  contracts?

7              MR. HORNE:  It is number -- interrogatory four.

8              THE COURT:  All right.  And his reply is exhibit

9  what?

10              MR. HORNE:  Exhibit B to our reply, Your Honor.

11              (Pause)

12              THE COURT:  So his response to that particular

13  interrogatory is that he didn't keep copies and some of them

14  were not written agreements.

15              MR. HORNE:  And -- yes, Your Honor.

16              THE COURT:  What evidence do you have that that's not

17  an accurate statement?

18              MR. HORNE:  We have obtained some written agreements

19  that -- between the debtor and publishers.  And given the fact

20  that he has maintained ongoing relationships to this day during

21  the post-petition period, the fact that he has no knowledge

22  about what the arrangements and the agreements are, is not a

23  credible response and we would seek an order ordering the

24  debtor to update the responses.

25              THE COURT:  Why don't you simply have him in for a

*Calhoun*

1   deposition and ask him the questions?

2            MR. HORNE:  We will do that as well, Your Honor.

3            THE COURT:  All right.  Did you have anything else on

4   your motion?

5            MR. HORNE:  Yes, Your Honor.  Given that the

6   responses that we did receive were served after the motion to

7   compel had been filed, we are seeking expenses for the cost of

8   the motion and the cost of today's hearing.  Rule 37(a)(5) is

9   mandatory that where responses are provided after the motion is

10  filed, expenses and costs should be awarded including

11  attorney's fees.

12           There's three narrow exceptions to that rule, Your

13  Honor.  The first is --

14           THE COURT:  Before you get there --

15           MR. HORNE:  Yes.

16           THE COURT:  -- what did you receive after the motion

17  to compel was filed?

18           MR. HORNE:  We received the document responses,

19  responses to the document requests and the responses to the

20  interrogatories and --

21           THE COURT:  So you hadn't received those before the

22  motion to compel was filed?

23           MR. HORNE:  That is correct, Your Honor.

24           THE COURT:  And Mr. Nickless says that he had a

25  personal emergency and some other circumstances that precluded

1  him from timely responding.  What's your reply to that?

2          MR. HORNE:  My reply is the following.  He has to

3  show substantial -- that is, failure to respond was

4  substantially justified.  I know Mr. Nickless refers to the

5  snowstorm and the fact that the debtor has been a party to

6  other litigation.  I would note that the responses were

7  originally due on January 4th, which I think was at least three

8  weeks before the first of the major snowstorms.  We didn't send

9  our 30 -- 7037 letter until January 23rd, which was not

10 responded to and then filed a motion on February 4th.

11          The failure to respond to the motion for a meet-and-

12 confer in itself under Local Rules would be a basis to award

13 costs in this matter.  With respect to a personal situation, I

14 am not informed other than what was in the objection -- what

15 the circumstances were.  I can only say that nothing was

16 communicated to us at any time regarding what those

17 circumstances were.  And this was not a case where we ran off

18 the first day that the responses were late and sought a motion

19 to compel.

20          THE COURT:  Well, what attempt did you make before

21 filing your motion to obtain the discovery without a court

22 order?

23          MR. HORNE:  We sent the letter -- or request to meet-

24 and-confer under the Local Rule.  We also before filing the

25 motion sent Mr. Nickless email correspondence indicating that

1  we were prepared to file the motion and to get back to us and,

2  you know, and we had not heard from him.

3         THE COURT:  Well, aside from the late response, if a

4  party didn't retain documents, how do you expect for them to be

5  produced by that party?

6         MR. HORNE:  I understand, Your Honor.  And it's our

7  position that Mr. Fustolo has retained documents.  A lot of the

8  communication with the CPE providers was through email.  We've

9  seen certain cop -- some copies of that that were produced from

10  the providers.  For Mr. Fustolo to claim that he has no record

11  of any emails I find kind of just not believable in that we do

12  believe that Mr. Fustolo has records in his possession that he

13  has not produced.  We'd seek an order compelling them to

14  produce those records forthwith or if we -- we do have to come

15  back then I think we would be seeking a more severe sanction

16  than simply the cost of the motion to compel.

17         THE COURT:  Okay.  Thank you.

18         MR. HORNE:  That's all I have, Your Honor.

19         MR. NICKLESS:  Your Honor, if I may, I do take

20  responsibility for the late filing of documents.  I had to go

21  out of state and the weather prevented me from getting back in

22  a timely fashion.  And I've had -- between the weather and

23  other issues with snow, if you will --

24         THE COURT:  Why didn't you file a motion to extend

25  time?

