**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| IN RE STEVEN C. FUSTOLO,<br>Debtor,<br>v.<br>THE PATRIOT GROUP, LLC,<br>Plaintiff,<br>v.<br>STEVEN C. FUSTOLO,<br>Defendant, | Chapter 7<br>Case No. 13-12692-JNF<br>AP No.: 14-01193-JNF |

**STEVEN C. FUSTOLO'S RESONSE AND OPPOSITION TO THE PATRIOT GROUP, LLC'S MOTION FOR CLARIFICATION REGARDING THE BANKRUPTCY STAY**

Debtor Steven C. Fustolo ("Mr. Fustolo") hereby opposes the Motion for Clarification Regarding the Bankruptcy Stay (the "Motion") filed by Plaintiff The Patriot Group, LLC ("Patriot') to the extent it concerns the contempt action, *The Patriot Group, LLC v. Steven C. Fustolo*, Middlesex Superior Court C.A. No. 1081-cv-00529 (the "Contempt Action"). The Bankruptcy Code's automatic stay applies to the Contempt Action because it is an action by Patriot to facilitate collection of a pre-petition judgment held by Patriot. Patriot has cited no law, nor set forth any "cause," in its Motion to support its claim for relief from the automatic stay under § 362(d)(1) with respect to the Contempt Action.

With respect to the case captioned *The Patriot Group, LLC v. Jeffrey Zeizel*, Middlesex Superior Court C.A. No. 1781-cv-01557 (referred to in Patriot's Motion as the "Zeizel Action"), Mr. Fustolo does not oppose Patriot's request for that litigation to proceed since, unlike the Contempt Action, that matter does not concern any pre-petition facts or conduct and the

automatic stay does not apply to the Zeizel Action. There is no need to address relief from stay issues with respect to the Zeizel Action, and the Zeizel Action should proceed without further delay. For the forgoing reasons, Mr. Fustolo will not further address any of the arguments set forth in the Motion relating exclusively to the Zeizel Action, other than to refute certain allegations.

## I. INTRODUCTION

Patriot's Motion does not comply with MLBR 9013-1. The allegations in the Motion are not set forth in separately numbered paragraphs, and the Court should deny Patriot's Motion for failure to comply with such rule. Nevertheless, in accordance with MLBR 9013-1(i) and 4001-1(c), Mr. Fustolo hereby responds to the allegations in Patriot's Motion as follows:

1) With respect to the Introduction in Patriot's Motion, Mr. Fustolo contends that no response is required. To the extent a response may be required, Mr. Fustolo denies the allegations in the second sentence of the Introduction, denies the existence of any "defamation campaign," and denies Patriot's assertion that proceeding with the Contempt Action does not implicate the "stay." Mr. Fustolo further denies any failure to comply with any state court injunction.

2) With respect to the section of the "Background" titled "The Bankruptcy and Adversary Proceedings," Mr. Fustolo admits the factual allegations except that he denies any allegations related to any alleged defamation and has insufficient knowledge to admit or deny the allegations in footnote 2. Mr. Fustolo denies any legal assertions or conclusions set forth by Patriot.

3) With respect to the section of the "Background" titled "The Trustee Adversary Proceeding and Settlement," Mr. Fustolo admits the factual allegations except that he denies that he paid the estate $200k; such amount was paid by his wife, Elisa Fustolo.

Mr. Fustolo denies any legal assertions or conclusions set forth by Patriot.

4) With respect to the section of the "Background" titled "The Zeizel Action," Mr. Fustolo admits he was sued as a third-party defendant in the Ziezel Action but denies any allegation related to any alleged defamation or concerning any allegedly defamatory articles. Mr. Fustolo also denies the allegations set forth in footnote 4. Mr. Fustolo has insufficient knowledge to admit or deny what Mr. Zeizel disputes, does not dispute, or claims.

5) With respect to the section of the "Background" titled "The Contempt Action and Pending Trial," Mr. Fustolo admits the factual allegations with the exception of Patriot's characterization of the state court injunction, any assertion that Mr. Fustolo violated any state court injunction and the alleged facts relating to the completion of the trial. Mr. Fustolo states that only two days of a scheduled seven-day trial have been held thus far. Mr. Fustolo further denies any legal assertions or conclusions set forth by Patriot.

6) With respect to Section I of the "Argument," no response is required to Patriot's legal arguments. To the extent a response may be required, Mr. Fustolo denies the allegations set forth therein. In addition, Mr. Fustolo specifically refutes Patriot's allegations that the Zeizel Action, which was filed five years after the filing of the bankruptcy petition, concerns any pre-petition facts. The Complaint and the Third Party Complaint in the Zeizel Action allege **only** post-petition conduct unrelated to the collection of any pre-petition debt.

7) With respect to Section II of the "Argument," no response is required to Patriot's legal arguments. To the extent a response may be required, Mr. Fustolo denies the

allegations set forth therein.

8) With respect to Section III of the "Argument," no response is required to Patriot's legal arguments. To the extent a response may be required, Mr. Fustolo denies the allegations set forth therein.

## II. <u>BACKGROUND</u>

Mr. Fustolo will not reiterate the procedural history of this matter, the Contempt Action, or the Zeizel Action. However, Mr. Fustolo wishes to clarify one critical point concerning the Contempt Action. Contrary to what Patriot claims in its Motion, Patriot's Complaint for Civil Contempt (the "Contempt Complaint") seeks to hold Mr. Fustolo liable for alleged violations of the Final Judgment and Permanent Injunction (the "Permanent Injunction") that took place ***pre-petition*** (as well as post-petition). *See* Mot. p. 2 (stating that "Patriot also seeks to hold Fustolo in civil contempt for *his post-petition and post-denial of discharge failure to comply with a state court injunction*") (emphasis added).