1          MR. NICKLESS:  I was out of -- when I received the

2  Rule 37 letter I was out of state.  I had gone down to Florida

3  to clear out mother-in-law's condominium down there and got

4  stuck down there as a result again of the snowstorm.

5          THE COURT:  How long were you away?

6          MR. NICKLESS:  Five, six days.  I forget exactly how

7  long it was, but it was a couple of extra days as a result of

8  the storm.  And --

9          THE COURT:  Did you call plaintiff's counsel about

10 your inability to respond?

11         MR. NICKLESS:  I did not call plaintiff's counsel,

12 no.  I had informed plaintiff's counsel that I had to go out of

13 state and didn't know when exactly it was going to be, but it

14 was going to be towards the end of the month.  And it wasn't

15 Mr. Horne; it was Mr. Fencer that I communicated with.  And I

16 did that in the examination that was conducted of Bruce Edmunds

17 back in -- sometime the early month of January.

18         So again, I do take responsibility for that.

19 Mr. Fustolo has informed me on multiple occasions that he

20 doesn't have most of these records.  He doesn't retain records,

21 *per se*.  He has 1099s which were already provided to counsel

22 and have been turned over to counsel in other matters.  He has

23 no copies of the contracts, some of which go back years and

24 they've been informed of that at the 2004 examination.  And

25 they had the checks from the financial institutions that show

1  the receipts of any funds.

2          THE COURT:  Well, what publishing agreements were the

3  subject of a writing?

4          MR. NICKLESS:  My client doesn't know.  He did not

5  retain -- these go back, again, as many as ten or more years,

6  these relationships.

7          THE COURT:  But -- and he has royalty income each

8  year from these contracts?

9          MR. NICKLESS:  He has royalty income for new product

10 that he provides each year and the issue --

11         THE COURT:  And presumably the publishers send him an

12 accounting each year with a check or he's entered into some

13 kind of direct deposit arrangement with them.  Is that right?

14         MR. NICKLESS:  He receives -- I've seen accountings

15 that have been provided by plaintiffs' counsel.  My client

16 has -- does not have accountings.  He doesn't keep accountings,

17 *per se*.  The 1090 --

18         THE COURT:  So when he gets an accounting in the mail

19 with a check, what does he do with it?

20         MR. NICKLESS:  The check is deposited in the -- he

21 doesn't retain the accountings.  He relies upon the 1099 that

22 he receives at the end of each year.  This is what he's

23 informed me, that he relies upon that 1099 for information on

24 what monies are due to him.  He doesn't know how much money is

25 due to him at any particular point in time.  And the issue with

1  respect to the post-petition royalties versus prepetition

2  royalties is that he made substantial amendments to documents.

3  We have gone on to the website that we've informed counsel of

4  and downloaded those.  I'm going to provide that on a thumb

5  drive to counsel immediately after the hearing.

6        THE COURT:  Well, I recall that at one of the prior

7  hearings whether it was in the main case or the adversary

8  didn't you concede that there were some prepetition royalties

9  that he was entitled to that were not turned over to the

10  Trustee?  The number that I recall was 20-something thousand.

11        MR. NICKLESS:  My client has from the outset said --

12  and this was -- wish to remind the Court that this was filed as

13  an involuntary petition.  So during that involuntary time

14  frame, my client has repeatedly said, "I received some

15  royalties that I believe were prepetition.  I don't know how

16  much, but" -- and he was then, remains today prepared to make

17  arrangements to turn over whatever amounts they made be.

18        But there was a substantial dispute between the

19  plaintiffs and my client, and I'm not just talking about the

20  creditor -- the two creditors in this particular adversary, but

21  I'm also talking about the bankruptcy Trustee who has never

22  asked for a turnover of the account of the royalties.  There's

23  a substantial dispute as to what's prepetition, what's post-

24  petition.  It was received after the filing of a bankruptcy

25  petition.

1          And the best information that we have because my

2   client has characterized the Achilles' heels is he hasn't

3   retained the copies of the updates, that he only writes over

4   the old information when he supplies it to the CPE providers,

5   and he doesn't know when they incorporate that information into

6   their materials.

7          THE COURT:  Doesn't he get annual royalty statements

8   from the publishers with an accounting of the sales of the

9   material?