The Permanent Injunction was entered by the Middlesex Superior Court in April 2012, and the bankruptcy petition was filed in this matter on May 6, 2013, more than one year later. The Contempt Complaint alleges that Mr. Fustolo has not complied with the Permanent Injunction and specifically includes allegations related to ***pre***-petition periods. *See e.g.*, Exh. 1, Contempt Compl. ¶ 19 (alleging "Fustolo['s] records show that he spent the following approximate amounts during the first annual period (beginning in May 2012, the first year for which Patriot was able to obtain Fustolo records) which exceeded the Permanent Injunction's monthly average and annual expenditure limits" ); *id.* ¶ 20 (alleging "Fustolo has never provided the documentation for the first annual period expenditures (through February 2013) required by paragraph 2 of the Permanent Injunction").

## III. ARGUMENT

On July 16, 2018, the United States Court of Appeals for the First Circuit (the "First Circuit") reversed and remanded this Court's order denying Mr. Fustolo his bankruptcy discharge. *See* D.E. 370. The First Circuit's decision reinstated the automatic stay provided for by § 362(a). The automatic stay applies to the Contempt Action because it is an action to enforce collection of a pre-petition judgment or, as Patriot admits itself, "an action in connection with Fustolo's debt to Patriot." Mot. p. 10. Patriot has not set forth sufficient "cause" to warrant this Court granting it relief from the automatic stay under § 362(d)(1), and its Motion must be denied with respect to the Contempt Action.

### A. The Automatic Stay Applies to the Contempt Action.

The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy law." *Midlantic Nat. Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 503 (1986). "The stay gives a breathing spell to the debtor and stops all collection efforts, all harassment, and all foreclosure actions." *Tringali v. Hathaway Mach. Co.*, 796 F.2d 553, 562 (1st Cir. 1986) (internal quotation omitted). The automatic stay provision is broad in scope and has narrow exceptions. Section 362 provides, in pertinent part, that:

> (a) Except as provided in subsection (b) of this section, a petition . . . operates as a stay, applicable to all entities, of—
> (1) the ***commencement or continuation,*** including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor **that was or could have been** commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;
> (2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title; [and]
> . . .
> (6***) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title***[.]

11 U.S.C. § 362(a) (emphasis added). Courts, including this Court, have determined that civil contempt cases are within the scope of the automatic stay. *See, e.g.*, *In re Birchall*, No. 07-13232-WCH, 2007 WL 1992089, at *5-9 (Bankr. D. Mass. July 3, 2007) (Feeney, J.) (finding that state court contempt proceedings against the debtor "were within the scope of the automatic stay" because the action was in "furtherance of collection of her [pre-petition] judgment"); *In re Daniels*, 316 B.R. 342, 348–9 (Bankr. D. Idaho 2004) (finding that "Creditor's use of the state court contempt proceedings was in furtherance of its collection action" and that "maintenance of that collection action . . . was prohibited by operation of the automatic stay once the bankruptcy case was commenced").

In *In re Birchall*, the creditor obtained a pre-petition judgment against the debtor and brought a supplementary process action against the debtor to collect her judgment. 2007 WL 1992089 at *1. The state court issued a capias, and the debtor was ultimately held in contempt and incarcerated for failing to pay the judgment. *Id.* Thereafter, the debtor filed bankruptcy and argued before this Court that the automatic stay applied to the contempt proceedings. *Id.* This Court ruled that the automatic stay applied, explaining its analysis as follows:

> In the present case, the action taken by the Creditor and the order of the Orleans District Court with respect to the capias were in the nature of civil contempt. ***The contempt proceeding was initiated by a private party, the Creditor, to coerce the Debtor's compliance with his duty to provide information about his assets and liabilities and in furtherance of collection of her judgment.*** [Creditor's] goal was and is to obtain payment of the civil judgment. Moreover, the district court's order specifically stated that it was a civil contempt order. It was obtained as a tool to enforce the Creditor's judgment in the Proceeding. Further, the order allowed the Debtor to purge himself of the contempt only by paying the judgment. ***These actions were and are within the scope of the automatic stay.***

*Id.* at *9 (emphasis added). In *In re Daniels*, 316 B.R. at 348-49, the United States Bankruptcy Court for the District of Idaho considered similar circumstances and reached the same conclusion.

Here, as in *In Re Birchall*, the creditor (Patriot) initiated the Contempt Action to coerce Mr. Fustolo to provide information about his assets and liabilities and in furtherance of collection of its judgment. There is no doubt that the Contempt Action is an action in furtherance of collection activity and, as held in *In re Birchall*, is subject to the automatic stay. To the extent there is any doubt as to the civil nature of the Complaint for *Civil Contempt* not removed by the prior analysis (together with the very title of such complaint), the only damages Patriot has sought in its Complaint for Civil Contempt are for the "[p]ayment of a civil penalty" by Mr. Fustolo for his alleged violations of the Permanent Injunction that allegedly frustrated Patriot's ability to collect on the judgment. *See* Exh. 1 p. 17 ¶ C. Therefore, the contempt proceedings and any order entered by the state court are unequivocally civil and subject to the automatic stay.

Patriot's repeated reliance on the fact that it seeks contempt for activities that occurred post-petition as well as pre-petition is also unavailing. The automatic stay expressly applies to an "action or proceeding against the debtor that was or ***could have been commenced*** before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title." § 362(d)(1) (emphasis added); *see also Advanced Computer Services of Mighican, Inc. v. MAI Systems Corp.*, 161 B.R. 771, 772 (Bank. E.D. Va. 1993) (holding automatic stay bars claims based on conduct that commenced pre-petition and continues post-petition). Patriot's Contempt Complaint (i) could have been commenced pre-petition, (ii) is a continuation of an action that was commenced pre-petition and (iii) is an act to collect, assess or recover a pre-petition claim against the debtor, Mr. Fustolo.