10         MR. NICKLESS:  Not -- I don't believe he receives

11  annually.  I think he receives -- he has received at least from

12  one --

13         THE COURT:  He's a West author, correct?

14         MR. NICKLESS:  -- periodic accounting.  Say again.

15         THE COURT:  He's a West author, correct?

16         MR. NICKLESS:  A West author.

17         THE COURT:  Um-hum.

18         MR. NICKLESS:  He has written for -- yes, he's

19  nodding his head.

20         THE COURT:  Does he have a written agreement with

21  West, now Thomson Reuters?

22         MR. NICKLESS:  He has not retained a copy.  He goes

23  back years, these agreements, Your Honor.

24         THE COURT:  Does he use the myroyalty.com site?

25         MR. NICKLESS:  He's shaking his head no, Your Honor.

1       So again, I -- we've downloaded the information that

2  includes peer review analysis by the peer reviewer.  That

3  individual is identified in the required disclosures.  That

4  name and address is on the letter from the peer reviewer of the

5  amendments of the dates that he reviewed particular amendments

6  to the product that was listed on box.com.  And all of that is

7  on the thumb drive that's being provided to counsel.

8       THE COURT:  Did you have anything else?

9       MR. NICKLESS:  I do not, Your Honor.  Thank you.

10      THE COURT:  I'm going to grant the motion to compel

11  noting for the record that the delay in responding was somewhat

12  but not substantially justified.  Debtor's counsel should have

13  communicated with plaintiffs' counsel, at least an oral request

14  for an extension of time, and should have filed with the Court

15  a motion to extend time through his office and should have at

16  the very least communicated with plaintiffs' counsel that he

17  was out of town and unable to get back.  But the material was

18  due in early January, correct?

19      MR. NICKLESS:  It was due in January, yes.

20      THE COURT:  The Court can't assess the credibility of

21  the assertion that documents were not retained.  When somebody

22  has publishing agreements, in typical arrangements these are in

23  writing.  Royalty accountings are always in writing and they

24  are usually submitted every six months or every year, so it is

25  not credible to me that Mr. Fustolo has nothing.

1        I will give him an additional 30 days to submit

2   whatever he has in response to the documents.  If the plaintiff

3   is able to prove at trial that he had documents that were not

4   produced in response to the request, then there are a number of

5   remedies that the plaintiff may pursue at that time including

6   orders to preclude the introduction of defenses by him or

7   summary judgment in the plaintiff's favor based upon the count

8   failure to keep and preserve recorded information, which is one

9   of the grounds that the plaintiff asserts exists for denial of

10  the debtor's discharge under Section 727.

11       To the extent the plaintiff is able to subpoena the

12  publishers of -- with respect to their agreements or

13  accountings, then the plaintiff is free to do that.  The

14  expenses, attorney's fees of filing today's motion will be

15  borne by the debtor.

16       MR. HORNE:  Thank you, Your Honor.  Would you like us

17  to submit an affidavit with respect to those expenses or how

18  would you like us to proceed?

19       THE COURT:  Yes.

20       MR. NICKLESS:  Thank you, Your Honor.

21       MR. HORNE:  Thank you.

22       MR. SMITH:  Thank you, Your Honor.  By the way, Your

23  Honor, I do note that the District Court did affirm your

24  earlier --

25       THE COURT:  I've seen it.

1          MR. SMITH:  -- order in the case.  Congratulations.

2          THE COURT:  Did you see Judge Zobel's memorandum?

3          MR. NICKLESS:  I did, Your Honor.

4          THE COURT:  Okay.  The District Court now sends

5   appeal memoranda directly by CM/ECF, so --

6          MR. SMITH:  Yes.

7          THE COURT:  -- that problem has been resolved.

8   (End at 2:18 p.m.)

9                          *  *  *  *  *  *  *

10         I certify that the foregoing is a true and accurate

11  transcript from the digitally sound-recorded record of the

12  proceedings.


                                                    3/3/2015
_____  _____
**RUTH ANN HAGER**                                      **Date**
**Certified Transcriber**
    **Federal C.E.R.T. **D-641**
*CASCADE HILLS TRANSCRIPTION, INC.*
8095 Darling Street SE
Salem, Oregon  97317-9074
Phone: (503) 371-8858
Email: hagerruthann@aol.com


**#13-12692**                    **AP #15-01015**                    **2-20-2015**