Furthermore, to the extent Patriot is arguing that the automatic stay should not apply because the Contempt Action was initiated "post-petition and post-denial of discharge," that argument fails for at least two reasons. First, the Contempt Action is an act to collect or recover on the judgment which arose pre-petition and is thus bared by § 362 regardless of when the "act to collect, assess, or recover" occurs. *See* § 362(a)(6) (automatic stay bars "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case"). Second, collection proceedings initiated post-petition are also subject to the automatic stay. *See Eskanos & Adler, P.C. v. Leetien*, 309 F.3d 1210, 1214 (9th Cir. 2002) ("It would be inconsistent with the statutory scheme to countenance post-petition collection actions filed in state court. . . . . For these reasons we have held that the automatic stay requires an immediate freeze of the status quo by precluding and nullifying post-petition actions."). Ultimately, the fact that the Contempt Action was initiated post-petition is irrelevant; it is undisputed that the Contempt Action is in furtherance of Patriot's efforts to collect a pre-petition debt arising from a pre-petition judgment, and it includes claims for alleged pre-petition contemptuous behavior. Any allegation that the Contempt Action was commenced post-denial of discharge is irrelevant in light of the First Circuit's decision.

It is also irrelevant that any judgment or damages Patriot may recover would come from non-estate property. The automatic stay is not designed to only protect property of the estate. It is also designed to protect a debtor against creditors seeking to recover on account of pre-petition debts. *In re Slabicki*, 466 B.R. 572, 577 (1st Cir. 2012) ("When a bankruptcy petition is filed, an automatic stay prevents creditors from taking any collection actions against the debtor . . . for pre-petition debts"); *see also In re Birchall*, 2007 WL 1992089 at *6 ("The automatic stay is the most basic of debtor protections under bankruptcy law" (quoting from *Soares v. Brockton Credit*

*Union*, 107 F.3d 969, 975 (1st Cir. 1997)). Here, Patriot willingly admits that the Contempt Action is in furtherance of its efforts to collect on account of and to enforce a pre-petition judgment. Based on the plain language of § 362(a), the legislative policy behind the automatic stay, the case law related to civil contempt proceedings, and the circumstances in this matter, the Court should find that the automatic stay applies to the Contempt Action.

**B. <u>There is No Cause to Lift the Automatic Stay.</u>**

The Court should not grant Patriot relief from the automatic stay so that it can proceed in the Contempt Action because Patriot has cited no law to this Court supporting its argument, nor has it demonstrated any "cause" for doing so under § 362(d)(1). Section 362(d)(1) permits a "party in interest" to obtain relief from the automatic stay "for cause." "Cause" is not defined by the statute but exists "when the harm that would result from a continuation of the stay would outweigh any harm that might be suffered by the debtor or the debtor's estate if the stay is lifted." *Peerless Ins. Co. v. Rivera*, 208 B.R. 313, 315 (D.R.I. 1997) (citing *In re Turner,* 161 B.R. 1, 3 (Bankr. D. Me.1993)). "[D]etermining whether 'cause' exists requires a fact intensive inquiry that must be made on a case by case basis." *Id.* (citing *In re Tucson Estates, Inc.,* 912 F.2d 1162, 1166 (9th Cir. 1990)).

Patriot has failed to meet its burden of demonstrating that any "cause" exists here. *See In re Spencer*, 568 B.R. 278, 280 (Bankr. W.D. Mich. 2017) ("If the movant fails to make an initial showing of cause, . . . the court should deny relief without requiring any showing from the debtor that it is entitled to continued protection." (internal quotation omitted)). In *In re Birchall*, this Court concluded that, where a creditor's claim is unsecured, the claim is not the subject of a lien, and the court has not yet determined whether the claim is nondischargeable, no "cause" existed to lift the stay. 2007 WL 1992089 at * 9. That applies on all fours here. Patriot's claim is

unsecured, is not the subject of a lien, and, as a result of the First Circuit's decision, there is no determination that Mr. Fustolo's is not entitled to a full discharge.

Moreover, Patriot fails to allege or explain how it will suffer any harm if the automatic stay is maintained. Mr. Fustolo, however, will suffer significant harm if the Contempt Action is permitted to proceed. Although Patriot has put on the majority of its case-in-chief, the trial is hardly over; so far, the trial has lasted only one full day and two half-days. Prior to the trial being cancelled, it was scheduled for five more full days. It was, therefore, less than one-third completed. Furthermore, the trial exhibits are extremely voluminous, consisting of over 20,000 pages. If the trial continues in the Contempt Action, Mr. Fustolo will incur significant legal costs that he should not be forced to incur in connection with defending an action brought by Patriot in furtherance of collecting its pre-petition claim.

The Contempt Action is based on Mr. Fustolo's alleged violation of the Permanent Injunction, ***which is a tool being used by Patriot to attempt to collect a pre-petition judgment.*** Patriot holds nothing more than a pre-petition unsecured claim against Mr. Fustolo. As a result of the First Circuit's decision, this Court's prior determination that Mr. Fustolo is not entitled to a discharge has been reversed, and Mr. Fustolo contends that his debt to Patriot is dischargeable and that he is entitled to a full discharge. Patriot should not be permitted to continue its collection efforts against Mr. Fustolo by way of the Contempt Action. If, at the end of the day, Mr. Fustolo obtains the full discharge that he claims he is entitled to, there will be no debt for Patriot to attempt to collect and the Contempt Action will have to be dismissed. If the trial in the Contempt Action is allowed to continue under these circumstances, Mr. Fustolo will have suffered needless and substantial economic harm. Patriot, however, has not alleged that it will

suffer any harm and has otherwise not demonstrated any "cause" for granting it relief from the automatic stay to continue the Contempt Action.

## IV. CONCLUSION

WHEREFORE, for the forgoing reasons, Mr. Fustolo respectfully requests that this Court:

A. Confirm, without any future proceeding or hearing, that the automatic stay does not apply to the Zeizel Action;

B. After a hearing, deny Patriot's Motion to the extent it seeks a determination that the automatic stay does not apply to the Contempt Action;

C. After a hearing, deny Patriot's request that the automatic stay be lifted with respect to the Contempt Action; and

D. Provide such other relief as is just and proper.

## V. REQUEST FOR HEARING

Mr. Fustolo respectfully requests that this Court schedule a hearing on Patriot's Motion as it relates to the Contempt Action.

STEVEN C. FUSTOLO
By His Attorneys,

PARTRIDGE SNOW & HAHN LLP

/s/ William R. Moorman, Jr.
William R. Moorman, Jr. (BBO #548593)
Paige V. Schroeder (BBO #689346)
PARTRIDGE SNOW & HAHN LLP
30 Federal Street
Boston, MA 02110
(617) 292-7900
Fax: (617) 292-7910

DATED: August 30, 2018

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30 day of August 2018, I electronically filed the within Opposition to Plaintiff the Patriot Group, LLC's Motion for Clarification Regarding the Bankruptcy Stay with the Clerk of the Bankruptcy Court for the District of Massachusetts using the CM/ECF System.

/s/ William R. Moorman, Jr.
William R. Moorman, Jr.

3363500.4/13014-3

# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 2010-00529-F

THE PATRIOT GROUP, LLC,

Plaintiff,

v.

STEVEN C. FUSTOLO,

Defendant,

v.

WINCHESTER SAVINGS BANK

Trustee Process Defendant,

v.

JAMES J. FOX & COMPANY LLP; NATIONAL TAX INSTITUTE, INC.; CPE MEETINGS, INC.; TERRACE HALL PARTNERS LLC; FIVE HIGH STREET LLC; HUNTINGTON PROPERTIES, INC.; PROPERTY TRUST CORPORATION; HUNTINGTON PROPERTIES HOLDING COMPANY, L.L.C.; 23-25 HIGHLAND AVENUE, LLC; FUSTOLO DEVELOPMENT LLC; AND ATLAS GARDEN SUPPLY LLC,

Reach and Apply Defendants.

**COMPLAINT FOR CIVIL CONTEMPT**

## INTRODUCTION

The Patriot Group, LLC ("Patriot"), Plaintiff in the underlying action and these proceedings, hereby brings this Complaint for Civil Contempt pursuant to Rule 65.3 of the Massachusetts Rules of Civil Procedure and G.L. c. 150C, § 13 against Steven C. Fustolo ("Fustolo") and the above-named Reach and Apply Defendants.[1] On April 18, 2012, this Court (Curran, J.) entered a Final Judgment and Permanent Injunction (the "Permanent Injunction") against Fustolo and the Reach and Apply Defendants in the underlying civil action (2010-00529-F). The Permanent Injunction limits Fustolo's expenditures, his ability to dissipate the value of his assets, and distributions from his wholly-owned alter ego Reach and Apply Defendants. Since the moment the Permanent Injunction issued, Fustolo has repeatedly and purposely violated it and continues to be in violation.

Indeed, in May 2016, Patriot proved at trial in a bankruptcy adversary proceeding in the District of Massachusetts (AP No. 14-01193-JNF) (Feeney, J.) ("Bankruptcy Proceeding") that Fustolo (a) dissipated large sums of undocumented and unaccounted for cash, (b) spent more than double the Permanent Injunction's expenditure allotment on private golf memberships, yacht clubs and other non-essential outflows, and (c) engaged in a fraudulent scheme by transferring the valuable assets out of two Reach and Apply Defendants to a new company called Fustolo CPE, LLC leaving those Reach and Apply defendants as valueless empty shells. These prohibited asset transfers were specifically designed to siphon cash for Fustolo's personal use, circumvent the Permanent Injunction, bypass the bankruptcy process, and thwart Patriot's efforts to collect on its now $40 million Judgement in the underlying action. Between January 1, 2014 and December 31, 2015, Fustolo CPE, LLC, exploited the illicitly transferred assets and generated almost $2 million in revenue, a large portion of which Fustolo paid to himself. Despite this significant income, Fustolo claims that he is penniless.

---

[1] For a full statement of the Parties relevant to this matter, please *see* Patriot's Complaint in the underlying action, C.A. 2010-00529-F, as captioned above, which is incorporated by reference.

As explained below, Fustolo's violations of the Permanent Injunction were deliberate and calculated. Fustolo has argued on different occasions - - when it was convenient - - that the Permanent Injunction does not apply to him, is unenforceable, and otherwise imposes no restrictions on him or his businesses whatsoever. His dismissive attitude coupled with the sheer magnitude of his violations demonstrates his culpable state of mind.

Fustolo has a long history of violating court orders. Most recently, in January 2017, the bankruptcy court denied Fustolo a discharge because he deliberately violated the Bankruptcy Court's Order to provide documents for it's *in camera* review. During that proceeding, he was adjudicated to have intentionally spoliated his financial records and otherwise acted in bad faith. Fustolo is also facing incarceration in Massachusetts on felony charges relating to his malicious defamation campaign against Patriot, its principal, and its principal's wife and daughter. Fustolo's contempt for the legal system, including this Court's Order, should not be countenanced and harsh sanctions are warranted.

## FACTS

**Background**

1. Fustolo is a Certified Public Accounting ("CPA") who earned a bachelor's of science degree in accounting from Bentley College and an MBA from Babson College.

2. Fustolo has been a CPA and professional tax advisor since the early 1980's. He is a partner in the accounting firm James J. Fox & Co.

3. In March 2007, Fustolo sought to develop property in Revere, Massachusetts.

4. On March 29, 2007, Patriot loaned $12.7 million to Fustolo's development company (Revere Beach Holdings) and secured the loan with mortgages and a personal guaranty signed by Fustolo.

5. In or around September 2008, Revere Beach Holdings defaulted on the loan and Fustolo became liable for the debt under the guaranty.

6. In February 2010, Patriot filed its original complaint in this matter against Fustolo and his related entities and named many of his companies as "reach and apply" defendants to collect on the debt (the "2010 Action").

7. The 2010 Action involved breach of contract, loan default, breach of guaranty and other causes of action against Fustolo and certain entities relating to the Revere Beach project.

8. On May 27, 2011, the Court entered final judgment in Patriot's favor in the amount of $20,423,216.44. With interest, the judgment now exceeds $40 million (the "Judgment").

9. A copy of the docket pertaining to the 2010 action is attached hereto as Exhibit A.

**The Permanent Injunction**

10. On April 18, 2012, the Honorable Dennis J. Curran issued the Permanent Injunction, a copy of which is attached hereto as Exhibit B.

11. The Permanent Injunction imposes restrictions on Fustolo and the Reach and Apply Defendants concerning expenditures to prevent Fustolo's dissipation and/or fraudulent transfer of assets.

12. Patriot attempted to collect on its Judgment but was unsuccessful because Fustolo actively thwarted Patriot's efforts through a series of misrepresentations and fraudulent transfers.

13. Fustolo claimed he was penniless. As explained below, however, bank and other records demonstrate that Fustolo was lying to Patriot, obfuscating his financial circumstances and living in violation of the Permanent Injunction's limits.

14. The Permanent Injunction's prohibitions include: (1) restrictions as to the transfer, sale, etc. of the assets or property of Fustolo and the Reach and Apply Defendants; (2) limiting Fustolo's annual spending to $84,000 per year for ordinary living expenses, such as "mortgage, food and the like;" and (3) restrictions on payments by the Reach and Apply Defendants to Fustolo:

> Fustolo and his respective managers, agents, members, partners, nominees, representatives, servants, employees, attorneys, and all people

> in active concert or participation with them are **permanently restrained and enjoined** from directly or indirectly assigning, alienating, selling, transferring, pledging, encumbering, concealing or in any other manner, disposing of, diminishing, dissipating, re-directing or otherwise instructing the re-direction and/or misapplication of any and all intangible properties received by Steven C. Fustolo from the Reach and Apply Defendants, except to pay ordinary living expenses for "mortgage, food and the like," **not to exceed $84,000 per year or a cumulative average of $7,000 per month**, to be documented to the Plaintiff on an annual basis."

(Permanent Injunction ¶2, p. 2) (emphasis in original);

> Fustolo and his respective managers, agents, members, partners, nominees, representatives, servants, employees, attorneys, and each and every one of them, and all people in active concert or participation with them are **permanently restrained and enjoined** from directly or indirectly assigning, alienating, selling, transferring, pledging, encumbering, concealing or in any other manner, disposing of, diminishing, diminishing or dissipating the value of Fustolo's beneficial, equitable, shareholder and/or ownership interests in the Reach and Apply Defendants.

(Permanent Injunction ¶3, pp. 2-3) (emphasis in original); and

> The Reach and Apply Defendants **are permanently restrained and enjoined** from directly or indirectly paying money or any other form of compensation or dividend to or for the benefit of Steven C. Fustolo, or from altering, amending, modifying, hypothecating, assigning, alienating, selling, transferring, encumbering, concealing or in any other manner, disposing of, diminishing or dissipating the value of Steven C. Fustolo's beneficial, equitable, shareholder and/or ownership interests in the Reach and Apply Defendants, except for payments to Fustolo not to exceed $84,000 per year for personal living expenses.

(Permanent Injunction ¶4, pp. 3-4) (emphasis in original).

15. As explained below, Fustolo knowingly and purposely violated the above Permanent Injunction provisions.

**Fustolo's Violations of the Permanent Injunction's Expenditure Limits <u>and Documentation Requirement</u>**

16. The Permanent Injunction limits Fustolo's expenditures to "ordinary living expenses for mortgage, food and the like, **not to exceed $84,000 per year or a cumulative average of $7,000 per month**, to be documented to the Plaintiff on an annual basis." *See* Exhibit B, ¶ 2.

17. According to bank and other institutional records concerning Fustolo's accounts ("Fustolo records")[2], Fustolo's expenditures for the one-year (first annual) period after the Permanent Injunction issued were over $388,000, with monthly expenditures as high as $81,000 in December 2012 - - which included over $57,000 in unexplained cash (hard currency) withdrawals.[3]

18. During this same period, Fustolo spent over $16,000 on a membership for the Woodland Golf Club, a luxury expense outside the scope of the "ordinary living expenses" the Permanent Injunction allows.

19. More specifically, Fustolo records show that he spent the following approximate amounts during the first annual period (beginning in May 2012, the first year for which Patriot was able to obtain Fustolo records) which exceed the Permanent Injunction's monthly average and annual expenditure limits:

- May 2012: $18,000;
- June 2012: $43,000;
- July 2012: $18,000;
- August 2012: $21,000;
- September 2012: $17,000:
- October 2012: $23,000;
- November 2012: $28,000;
- December 2012: $80,000;
- January 2013: $38,000; and
- February 2013: $40,000.

---

[2] To be clear, Fustolo did <u>not</u> produce the Fustolo records. Rather, Patriot obtained them through subpoenas to banks and other parties. Indeed, Fustolo resisted Patriot's efforts to obtain these documents.

[3] All references to "cash" herein mean hard currency unless otherwise specifically stated.

20. Fustolo has never provided the documentation for the first annual period expenditures (through February 2013) required by paragraph 2 of the Permanent Injunction.

21. On May 6, 2013, creditors, including Patriot, put Fustolo into an involuntary Chapter 7 bankruptcy via petition (*In re Steven C. Fustolo*, No. 13-12692-JNF).

22. Fustolo contested the validity of the involuntary bankruptcy, which was ultimately upheld by the First Circuit Court of Appeals.

23. In January 2014, Fustolo filed financial disclosures and his statement of financial affairs. On his bankruptcy Schedule J, Fustolo reported that his monthly household expenses were over $20,000, which is approximately *three times* the monthly limit set forth in paragraph 2 of the Permanent Injunction. A copy of Fustolo's Schedule J is attached as Exhibit C.

24. Fustolo's expenditures during this period included tens of thousands of dollars of payments to his golf club and significant cash withdrawals. Fustolo has never produced records that demonstrate the uses of the withdrawn and unaccounted for cash.

25. Fustolo records also demonstrate that he spent the following approximate amounts during the second annual period (March 2013 through February 2014) which exceed the Permanent Injunction's monthly and annual expenditure limit:

- March 2013: $24,000;
- April 2013: $25,000;
- May 2013: $28,000;
- June 2013: $27,000;
- July 2013: $32,000;
- August 2013: $46,000;
- September 2013: $33,000;
- October 2013: $37,000;
- November 2013: $68,000;
- December 2013: $26,000;

- January 2014: $46,000; and
- February 2014: $35,000.

26. Indeed, Fustolo's average monthly expenditures *increased* while he was in bankruptcy.

27. On November 28, 2014, Harold Murphy, the trustee for Fustolo's estate, filed an action against Fustolo to recover proceeds for the estate based upon Fustolo's fraudulent scheme to dissipate assets, primarily cash. The trustee's complaints alleged, among other things, that Fustolo engaged in "an elaborate and intentional scheme to conceal [Fustolo's] income and assets from creditors and the Trustee." Fustolo eventually settled with his estate for $350,000.

28. Fustolo also failed to provide Patriot with "documentation" of expenses for the second annual period as required by paragraph 2 of the Permanent Injunction.

29. Thereafter, Fustolo continued his practice of spending beyond the Permanent Injunction's "ordinary household" expenditure limits (including for his golf membership, membership at the Hyannis Yacht Club, unexplained payments to third parties, and large unexplained and unaccounted for cash withdrawals).

30. Fustolo records demonstrate that he spent the following approximate amounts during the third annual period (March 2014 through February 2015) which exceed the Permanent Injunction's monthly and annual expenditure limits:

- March 2014: $27,000;
- April 2014: $36,000;
- May 2014: $24,000;
- June 2014: $32,000;
- July 2014: $25,000;
- August 2014: $33,000;
- September 2014: $20,000;
- October 2014: $24,000;
- November 2014: $17,000;

- December 2014: $27,000;
- January 2015: $23,000; and
- February 2015: $32,000.

31. Fustolo also failed to provide Patriot with "documentation" of expenses for the third annual period as required by paragraph 2 of the Permanent Injunction.

32. Patriot has only obtained Fustolo records through December 31, 2015, see Footnote 2. Fustolo's approximate monthly expenditures from March through December 2015 (10 months) were greater than the Permanent Injunction's monthly and annual expenditure limits:

- March 2015: $16,000;
- April 2015: $19,000;
- May 2015: $29,000;
- June 2015: $30,000;
- July 2015: $18,000;
- August 2015: $52,000;
- September 2015: $28,000;
- October 2015: $25,000;
- November 2015: $27,000; and
- December 2015: $28,000.

33. Fustolo has not provided Patriot with "documentation" for his expenses as required by paragraph 2 of the Permanent Injunction - - despite over $240,000 in unexplained cash and credit card transactions between May 2013 and December 2015.

34. On January 9, 2017, after a six-day bench trial in May 2016 (the "Trial"), the Bankruptcy Court denied Fustolo's discharge and the automatic stay (11 U.S.C § 362) as it applies to Patriot and the Permanent Injunction came to an end.

35. Accordingly, Patriot requested that Fustolo provide it with full accountings required by the Permanent Injunction and otherwise comply fully with the Permanent Injunction. A copy of Patriot's request is attached as Exhibit D.

36. Fustolo, however, has never *at any time* (as explained above), provided Patriot with expenditure-related accountings documenting how he has spent his funds and whether/how his expenditures were within the Permanent Injunction's limits.

37. Patriot has requested that Fustolo produce his bank records from January 1, 2016 through the present, which Patriot received on August 30, 2017. Accordingly, Patriot reserves the right to amend its Complaint.

38. Upon information and belief, Fustolo continues to spend beyond limits imposed by the Permanent Injunction, paragraph 2.

39. As explained below, Fustolo's violations and over spending were and are willful and deliberate. Accordingly, Fustolo should be held in contempt.

**Fustolo Destroyed the Value of Two Reach and Apply Defendants**
**Through Fraudulent Asset Transfers**

40. Paragraph three of the Permanent Injunction states that Fustolo is "permanently **restrained and enjoined** from directly or indirectly altering, modifying, transferring, or in any other manner diminishing or dissipating the value of Steven C. Fustolo's beneficial, equitable shareholder and/or ownership interests in the Reach and Apply Defendants: . . . National Tax Institute, Inc., CPE Meetings, Inc. . . , or any other of their tangible **or intangible assets** except to pay ordinary business operation or living expenses, as described above in paragraph 2, or to pay the Plaintiff." *See supra*, ¶ 14 (Exhibit B ¶3, pp. 2-3) (emphasis added).

41. For many years prior to the entry of the Permanent Injunction, Fustolo operated a continuing professional education seminar business geared toward accounting and tax professionals.

Fustolo's business model was to host seminars at exotic locations around the world, offer live courses with paid instructors, and provide participants learning experiences in a luxurious environment.

42. The business moniker or trade name was "NTI." It had a website, brochures, catalogs, products, licenses, vendor relationships, and other property - - tangible and intangible.

43. Fustolo operated his seminar business through two Reach and Apply Defendants - - National Tax Institute, Inc. and CPE Meetings, Inc., which are collectively referred to as the "Resort Seminar Business."

44. Fustolo was the sole owner and manager of the Resort Seminar Business, which was effectively his "alter ego":

- Fustolo was its sole shareholder, owner and manager;
- He dominated and controlled every aspect of its business;
- He did not take a salary; rather he withdrew funds from the business as he saw fit as part of a fraudulent scheme to divert the business's revenue to himself, his spouse and other of his wholly-owned businesses in a manner designed to evade his personal creditors;
- He commingled funds from the Resort Seminar Business with his other businesses;
- He withdrew cash from the Resort Seminar Business for his personal use, the use of his spouse, and the use of his other businesses;
- He did not capitalize the business and/or formed and maintained the company with capitalization totally inadequate for the business in which the company was engaged;
- He failed to maintain the Resort Seminar Business' corporate formalities, including filing annual reports with Massachusetts Secretary of State;
- He failed to maintain contemporaneous business records, including financial records, which would allow a creditor to determine which assets and liabilities belong to the Resort Seminar Business and which are his personally;

- He engaged in self-dealing loans with Resort Seminar Business which he never intended to repay yet used them to show a loss on his personal tax returns; and

- He operated the Resort Seminar Business in a manner designed to perpetrate a fraud on his creditors. (Collectively the "Alter Ego Facts").

45. The defining attribute of the Resort Seminar Business was what it advertised on its website (www.nti-inc.com) as "perfecting the art of resort CPE."

46. The Resort Seminar Business was marketed as "a premier provider of continuing professional education (resort CPE) geared towards CPA's, attorneys and other professionals."

47. The Resort Seminar Business had valuable assets, including its business concept, its copyrighted materials, its logo, goodwill, customer/client base, vendors, products and other assets.

48. Attached as Exhibit E are pages from the Resort Seminar Business website which show copyrighted materials, as well as license and contact information.

49. As explained above, on May 6, 2013, Fustolo was put into Chapter 7 bankruptcy.

50. In January 2014, Fustolo filed bankruptcy schedules of his assets which confirmed his 100% ownership of the Resort Seminar Business, but under oath swore that it was *worthless*. *See* Exhibit C.

51. Concurrently with the January 2014 filing of the Asset Schedules, Fustolo formed a new company, Fustolo CPE, LLC, to continue his Resort Seminar Business. Fustolo CPE, LLC uses the trade name "NTI" which is the same trade name acronym which the Resort Seminar Business used.

52. Fustolo created a website for Fustolo CPE, LLC at www.NTICPE.com and directed former and prospective clients who visited the Resort Seminar Business' site to the new website.

53. Fustolo operates Fustolo CPE, LLC in the same fashion described above regarding the Resort Seminar Business (*i.e.*, Fustolo and Fustolo CPE LLC are mere alter egos). Indeed, each of the Alter Ego Facts applies to how Fustolo operates Fustolo CPE, LLC.

54. A comparison of the websites, brochures, products and other services of the Resort Seminar Business and Fustolo CPE, LLC demonstrate that (a) the companies are identical in all material respects and (b) Fustolo took the Resort Seminar Business' property and has exploited it through Fustolo CPE, LLC. For example:

- The websites and brochures had the same format, layout, sections and text;
- The websites described the entities identically, targeting the same audience and providing the same services and products;
- The websites and brochures listed the same licensing and accrediting information, including the same IRS license number;
- The brochures listed virtually the same speakers and presenters;
- The marketing materials included the same quotes from satisfied customers for the past 14 years;
- The websites and brochures had the same registration form, registration process, and contact information; and
- The phone number was the same.

55. There was no agreement between or among Fustolo, the Resort Seminar Business or Fustolo CPE LLC that conveyed or assigned the Resort Seminar Business' copyrighted web content, goodwill and business relationships to Fustolo CPE, LLC.

56. The transfer of assets was not at arms-length, bona fide or done for any other reason than to avoid the bankruptcy and Patriot. In short, the transfers were fraudulent and artifices to defraud Patriot and other creditors.

57. Since January 2014, Fustolo CPE, LLC continues to use the exact same website content, logo and business concept.

58. Fustolo CPE, LLC also uses the same fundamental structure, marketing materials, customer base, presenters, and many similar off-the-shelf products as NTI.

59. In short, Fustolo took the assets of the Resort Seminar Business and transferred them for no consideration to his new company, Fustolo CPE, LLC, which was not in the bankruptcy proceeding and not a Reach and Apply defendant, and continued to operate his business. In classic fashion, Fustolo left creditors, including Patriot, with shell companies from which to collect, and is attempting to avoid to repay his creditors. As such, he dissipated and destroyed the value of the Resort Seminar Business and his ownership interest therein.

60. Fustolo CPE, LLC is a mere continuation of and successor-in-interest of the Resort Seminar Business which Fustolo operated for decades, but under a different name as a way to avoid the Permanent Injunction and Patriot's judgment and defraud his creditors.

61. Between January 2014 and December 2015, Fustolo CPE, LLC generated almost $2 million in revenue from the exploitation of the Resort Seminar Business assets. This figure is derived from account statements which Patriot has obtained via subpoenas to banks named as trustee process defendants in related litigation, where Fustolo, Fustolo CPE, LLC and other entities controlled by Fustolo held accounts.

62. Upon information and belief, Fustolo CPE LLC continues to generate significant revenue and divert cash from the business as another way of hiding assets from his creditors.

63. Attached as Exhibit F (and incorporated herein by reference) are Patriot's Proposed Findings of Facts and Conclusions of Law from a May 2016 trial involving these same issues which describe evidence and greater detail concerning Fustolo's fraudulent transfer of the Resort Seminar Business assets to Fustolo CPE, LLC.[4]

---

[4] Exhibit F also provides background information about Fustolo's expenditures, asset depletion, spoliation of evidence and other malfeasance, with citations to facts and trial evidence, including Fustolo's trial testimony. In short, Exhibit F concisely sets forth evidence demonstrating Fustolo's contempt for the Permanent Injunction.

**Payments to Fustolo in Violation of the Permanent Injunction**

64. The Permanent Injunction states that: "The Reach and Apply Defendants **are permanently restrained and enjoined** from directly or indirectly paying money or any other form of compensation or dividend to or for the benefit of Steven C. Fustolo, except for payments to Fustolo not to exceed $84,000 per year for personal living expenses." (Exhibit B ¶4, p. 3) (emphasis added).

65. Since the Permanent Injunction was entered, the Reach and Apply Defendants have made payments to Fustolo in excess of the annual $84,000 limit, as evidenced by the Fustolo records.

66. Fustolo has recently provided an accounting for payments made by the Reach and Apply Defendants to Fustolo for the time period since the Permanent Injunction issued which reflects payments made to Fustolo on a net basis rather than a gross basis. *See* Computation of Net Distributions, attached hereto as Exhibit G.

67. Patriot has asked Fustolo to provide the gross payment figures, which he has refused to do because presumably it would show that he violated the Permanent Injunction.

68. As stated above, Fustolo has caused valuable assets to be transferred from Reach and Apply Defendants CPE Meetings, Inc. and National Tax Institute, Inc. to Fustolo CPE, LLC, which is the de facto successor to Fustolo's Resort Seminar Business. *See supra* ¶¶ 45-62; Exhibits E-F.

69. According to the accounting provided by Fustolo, CPE Meetings, Inc. and National Tax Institute, Inc. ceased making payments to Fustolo as of April 19, 2014. *See* Exhibit G.

70. Fustolo, however, has failed to provide any documentation for payments made to him by Fustolo CPE, LLC. Fustolo cannot avoid the Permanent Injunction by fraudulently transferring his business assets to a new company. Upon information and belief, the payments from Fustolo CPE, LLC to Fustolo alone exceed the Permanent Injunction's limits.

**Fustolo Deliberately Violated the Permanent Injunction**

71. Fustolo deliberately violated the permanent injunction. Fustolo has never claimed that he was unaware of the Permanent Injunction. Rather, the opposite is true. Fustolo has repeatedly acknowledged the Permanent Injunction, but either claimed that it did not apply to him or that his attorneys have told him that he had complied with it previously. To the extent he is relying on advice of counsel as a defense to this action, he is waiving the attorney/client privilege.

72. On March 17, 2017, Fustolo was adjudicated to have deliberately spoliated his records pertaining to the bankruptcy, including records that supposedly explained the uses of his funds, including hundreds of thousands of dollars in unexplained and unaccounted for cash.

73. Fustolo's spoliation of records is significant given his responsibility to provide documentation and accountings on an annual basis to Patriot per the Permanent Injunction, which he cannot now do because of his deliberate destruction of evidence.

74. Further, Fustolo's violations of the Permanent Injunction are not one-off or isolated. Rather, they are systemic and involve fraudulent artifices specifically designed to circumvent the Permanent Injunction and Patriot's collection efforts.

75. Fustolo's dismissive statements, the magnitude of his violations, and the totality of the circumstances demonstrate that he has and continues to willfully and deliberately violate the Permanent Injunction.

**COUNT I**
**CIVIL CONTEMPT**

76. Patriot hereby incorporates and restates Paragraphs 1 through 76 by reference.

77. Fustolo has refused to comply with the Permanent Injunction paragraph 2 by spending in excess of $84,000 per year on ordinary living expenses.

78. Fustolo has violated the "documentation" requirements of Permanent Injunction, paragraph 2.

79. In violation of Permanent Injunction paragraph 3, Fustolo has destroyed the value of his ownership interest and the worth of Reach and Apply Defendants CPE Meetings, Inc. and National Tax Institute, Inc. through a fraudulent transfer scheme resulting in illicit asset transfers to Fustolo CPE, LLC.

80. In violation of Permanent Injunction paragraph 4, Reach and Apply Defendants and/or their successors in interest have transferred in excess of $84,000 per year to Fustolo.

81. Fustolo's violations of the Permanent Injunction are willful, deliberate, and with utter disregard for this Court and its authority.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Patriot requests and prays that the Court enter the following relief:

A. Issue a summons as specified in Rule 65.3(d) of the Massachusetts Rules of Civil Procedure directing the parties to appear before the Court and describing the matters to be discussed;

B. Schedule a trial on the merits on the earliest available date;

C. Payment of a civil penalty by Fustolo and other parties in contempt;

D. Order that the parties in contempt cease and desist from failing to comply with the Permanent Injunction;

E. Order Fustolo to submit for advance Court approval on a monthly basis (with a copy to Patriot) his proposed expenditures for ordinary living expenses and other personal and business related expenses for the following month which may be spent only after court approval;

F. Order that Fustolo CPE, LLC be substituted for National Tax Institute, Inc. and CPE Meetings, Inc. as a party to the Permanent Injunction and underlying Final Judgment pursuant to Mass. R. Civ. P. 25(c) and other applicable rules, due to the transfer to interest in assets from National Tax Institute, Inc. and CPE Meetings, Inc. to Fustolo CPE, LLC;

G. Order Fustolo to disclose to the Court and Patriot all sources of income and location of financial accounts;

H. Grant attorney's fees and costs for Patriot.

Respectfully submitted,

THE PATRIOT GROUP, LLC
Plaintiff, by its attorneys

Dated: September 15, 2017

Jack I. Siegal (BBO No. 669173)
Michael P. Burke (BBO No. 682796)
DEVINE MILLIMET & BRANCH
PROFESSIONAL ASSOCIATION
Two Oliver Street, 10th Floor
Boston, MA 02109
(617) 778-7502
(617) 778-7501 (fax)
jsiegal@devinemillimet.com

**VERIFICATION**

I, Kim Hopkins, am a paralegal at The Patriot Group, LLC. I verify that I have ready the foregoing Complaint for Civil Contempt and Exhibits thereto, and based upon my personal knowledge, information provided by the Expert Report of Anne Eberhardt, bank and other records obtained from institutions where Fustolo and his related companies have accounts, my participation in the Bankruptcy Proceeding, transcripts and the details of litigation with Fustolo, and information provided by others the information contained herein is true and accurate to the best of my knowledge and recollection.

Kim Hopkins