# UNITED STATES BANKRUPTCY COURT
## FOR THE
### DISTRICT OF MASSACHUSETTS

~~~~~~~~~~~~~~~~~~~~~~~~

In re
**STEVEN C. FUSTOLO**,                                     Chapter 7
     Debtor                                        Case No. 13-12692-JNF

~~~~~~~~~~~~~~~~~~~~~~~~

**THE PATRIOT GROUP, LLC**,
     Plaintiff
v.                                                 Adv. P. No. 14-1193
**STEVEN C. FUSTOLO**,
     Defendant

~~~~~~~~~~~~~~~~~~~~~~~~

## MEMORANDUM

## I. INTRODUCTION

The matter before the Court is the Complaint filed by The Patriot Group, LLC (the "Plaintiff" or "Patriot") against Steven C. Fustolo ("Fustolo," the "Defendant," or the "Debtor").[1]  The Court conducted a six-day trial commencing on May 23, 2016 and

---

[1] On September 30, 2014, Patriot, together with 50 Thomas Patton Drive, LLC ("Patton Drive"), timely filed a 62–page Complaint against Fustolo in which they sought to except certain debts from discharge, as well as to deny the Debtor a discharge, pursuant to 11 U.S.C. §§ 523 and 727.  Specifically, the Complaint contained eight counts as follows: Count I - Objection to Discharge - 11 U.S.C. § 727(a)(2)(A); Count II - Objection to Discharge - 11 U.S.C. § 727(a)(2)(B); Count III - Objection to Discharge - 11 U.S.C. § 727(a)(3); Count IV - Objection to Discharge – 11 U.S.C. § 727(a)(4); Count V - Objection to Discharge - 11 U.S.C. § 727(a)(5); Count VI - Non-Dischargeability of Patton Drive Claim - 11 U.S.C. § 523(a)(4); Count VII - Non-Dischargeability of Patton Drive Claim - 11 U.S.C. § 523(a)(6); Count VIII - Non-Dischargeability of Patriot Claim - 11 U.S.C. § 523(a)(2).  Initially, Patriot and Patton Drive were represented by the law firm of Jager Smith P.C. ("Jager Smith") which filed the Complaint on their behalf.  On May 28, 2015,

concluding on June 23, 2016.  At the trial, six witnesses testified and 37 exhibits were

admitted into evidence.  Both before, during, and after the trial, the parties filed

numerous discovery-related motions with respect to proposed trial exhibits and the

testimony of witnesses.  In addition, on September 12, 2016, 17 days after the filing of the

parties' post-trial submissions, Patriot filed a Motion to Conform the Pleadings to the

Evidence (the "Motion to Conform"), which the Debtor opposed.  Through its Motion,

Patriot sought to assert a claim and obtain judgment against Fustolo for denial of his

discharge pursuant to 11 U.S.C. § 727(a)(6) based on his refusal to comply with this

Court's Order dated December 31, 2015 (the "December 31st Order").[2]

---

Jager Smith filed a Motion to Withdraw as Counsel to Patriot, which the Court allowed
on June 2, 2015, and Patriot retained new counsel.  On October 28, 2015, Patton Drive filed
a Motion to Dismiss Its Claims against Fustolo, consisting of Counts VI and VII, which
the Court allowed on November 5, 2015, without prejudice to the rights of Patriot.  In
addition, on September 11, 2015, this Court entered an order denying a Motion for Partial
Summary Judgment filed by Patriot pursuant to which it sought denial of the Debtor's
discharge under § 727(a)(4)(A) for knowingly and fraudulently making a false oath by
listing, as an asset, a "[p]ossible whistleblower recovery" with an unknown value on an
Amended Schedule B – Personal Property. *See* The Patriot Grp., LLC. v. Fustolo (In re
Fustolo), 537 B.R. 55, 63 (Bankr. D. Mass. 2015) ("[B]y listing the Whistleblower Claims as
'possible' and ascribing no value to them, creditors were not deceived into believing that
Fustolo was listing a valuable asset. Indeed, by characterizing the claims as 'possible,' he
was intimating that they may be tenuous and have no value. Under those circumstances,
the materiality of the alleged false oath weighs against granting Patriot's Motion for
Summary Judgment.").

[2] The December 31st Order concerned a Motion by Patriot to Compel the Defendant to
Produce Documents. *See* The Patriot Grp., LLC v. Fustolo (In re Fustolo), No. 14-1193,
2015 WL 9595421 (Bankr. D. Mass. Dec. 31, 2015).  In that decision, the Court, citing Fed.
R. Civ. P. 37, Fed. R. Bankr. P. 7037, and MLBR 7037-1, stated:

> Patriot seeks to compel Fustolo to produce "(a) emails responsive to
> Patriot's First Request for Production of Documents (the "First Set") and (b)
> up to date bank account statements and other financial records through

2

2015 for each of the entities Fustolo controls." Specifically, Patriot requests
an order compelling Fustolo to produce certain emails immediately or
otherwise grant it access to them directly from Fustolo's account provider .
. . [AOL] . . . . Patriot also seeks documents updating Fustolo's bank records
and other account information, which he previously produced, "for the
remainder of 2014 and through the present date" because Fustolo employed
an arbitrary cut-off date of December 2014 and has refused to produce any
updated financial information. In Patriot's view, the requested updated
bank records will expose Fustolo's alleged postpetition wasting of
bankruptcy estate assets which it maintains is relevant to certain counts in
its adversary complaint under 11 U.S.C. §§ 727(a)(2)(B), (a)(3), (a)(5).

2015 WL 9595421 at *1. This Court also observed:

> Patriot further alleged in its Complaint that the Debtor "established and
> continued to utilize a multi-layered conglomeration of juridical entities and
> trusts that in relationship to the Debtor's past and present business
> activities is unnecessarily complex and, upon information [and] belief,
> intentionally established and utilized to assist the Debtor in concealing his
> assets from creditors" and promoting fraud. Patriot identified numerous
> entities which it alleged held one or more deposit accounts, did not observe
> corporate or other formalities, and *were mere instrumentalities or alter egos of*
> *the Debtor.*

Id. at *2 (emphasis supplied). As this Court noted in its decision, Fustolo, in his opposition
to the Motion to Compel, asserted the following:

> With respect to the emails, Fustolo maintains that he cannot produce them
> as his emails are deleted every thirty days by AOL pursuant to its policies.
> Indeed, in an Affidavit, Fustolo stated . . . he has used AOL as his internet
> service provider for years; that he does not and never has used folders as
> part of his management of his emails; and that he does not move emails to
> "Saved Mail." He stated that it is his practice "to simply read incoming e-
> mails that do not constitute junk and to print any that I will need in
> addressing my accounting client's matters," adding "[o]nce I open and read
> an e-mail, *it is moved by AOL to 'Old Mail' unless I chose the first action item*
> *labeled as 'Keep as New'."* (emphasis supplied). Fustolo also stated: "After a
> period of time, which I have not previously measured but now believe to
> be approximately 30 days, e-mails in 'Old Mail' are deleted by AOL."

Id. at *3. The Court determined the Debtor's position was devoid of merit, stating: "If he
is unable to produce emails, it can only mean that he deleted them, as according to the

3

On January 9, 2017, this Court granted Patriot's Motion to Conform and issued a

decision in which it concluded that, pursuant to Fed. R. Civ. P. 15(b)(2), made applicable

to the proceeding by Fed. R. Bankr. P. 7052, it was required to treat Patriot's claim under

11 U.S.C. § 727(a)(6)(A) as if it were raised in the Complaint, and that Fustolo's refusal to

obey the December 31st Order warranted denial of his discharge under § 727(a)(6)(A).

The Court also determined that the remaining counts in the Complaint were moot. *See*

The Patriot Grp., LLC v. Fustolo (In re Fustolo), 563 B.R. 85, 113 (Bankr. D. Mass. 2017).[3]

---

information provided by Patriot as to AOL's policies, 5,000 emails are viewable at any
time." Id. at *4. The Court entered an order granting, in part, Patriot's Motion to Compel,
denying, in part, the Debtor's Cross–Motion to Quash Second Request for Production of
Documents and ordered "Fustolo to submit for the Court's *in camera* review copies and
indexes of emails and documents, the production of which he asserts are protected by his
rights under the Fifth Amendment." Id. at *6.

As noted by the Court in its 2017 decision, "Fustolo did not comply with the
submission requirements of the December 31st Order as he untimely produced only bank
records with a deficient index." 563 B.R. at 97. He "also did not comply with the
December 31st Order with respect to the production of nonprivileged AOL emails and
documents to Patriot." Id.

Subsequently, on March 17, 2016, the Court granted Patriot's Motion for Sanctions
and denied the Debtor's Motion for Stay or Protective Order Concerning His Deposition.
Portions of the transcript from the March 17, 2016 hearing are reproduced in the Court's
2017 decision.

[3] In that decision, the Court observed:

> The Debtor filed an Opposition to the Motion for Sanctions to which he
> attached his Affidavit, dated March 15, 2016. Fustolo offered the following
> explanation for his failure to produce certain emails to Patriot in paragraph
> 10 of his Affidavit:
>
> > On July 27, 2014 I lost my laptop with its external back-up
> > drive. At that time, all e-mails were saved directly on the
> > laptop using the AOL software program. They were not saved
> > on the "AOL Cloud." As a result, all e-mails on my laptop and
> > the external back-up drive were, I believe, irretrievably lost.

The United States District Court for the District of Massachusetts affirmed this Court's
January 9, 2017 decision on September 6, 2017, *see* Fustolo v. The Patriot Grp., LLC, No.
17-CV-10128-LTS, 2017 WL 3896667 (D. Mass. Sept. 6, 2017), but the United States Court
of Appeals for the First Circuit, on July 16, 2018, reversed this Court's order granting the
Motion to Conform.  While concluding that "Fustolo did not receive adequate notice of
an unpleaded claim, and did not provide his implied consent," the First Circuit remanded
for further proceedings. *See* Fustolo v. The Patriot Grp., LLC, 896 F.3d 76, 90 (1st Cir.
2018).

One week after the First Circuit's decision, Patriot, on July 23, 2018, filed a Motion
for Reconsideration of Order in Light of Appellate Decision, seeking relief from the
Court's January 9, 2017 Order deeming moot the counts pled in its Complaint for denial
of the discharge.  The Defendant opposed the Motion.  On September 6, 2018, this Court
entered an order treating Patriot's Motion as a "Motion for Clarification of the
Memorandum and Order dated January 9, 2017 (Doc. Nos. 323 and 324) (jointly, the
"Rulings") as no reconsideration or relief from the Rulings with respect to Counts I
through V and VIII in the Plaintiff's Complaint is warranted under Fed. R. Civ. P. 59 or
Fed. R. Civ. P. 60(b), made applicable hereto by Fed. R. Bankr. P. 9023 and Fed. R. Bankr.
P. 9024, respectively."  This Court stated:

> The Court clarifies that it did not, and did not intend to, dismiss, dispose
> of, or adjudicate the remaining counts of the Plaintiff's Complaint, namely
> Counts I through V and VIII (the "Remaining Counts") through the
> Rulings. Rather, the Court merely determined that it was unnecessary to

---

563 B.R. at 97-98.

adjudicate the Remaining Counts as to do so would be superfluous because the Court entered judgment in favor of the Plaintiff on the added claim under 11 U.S.C. § 727(a)(6) pursuant to the Plaintiff's Motion to Conform the Pleadings to the Evidence (Doc. No. 308). The Court's Rulings that the Remaining Counts were moot reflects the Court's determination that they no longer presented a justiciable controversy because issues involved in their resolution were academic in light of the denial of the Debtor's discharge. *See generally* Black's Law Dictionary 909 (5th ed. 1979). *See e.g.,* JP Morgan Chase Bank v. Koss (In re Koss), 403 B.R. 191, 215 (Bankr. D. Mass. 2009) (after denying the debtor's discharge for false oath under 11 U.S.C. § 727(a)(4)(A), the Court "dismissed as moot" the remaining §§ 523 and 727 counts in the complaint). To the extent the Court is required to "correct" the record, it has authority to do so pursuant to Fed. R. Civ. P. 60(a).

In light of the Opinion issued by the United States Court of Appeals for the First Circuit on July 16, 2018, through which it "REVERSE[D] the bankruptcy court's order and REMAND[ED] for further proceedings consistent with this opinion" and "[took] no position as to the merits of any remaining claims and [left] such further analysis to the bankruptcy court[,]" this Court will adjudicate the Remaining Counts on the merits.

Docket No. 381. Accordingly, as a result of the decision of the United States Court of Appeals for the First Circuit and this Court's order of September 6, 2018, the Court now makes its findings of fact and conclusions of law in accordance with Fed. R. Bankr. P. 7052 with respect to Counts I, II, III, IV, V and VIII of the Complaint.

During the trial, the Court precluded Fustolo from submitting certain evidence. In determining the "Plaintiff's Rule 37 Motion Concerning Defendant Steven C. Fustolo's Spoliation of Purported 'Books and Records' and Late Production of Documents," this Court, on May 18, 2016, entered the following order:

Upon consideration of the Plaintiff's Rule 37 Motion (#196), the Defendant's Objection, the arguments of counsel at the hearing held on May 17, 2016, the Court's orders dated December 31, 2015 and March 17, 2016, the Defendant's failure to comply with the December 31, 2015 order, and the entire record of proceedings in this adversary proceeding, the Court finds

6

that the Defendant has not obeyed a discovery order and that sanctions are warranted under Rule 37(b)(2). The Motion is allowed in part and denied in part. Pursuant to Fed. R. Civ. P. 37(b)(2)(A)(ii), *the Court prohibits the Defendant from introducing at trial any document, whether in electronic or paper form, which was not produced to the Plaintiff prior to the Defendant's deposition as ordered by the Court in the December 31, 2015 order. Moreover, the Defendant is prohibited from introducing into evidence at trial any documents or financial records which were electronically prepared and were produced in printed or paper form to the Plaintiff where the Defendant did not produce those documents in their electronic format, particularly, where certain documents produced contain disclaimers* ("Steven Fustolo takes NO RESPONSIBILITY for the accuracy of the enclosed balance sheet, which he has created solely for the benefit of and as a courtesy to the Chapter 7 trustee, without representation as to its accuracy.") rendering them unreliable. In addition, *the Court prohibits the Defendant from testifying about or introducing any documents which were not produced to the Plaintiff prior to his deposition*, as ordered in the December 31, 2015 order. The Court makes no finding with respect to whether the Defendant intentionally spoliated his electronic books and records.[4]

(emphasis supplied).

---

[4] On June 22, 2016, Fustolo filed a motion to vacate the May 18, 2016 order. On June 23, 2016, during the trial, this Court ruled on that motion as follows:

> I did admit into evidence the 1099s which were referenced by Mr. Fencer in his testimony as produced. These are 1099s of the debtor's royalty income. And consistent with that decision, I intend to allow into evidence any documents produced to Patriot before Mr. Fustolo's deposition, which were produced and obtained by Mr. Fencer from third parties in paper format only. I intend to exclude documents generated by Mr. Fustolo consistent with the May 18th order where the paper document was produced to Patriot, but where electronic versions were not produced to Patriot. For the reasons that Mr. Siegal stated in his argument, the absence of the electronic versions of such generated documents precludes the plaintiff from verifying the time of the document and its integrity. So that's my order on the motion to vacate.

Trial Transcript, June 23, 2016, p. 88.

## II. BACKGROUND

As evident from the procedural matters set forth above, the Debtor's Chapter 7

case and this adversary proceeding have been marked by contention between the Debtor

and Patriot.  Indeed, the Debtor's bankruptcy case was commenced by the filing of an

involuntary petition by Patton Drive, Patriot, and Richard Mayer on May 6, 2013, which

the Debtor vigorously contested.  On December 16, 2013, this Court, in ruling on cross-

motions for summary judgment, refused to dismiss the involuntary petition and entered

an order for relief.  *See* In re Fustolo, 503 B.R. 206 (Bankr. D. Mass. 2013), *aff'd,* 2015 WL

4876075 (D. Mass. Feb. 17, 2015), *aff'd,* 816 F.3d 1 (1st Cir. 2016).

On January 17, 2014, Fustolo filed sworn Schedules, a Statement of Financial

Affairs and other required documents.  On August 14, 2014, he filed amended Schedules

B, D, F, and H and an amended Statement of Financial Affairs.  On Amended Schedule

B–Personal Property, he listed a "Possible whistleblower recovery" with an unknown

value.  Throughout the course of this litigation, the so-called "Whistleblower Claims"

have been a shorthand reference to claims against Patriot which Fustolo asserts he made

to the Internal Revenue Service ("IRS") and the Securities and Exchange Commission

("SEC") based upon what he states in his Post-Trial Memorandum, was a "reasonable

belief that there had been a possible violation by Patriot of federal tax law and provisions

of the Securities and Exchange Commission statute."[5]

---

[5] The Plaintiff submitted, as an exhibit, copies of the Debtor's Schedules and Statement of
Financial Affairs filed on January 17, 2014, as well as the amended Schedules and
Statement of Financial Affairs filed on August 14, 2014. Moreover, as noted in LeBlanc v.

As noted above, Patriot and Patton Drive filed a Complaint against Fustolo on September 30, 2014. The Court summarized their allegations in <u>In re Fustolo</u>, 2015 WL 9595421 at *2–3. On November 13, 2014, the Court issued a Pretrial Order (the "Pretrial Order") which, among other things, provided deadlines for the completion of discovery and for filing a Joint Pretrial Memorandum. The discovery process in this proceeding was lengthy, complex, and contentious. The Court conducted several hearings on the parties' discovery disputes and extended the Pretrial Order deadlines on several occasions. On March 17, 2016, the Court expedited the trial date as a sanction against Fustolo pursuant to Fed. R. Civ. P. 37 for his failure to comply with the Court's December 31st Order concerning the production of documents, some of which Fustolo claimed were privileged under the Fifth Amendment to the United States Constitution.

On remand, the remaining six counts of the Complaint are now before the Court for determination. The Court now makes the following findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## III. FACTS

### A. <u>Stipulated Facts</u>

On May 19, 2016, the parties filed their Joint Pretrial Memorandum in which they stipulated to the admissibility of certain facts, including the following, which the Court paraphrases. Fustolo is an individual who resides in Winchester, Massachusetts and is married to Elisa Fustolo ("Mrs. Fustolo"). He holds a BS degree in accounting from

---

Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir. 1999), "The bankruptcy court appropriately took judicial notice of its own docket."

Bentley College and an MBA from Babson College, and has been a Certified Public Accountant and professional tax advisor since the early 1980s.  At all relevant times to this action, Fustolo operated a seminar business, which he organized and at which he teaches, that provides continuing professional education courses geared toward CPAs, attorneys, and other tax and accounting professionals. Fustolo also provides written educational materials to publishers of continuing education treatises and pamphlets.

In March 2007, Fustolo, through business entities he owned and controlled, was seeking to develop property located on Revere Beach Boulevard (the "Revere Beach Property").  On March 29, 2007, Revere Beach Holdings LLC borrowed $12.7 million from Patriot.  The note evidencing the debt was secured by a mortgage lien upon the Revere Beach Property.  Fustolo personally guarantied the debt.  From April of 2007 through August of 2008, Revere Beach Holdings LLC paid Patriot $450,000.00.  On or around September 2008, Revere Beach Holdings LLC defaulted on the Patriot loan and made no further payments to Patriot.  The loan matured on December 31, 2008.[6]  On April 30, 2010, Patriot conducted a public foreclosure sale of the Revere Beach Property. At the foreclosure sale, Affinity Investments, LLC ("Affinity"), an entity formed and controlled by Fustolo, submitted the high bid of $5.2 million for the Revere Beach Property, tendered a $50,000.00 deposit, and executed a sale agreement.  Thereafter, Affinity failed to

---

[6] The Court takes judicial notice that Revere Beach Holdings LLC commenced a Chapter 11 case on January 26, 2010.  Represented by Attorney Frank Kirby, the debtor and Patriot entered into a stipulation with respect to the motion for relief from the automatic stay filed by Patriot.  The debtor's case was dismissed after four months when the court granted a motion to dismiss filed by the U.S. trustee.

consummate the sale and defaulted on the sale agreement. Patriot retained the $50,000.00 deposit and, thereafter, obtained a default judgment against Affinity in a lawsuit it commenced in Suffolk Superior Court.  On April 14, 2011, Patriot conducted a second foreclosure sale at which it was the successful bidder, paying $1.7 million for the Revere Beach Property.

By document recorded on July 22, 2015, Patriot assigned its bid to Patriot Revere Beach, LLC.  John Howe ("Howe") signed the Certificate of Organization of Patriot Revere Beach, LLC as its manager.  Patriot Revere Beach, LLC sold the Revere Beach Property in September of 2015 for $4.5 million.

On May 27, 2011, the Middlesex Superior Court, Department of the Massachusetts Trial Court entered a judgment for Patriot against Fustolo in the amount of $20.5 million as a result of Revere Beach Holdings LLC's default and Fustolo's guaranty of the Patriot loan (the "Judgment").[7]  On October 4, 2011 and February 14, 2012, Patriot, by and through its counsel, deposed Fustolo in furtherance of Patriot's efforts to collect on the Judgment.  On April 18, 2012, the Superior Court issued a permanent injunction, discussed in detail below, with respect to assets of reach and apply defendants.  Less than three weeks later, on May 6, 2013, Patriot and two other creditors filed the involuntary petition against Fustolo.  As noted above, on December 16, 2013, this Court entered an order for relief.  During the so-called "gap period" between the petition date of May 6,

---

[7] Fustolo testified that the complaint filed by Patriot against him in the Middlesex Superior Court contained no allegations of fraud or misrepresentation.

2013 and December 16, 2013, no party sought injunctive relief or the appointment of a

trustee.

      B. <u>Facts Adduced at Trial</u>

            1. The Debtor's Schedules and Statement of Financial Affairs ("SOFA")

      The Debtor executed his Schedules and SOFA under penalty of perjury, attesting

that he read them and that the information he supplied to complete them was true and

correct to the best of his knowledge, information, and belief.   On Schedule A-Real

Property, the Debtor listed his residence in Winchester, Massachusetts, which he and

Mrs. Fustolo own as tenants by the entirety, fee simple interests in five condominium

units (units 11, 12, 13, 14, and 15), located on Salem Street in Boston, Massachusetts, and

a condominium unit located at 500 Ocean Street, Hyannis, Massachusetts.   On both his

original and amended Schedule B-Personal Property, he listed three bank accounts at

Bank of America ending in 1461, 3923, and 9490.[8]   He also listed accounts receivable for

"shareholder loans" as follows:

      50 Thomas Patton Drive LLC Management fees
      $79,013 gross amount due - potential offset

      Shareholder's loan to National Tax Institute
      ($1,045,429 gross amount – uncollectable [sic])

      Shareholder's loan to CPE Meetings Inc.

---

[8] The Debtor's expert witness concluded that the Debtor owned an account at Belmont Savings Bank ending in 1750. The Debtor did not include that account on his original Schedule B, and he did not amend Schedule B to include that bank account either on August 14, 2014 or at any other time.  Two tables setting forth the personal bank accounts of the Fustolos and those belonging to Fustolo's business entities are set forth below in Part III. B. 7.i.

$355,530 gross amount – uncollectable [sic]

Shareholder's loan to Ocean Club Condominium
LLC
$6,157,749 gross amount – uncollectable [sic]

Shareholder's loan to Huntington Properties Inc.
$318,271 gross amount – uncollectable [sic]

Shareholder's loan to Huntington Properties
Holdings LLC
$1,864,000 gross amount – uncollectable [sic][9]

In addition, on Schedule B, in response to question 13 relating to stocks and interests in incorporated and unincorporated businesses, the Debtor listed numerous stocks and interests in incorporated and unincorporated businesses.  Except for Terrace Hall Partners LLC (33% interest), Atlas Garden Supply, LLC (50% interest), James J. Fox & Company (35% interest) and Prospective Hill Partners LLC (12% interest),[10] the Debtor represented that he owned one hundred percent of the interests or stock in the following entities:  Huntington Properties Inc., Revere Beach Properties, Inc. (100% owned by Huntington Properties Inc.), CPE Meetings Inc., National Tax Institute, Inc., Property Trust Corporation, and the 32 Park Vale Avenue Trust.  According to the Debtor, the 32 Park Vale Avenue Trust, in turn, owned 100% of the following entities:  5 High Street, LLC, 7 Stillman Place LLC, 11 Sheafe Street, LLC, 23 Margaret Street LLC, 23-25 Highland

---

[9] The "shareholder loans" totaled approximately $9.7 million although some of the loans were made to limited liability companies.

[10] On his amended Schedule B, filed on August 14, 2014, the Debtor added a 50% shareholder interest in "D&S Realty Corp. (manager of property located in St. Croix, Virgin Islands)," as well as the "Possible whistleblower recovery."

Avenue LLC, 34 Cooper Street LLC, 65 North Margin Street LLC, 101 Prince Street, LLC,

115 Salem Street Realty LLC, 116 Marlborough Properties, LLC, 128 Marlborough Street

LLC, 128 Marlborough Street Parking, LLC, 135-137 Salem Street LLC, 162 Salem Street,

LLC, Fustolo Development LLC, Fustolo Properties LLC, New Sheafe Street Realty LLC,

North Margin Street Development LLC, The Ocean Club Condominium LLC, Ocean GP

LLC, Revere Beach Holdings LLC, Excelsior Holdings Group LLC, which owned NTI

LLC and Conference Meeting Planners, LLC, Affinity Investments, LLC (99% interest),

Huntington Properties Holding Company LLC, and the "Steve [sic] C. Fustolo Revocable

Trust."  The Debtor also disclosed on amended Schedule B the following:

> All entities owned by the [32 Park Vale Avenue] Trust excepting New
> Sheafe Realty, LLC [sic] and Excelsior Holdings Group, LLC [sic] and
> subsidiaries were dissolved by the Secretary of State in either 2009 or 2011.
> None are believed to have any value for the member other than perhaps 65
> North Margin Street LLC, whose only asset is a bank account.

Thus, the status of the Steve C. Fustolo Revocable Trust is unclear based upon the

Debtor's statement on Schedule B, as a revocable trust would not be subject to dissolution

by the Secretary of State.  The Debtor also disclosed that the 32 Park Vale Avenue Trust

had "a 1/3 joint venture interest in stones." The Debtor indicated that the value of his

interest in that venture was "Unknown."[11]

---

[11] At this juncture, the Court observes that the names of the various entities in which the
Debtor held interests are similar in many instances (e.g., 115 Salem Street Realty LLC,
135-137 Salem Street LLC, and 162 Salem Street, LLC).  The Court has endeavored to refer
to the various entities in the same manner as the Debtor on Schedule B, although the
parties and expert witnesses were not consistent in how they referred to the entities, in
particular including or omitting commas before the terms "LLC" or "Inc."  The Court
shall not assume, for example, that the Steve C. Fustolo Revocable Trust is the same entity
as the Steven C. Fustolo 2004 Revocable Trust about which the Debtor testified at trial.

On Schedule D-Creditors Holding Secured Claims, the Debtor listed obligations on a number of mortgages encumbering property located at 5 High Street, Medford, Massachusetts, although he listed 5 High Street, LLC as being solely owned by the 32 Park Vale Avenue Trust. On Schedule F-Creditors Holding Nonpriority Claims, the Debtor listed credit card debts in excess of $139,000.00 owed to two creditors, as well as numerous other creditors, many with claims which he listed as being in "unknown" amounts. He listed total unsecured debt of approximately $29 million, including Patriot's claim.[12] On Schedule H-Codebtors, the Debtor listed a number of his incorporated and unincorporated businesses as co-debtors.

On Schedule I: Your Income, the Debtor listed James J. Fox & Company LLP as his employer. He listed his monthly income in the amount of $16,918.00. In an Addendum to Schedule I, the Debtor specifically referenced "Attachment 1: Additional Notes," stating: "All earned income is based upon the 2012 Tax Return." Thus, the Debtor attached to Schedule I a summary of his monthly income, including statements of business income and expenses for 1) James J. Fox & Company LLP, 2) "Lectures/ writing," 3) Director's fees, 4) Atlas Garden Supply LLC, and 5) "National Tax Institute/ and CPE Meetings," as well as Rental Income (Losses) for Terrace Hall Partners LLC and other entities owned by the 32 Park Vale Avenue Trust. He also listed income and losses for Mrs. Fustolo, including her monthly income of $792.00 from her psychotherapy

---

[12] The Debtor failed to fully complete Schedule F as he did not disclose the date the claims were incurred, the consideration for the claims, or whether any of the claims were subject to setoff.

practice and ($378.00) in rent for 135-137 Salem Street, Boston.   According to the information provided by the Debtor, his total net monthly income of $16,918.00 was derived from income of $3,752.00 from James J. Fox & Company LLP, $15,745.00 from Lectures/writing, $417.00 from Director's fees, and $1,057.00 from Atlas Garden Supply, LLC.  He reported a loss of $623.00 for National Tax Institute/CPE Meetings, as well as losses from his rental income stream of $3,430.00.  Income attributable to Mrs. Fustolo equaled $414.00 after netting the loss from her rental property.

The attachments to Schedule I include statements of gross income comprised of the following, which the Court has compared with the income determined by the Debtor's expert, Kimberley A. Train ("Train"):

|  | Schedule I | Train |
|---|---|---|
| Lecture/writing | $200,435.00 | $ 16,800.00 |
| Directorship | $ 5,000.00 | $ 5,000.00 |
| Royalties |  | $183,635.84 |
| 135 Salem Street - Rents | $56,400.00 | $ 33,275.00 |
| 115 Salem Street - Rents | $27,600.00 + $91,424.00 | $ 91,424.00 |
| James J. Fox & Company LLP - Distribution | $45,029.00 | $ 55,600.00 |
| Atlas Garden Supply LLC - Distribution | $12,687.00 | $ 13,250.00 |
| Miscellaneous - Other | $246,309.00 | $ 19,500.00 |
|  | $684,884.00 | $418,484.84 |

The Debtor did not separately report royalty income on his statements attached to Schedule I.   In addition, he reported two sources of gross income related to 115 Salem Street on  his statement attached to Schedule I and reported $246,309.00 related to 5 High Street, LLC, which he represented was owned by the 32 Park Vale Avenue Trust and which the Court has included in the "miscellaneous" category employed by Train for ease of reference.

16

On Schedule J: Your Expenses, the Debtor listed no dependents and total monthly expenses of $20,322.00.  Those monthly expenses included $2,861.00 for "[E]ntertainment, clubs, recreation, newspapers, magazines, and books" and "other" expenses of $2,560.00, comprised of the following:  $500.00 for Education courses; $486.00 for Holiday and special events; $500.00 for "Misc professional fees;" $201.00 for Supplies; $173.00 for Computer/internet; and $700.00 for "CPE Meetings: Internet and email costs."

On his SOFA, the Debtor disclosed the following in response to Question 10, "Other transfers":

a. List all other property, other than property transferred in the ordinary course of the business or financial affairs of the debtor, transferred either absolutely or as security within two years immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|
| Debtor: Elisa Fustolo | 12/2012 | Funds towards the purchase of a replacement vehicle |
| Relationship to Debtor: Wife | | Value: Unknown |

In response to the instruction to "List all property transferred by the debtor within ten years immediately preceding the commencement of this case to a self-settled trust or similar device of which the debtor is a beneficiary," the Debtor stated "Debtor has numerous LLC's and Trusts as listed on Sch B [sic] and has transferred money into the business entities."  He did not list the dates of the transfers, simply stating: "Various,"

and he did not reveal, as required,  "AMOUNT OF MONEY OR DESCRIPTION AND VALUE

OF PROPERTY OR DEBTOR'S INTEREST IN PROPERTY."[13]

In response to question 18 on the SOFA, relating to "Nature, location and name of

business," which the Debtor amended on August 14, 2014, to disclose a 50% ownership

interest in D & S Realty Corp., a manager of property located on St. Croix in the U.S.

Virgin Islands, the Debtor did not list Fustolo CPE, LLC, which appears to have been

formed after May 6, 2013.  The primary purpose of the August 14, 2014 amendment was

to list on Schedule B, "Possible Whistleblower recovery" with an unknown value.

2. Testimony of John Howe

Howe, a principal of the Plaintiff, testified that he is employed by an asset

management company he founded and directs by the name of Old Hill Partners, an

affiliate of Patriot, located in Darien, Connecticut.  He also testified that Old Hill Partners

is in the business of lending money, "like a non-bank bank."  Howe founded Patriot in

2002, testifying that he "spun it off" in 2005.  Nevertheless, he indicated that he was asked

to resume management of Patriot as "non-executive chairman" in 2008 during the

financial crisis.

Howe testified that Patriot made a short term, high interest rate loan to Revere

Beach Holdings LLC in 2007, although he was not managing Patriot at the time the loan

was made.  The Secured Promissory Note, dated March 29, 2007, was in the principal

amount of $12,700,000.00 and had a maturity date of December 28, 2007 and an interest

---

[13] *See* note 9, *supra.*

rate of 14% per annum.  Howe testified that the loan matured and was in default in 2008,

before he resumed management of Patriot.  According to Howe, Patriot, mindful of the

financial crisis of 2008, attempted to negotiate with Fustolo and, indeed, executed a Loan

Modification Agreement with him on September 18, 2008.

Howe testified that he first met Fustolo at the law offices of Mintz, Levin, Cohn,

Ferris, Glovsky and Popeo, P.C. after the default when he was attempting to work out

the loan.  He testified that Patriot's settlement offer to Fustolo was "You give us back

the property and we'll let you out of your personal guarantee [sic]."[14]  According to

Howe, despite the offer and "[a] lot of good talk," nothing came of the settlement

discussions.  Howe added that Fustolo "kept promising to pay back the loan," saying

he had ways to do it.  Howe also testified that Fustolo communicated with Patriot's Dan

Harrington, whose management duties at Patriot coincided with his for a period of time

in 2008 and 2009.[15]  As a result of those discussions, Patriot took no steps to collect the

---

[14] Fustolo denied that Howe offered to waive the guaranty.

[15] Fustolo testified:

> [A]t that juncture through all of '09 I was in touch with Patriot Group, Dan
> Harrington on a – pretty basically a weekly basis. And not John Howe.
> John Howe I met with once at Mintz Levin in December of 2008 with Dan Gaquin
> at Mintz Levin, the three of us. Riemer & Braunstein wasn't even involved,
> despite Mr. Howe's testimony. So the whole goal of that project was to try
> to get it refinanced in an impossible market. The market had died and there
> was just no market. There's all there is to it.

Fustolo also testified extensively about his efforts to obtain financing for the Revere
Beach Property in 2008 and 2009, identifying "Prosperity International" and its
principal, Barry Funt, as a potential source of funding suggested by Patriot.

19

loan in 2009 and 2010. Howe testified that, absent Fustolo's representations that he would refinance the loan, Patriot would not have agreed to forbear from commencing foreclosure proceedings. According to Howe, he relied upon Fustolo's representations, causing Patriot to forbear from pursuing its rights under the loan documents and that Patriot was harmed by the delay in pursuing its rights owing to the accrual of unpaid real estate taxes and legal fees.[16] Specifically, Howe indicated that Patriot was harmed by the delays which resulted in carrying costs of between $40,000.00 and $50,000.00 and "over $100,000" in legal fees.

In 2010, Patriot commenced litigation against Fustolo and certain reach and apply defendants[17] because Howe concluded that Fustolo would not be able to refinance the loan or service the debt. On May 26, 2011, the Superior Court issued a judgment against Fustolo "in the amount of $20,423,216. 44, plus interest on the principal sum at the contract rate of nineteen (19%) [sic] from April 25, 2011," pursuant to count I of Patriot's state court verified complaint. On April 18, 2012, Patriot obtained a final judgment

---

[16] According to Fustolo, he was working "with a group after the financial market collapsed in late '08 and my -- the Prosperity loan, which was what we were really focusing on with Mintz Levin, fell apart, 160 million. I was out trying to get financing, desperately trying to get financing and I got a group who had some funding. I think it was out of Europe or Asia and they seemed very, very viable. They were on the phone with Patriot Group and my other lenders and I thought they were for real." He later admitted that he was attempting to obtain financing from a "hard money" lender.

[17] The reach and apply defendants, as named in the complaint, were "James J Fox & Company LLP, National Tax Institute, Inc., CPE Meetings, Inc., Terrace Hall Partners, LLC, Five High Street, LLC, Huntington Properties, Inc., Property Trust Corporation, Huntington Properties Holding Company, L.L.C., 23-25 Highland Avenue, LLC, Fustolo Development LLC and Atlas Garden Supply LLC."

against the reach and apply defendants in the same action, as well as a permanent

injunction that restrained and enjoined Fustolo and the reach and apply defendants from

making transfers as follows:

> . . . Steven Fustolo and his respective managers, agents, members, partners,
> nominees, representatives, servants, employees, attorneys, and all people
> in active concert or participation with him are permanently restrained and
> enjoined from directly or indirectly assigning, alienating, selling
> transferring, pledging, encumbering, concealing or in any other manner,
> disposing of, diminishing, dissipating, re-directing, or otherwise
> instructing the re-direction and/or dissipation of any and all intangible
> properties received by Steven C. Fustolo from the Reach and Apply
> Defendants, except to pay ordinary living expenses for mortgage, food and
> the like, **not to exceed $84,000 per year or a cumulative average of $7,000
> per month,** to be documented to the Plaintiff on an annual basis, and to pay
> ordinary operating expenses for the operation of the Reach and Apply
> Defendants, including but not limited to real estate taxes, utilities,
> insurance premiums, payroll (excluding Steven C. Fustolo), payroll taxes,
> occupancy costs, and supplies, or as otherwise directed by this Court and
> from paying any monies directly or indirectly to any other person or entity
> created or controlled by Steven C. Fustolo.

(emphasis in original).[18]    According to Howe, Fustolo did not provide Patriot with

annual reports, although the involuntary petition was filed approximately three weeks

after the initial annual report was due, thus staying the state court action against

Fustolo. Fustolo's expert witness, Train, documented disbursements from multiple

bank accounts belonging to the Fustolos personally between May 7, 2012 and December

31, 2013, totaling $449,518.47, including disbursements to Woodland Golf Club totaling

$21,400.00, transfers of $42,000.00 relating to the acquisition of gemstones, and

$37,673.93 in cash withdrawals.  Thus, the Fustolos' disbursements, which were enabled

---

[18] Mrs. Fustolo was not a party to the Superior Court action.

by income generated by Fustolo, as Mrs. Fustolo's income was less than $13,000.00 per year, far exceeded the $84,000.00 cap imposed by the Superior Court. The Debtor did not document the source of the deposits into the various accounts belonging to him and his spouse. Accordingly, it is unclear whether the disbursements in excess of $84,000.00 were from income obtained from the reach and apply defendants or from other sources.

Howe testified that Patriot commenced foreclosure proceedings and conducted a public auction at which Affinity was the winning bidder. After Affinity defaulted, Howe testified that he learned that Fustolo was the owner of Affinity.

Howe testified that the filing of the involuntary petition against Fustolo was "a last resort," adding that Patriot also obtained a default judgment on January 20, 2011 against Affinity in the sum of $5,150,000.00 plus interest from June 8, 2010 to January 10, 2011 in the sum of $363,933.32, all of which remains uncollected.

With respect to the Whistleblower Claims, which Fustolo set forth on his amended Schedule B, Howe testified that at no time prior to May of 2014 was he aware of any potential claims against Patriot relating to tax fraud or securities laws violations. He also denied being informed by anyone of any such claims. Howe was presented with a letter, dated May 9, 2014, from an attorney, Bruce W. Edmands, Esq. ("Attorney Edmands"), who represented Fustolo, which letter was directed to Patriot's attorney at the time, Michael J. Fencer, Esq. ("Attorney Fencer").[19] In the letter, Attorney Edmands stated, in pertinent part, the following:

---

[19] Fustolo amended Schedule B on August 14, 2014, approximately three months later.

Having previously informed a Patriot representative of his intention to notify the Internal Revenue Service of Patriot's alleged tax fraud, Mr. Fustolo has come to believe and now alleges that Patriot and its principal, John Howe, abused and will continue to abuse the bankruptcy proceedings as a means to retaliate against him for reporting Patriot's tax violations.

 . . . Mr. Fustolo alleges that with advance knowledge of Mr. Fustolo's pending IRS filings, Patriot and John Howe, personally, embarked on a campaign to harass and intimidate him and destroy his reputation by filing a petition for involuntary bankruptcy under Section 303(b) of the Bankruptcy Code. In doing so, Patriot also conspired with two other creditors whom you represent, 50 Thomas Patton Drive, LLC and Richard Mayer, who joined Patriot in filing the involuntary bankruptcy petition which is currently pending against Mr. Fustolo in the United States Bankruptcy Court in Massachusetts.

<div align="center">***</div>

As all three petitioners in the involuntary bankruptcy are represented by the same law firm, the knowledge and actions of each are chargeable to the others. The facts in this case clearly support an inference that all three petitioners entered into a conspiracy for the principal purpose of subjecting Mr. Fustolo to the embarrassment, inconvenience, emotional stress, and harassment of bankruptcy proceedings. As jointly represented, all the participants have acted with actual or constructive knowledge that (l) Patton Drive's monetary claim is vastly inflated, (2) Mr. Schorer harbors a strong personal animosity against Mr. Fustolo, (3) Patriot conducted exhaustive post-judgment discovery efforts that failed to identify any assets with which Mr. Fustolo could satisfy a judgment and that it is unlikely that the bankruptcy trustee will be able to benefit creditors, and (4) Mr. Fustolo had previously disclosed to Patriot his intention to report Patriot's tax fraud to the Internal Revenue Service.

These facts demonstrate that Patriot, in collusion with the other petitioners, their principals and their agents, has been and continues to be in violation of several federal and state anti-retaliation provisions of whistleblower statutes for which Mr. Fustolo may be entitled to damages and other forms of redress from all the petitioners, their principals and agents.

Patriot's fraudulent tax filings also constitute violations of cognizable SEC filing requirements. As a result of his IRS and SEC filings, Mr. Fustolo is entitled to protection against further retaliation by Patriot and its co-conspirators. You and your clients are, therefore, on notice that Mr. Fustolo

will pursue all available remedies in response to any continuing or further
acts of retaliation or harassment.

Howe denied that Patriot ever submitted a fraudulent tax filing, adding that it has never

been investigated by the IRS or the SEC.  He also testified that Patriot was not contacted

by the IRS or the SEC regarding any possible Whistleblower Claims.

Howe further testified that both he and Patriot were the subject of negative articles

posted on the internet and that he first learned about the articles in mid-to-late August of

2014.  Howe revealed that the articles "talked about us having SEC and IRS problems,

which is pretty much the death knell of a firm like ours," adding that because Patriot's

business was based upon trust, if investors could not trust the company they would no

longer invest in it.  Howe concluded that Fustolo was responsible for the articles because

"he was the only one with motivation."

As a result of the negative internet posts, Patriot commenced an action in Florida

and obtained, by agreement, a permanent injunction against Fustolo.  The injunction

against Fustolo, issued by Circuit Judge Virginia B. Norton of the Fourth Judicial Circuit

for Duval County, Florida on April 14, 2015, provided that Fustolo would take all

reasonable actions necessary to contact 39 websites and request that each website remove

the "Statements" contained on 290 URLs identified in the injunction.  In addition, Fustolo

was required to take all reasonable actions necessary to contact internet search engines,

Google, Microsoft, Bing, Yahoo, and Search, and request that each search engine remove

the URLs on the 290 sites referenced in the injunction.

### 3. The Testimony of Kim Hopkins

Kim Hopkins ("Hopkins") testified that, since 2011, she has been employed by Old Hill Partners, an affiliate of Patriot, as a paralegal, working on compliance issues as well as serving as an executive assistant to Howe.  She stated: "I do a lot of legal research on the internet and other sort[s] of research depending on deals and other things and I had a -- a lot to do with tracking the internet negative campaign against us."  She also indicated that she worked with outside counsel and was a notary.

Hopkins testified about a so-called "Wayback Machine," which she described as "a non-profit in San Francisco called archive.org, and they [sic] create a library of the internet, so to speak, with snapshots of websites over time. And they [sic] have a function in that website called the Wayback Machine where you can search any URL and get a snapshot [of a website]."  After testing the function with Patriot's websites, which she created and for which she was responsible, she looked at Fustolo's old companies "right around the time after we filed the petition and then I looked at his new company this year to see if they were the same because we contend that it's the same business, a continuation." Specifically, she examined "nti-inc.com" for 2012 and 2013, as well as Fustolo CPE, LLC.  She explained the procedure as follows:

> [W]hen you punch in the URL it comes up and says there's hits and it gives you all the years.  And then you can click on -- it has a green dot over the date that they have captured that website and you can click on it.  When you click on it, it opens the website as of that day. And you can click on the links and it will give you the links as of that moment in time.

Hopkins testified that she was tasked with monitoring internet content concerning Howe and Patriot.  She provided the following chronology:

In August 2014, we subpoenaed Mr. Fustolo's bank records since we had
gotten no other documents. And right after that happened, the first negative
internet posting showed up on the internet. In September --mid-September
we subpoenaed his [Fustolo's] attorney, Mr. Edmands, who had sent us --
our attorney the letter, saying that he was a whistleblower and the very next
day, another posting showed up.  And then on September 30th, we filed
this action and from there on it was a proliferation of postings.

With respect to the permanent injunction against Fustolo entered by Judge Norton

of the Fourth Judicial Circuit on April 14, 2015, which referenced 290 URLs, Hopkins

testified that she saw the content, catalogued it, and provided the list for the injunction

to the attorneys involved in the litigation.

Prior to the entry of the permanent injunction, Patriot and Fustolo executed a

Forbearance Agreement, which was conditioned upon Fustolo's execution of an agreed

permanent injunction.  The Forbearance Agreement provided the following:

Nothing in the Agreement or the Permanent Injunction is intended as, shall
constitute, or be used as evidence of an admission by any Party of any
wrongdoing, liability, or fault, a waiver of any right or defense, an estoppel,
or an admission as to any matter of law or fact, either as among the Parties
or with respect to any person or entity not a Party to this Agreement.

Hopkins testified that the agreement was executed to stop Fustolo from posting negative

content on the internet and to cause him to take down the existing content.  In her words:

"Mr. Fustolo was never going to admit what he did and we needed to get the content

down."

### 4. The Defendant's Testimony

Fustolo testified that he has been a certified public accountant for more than 30

years and is a partner in the accounting firm of James J. Fox & Company LLP.  In addition

to auditing and tax work, Fustolo testified that he has an MBA, has lectured on

accounting and tax issues, and has written several books and articles on the subject of accounting.  He also stated that he has owned and continues to own many businesses, as well as real property.  Fustolo testified that he has operated his seminar business since the 1990s.  Additionally, he serves on the board of directors of several companies.

Fustolo testified about his attempts to refinance the Patriot loan in 2009, explaining that he discussed refinancing the Revere Beach Property with several lenders including Prosperity International. With respect to the foreclosure sale of the Revere Beach Property, Fustolo admitted that he did not disclose to Patriot his ownership interest in Affinity, the successful bidder at the foreclosure sale, and he admitted that Affinity had no assets other than "Just the -- just the efforts to obtain financing." He also admitted that neither he nor Affinity had the funds to finalize the sale and that neither he nor Affinity had satisfied the respective judgments entered against them.

When asked about the final judgment entered on May 27, 2011 and the permanent injunction entered by the Middlesex Superior Court on April 18, 2012, reproduced above, Fustolo testified that he understood that the $84,000.00 cap on his annual income only applied to income received by way of disbursements from the reach and apply defendants and that he was not precluded from collecting income from other sources that would result in personal income exceeding $84,000.00.  He admitted, however, that he never documented his ordinary living expenses to Patriot as required by the terms of the preliminary injunction.

With respect to the entities he listed on amended Schedule B, Fustolo conceded that for the entities which he exclusively owned, he controlled their assets and bank

27

accounts and "had the authority and could make the decision to take money out of these companies at any time." In addition, he testified that the income earned by the entities listed on Schedule B flowed through him personally and that he took money from them whenever he saw fit.

Fustolo testified that CPE Meetings Inc. and National Tax Institute, Inc. were entities that were part of his seminar business and that the 32 Park Vale Avenue Trust held interests in numerous LLCs that he operated over the years "for my -- primarily my real estate, either my real estate development or my real estate rental businesses that were held in single-member LLCs."

### a. The Debtor's Books and Records

Fustolo ascribed no value to any of the entities listed on Schedule B, except for Terrance Hall Partners LLC ($2,188), Prospective Hill Limited Partnership in which he held a 12% interest ($5,000+/-), 65 North Margin Street LLC ($25), and the Steven C. Fustolo Revocable Trust ($2,574).[20]  He testified that he determined those values using

---

[20] With respect to National Tax Institute, Inc. and CPE Meetings Inc., Fustolo testified:

> Even CPE Meetings had a bank account with not a significant amount of money in it, what it had was sizeable liabilities, several hundred thousand dollars of liabilities plus litiga -- plus judgments against it from several hotels, one of which was -- is a creditor in this claim [sic]. The Wyn [sic] Hotels for $30,000 had a judgment against CPE Meetings. So the net stock value is clearly zero. It was grossly under water at that entity [sic].

With respect to National Tax Institute, Inc., he testified that it had $1.6 million in debts owed to hotels.  Nevertheless, on Schedule J, the Debtor reported distributing $700.00 to CPE Meetings, Inc. for internet and email costs.

"trial balances" and tax returns that he stated were submitted to the Trustee, adding that

he also had contemporaneously kept records for the entities.  He qualified that statement

by adding "contemporaneous generally means, for tax purposes all books and records

created up to the point of the preparation and submission of the tax return."  He also

stated: "The sole purpose for my books and records is to prepare tax returns."  Fustolo

admitted that he did not use QuickBooks and did not have a general ledger or an income

statement for Huntington Properties Holding Company LLC or his other businesses,

emphasizing that the "adjusted trial balance had the income statement on it."

On cross-examination, Fustolo expressed the view that contemporaneously kept

records were unnecessary, referencing, without explication, section 170 of the Internal

Revenue Code.  He testified that he kept his financial records on Excel spreadsheets,

which were not produced or which he was not permitted to introduce into evidence.[21]

He added:  "[t]here's no need to use a general ledger if --if you're a cash basis taxpayer.

The only activity you have is cash receipts, cash disbursements and maybe depreciation

entry from time to time. So the adjusted trial balance is a *de facto* general ledger."  Fustolo

testified that he recalled providing Patriot's former counsel and the Chapter 7 Trustee

with "a .pdf . . . [of] . . . the adjusted trial balances, cash receipts, cash disbursements,

journals for the various active entities. The entities who were active, including National

Tax Institute and CPE Meetings for those years." Nevertheless, Fustolo admitted that he

---

[21] *See* the May 18, 2016 order, reproduced above, and note 4, *supra.*

only prepared "trial balances" to facilitate preparation of tax returns, stating "my trial balances and my financial records are created for the sole purpose of filing tax returns."[22]

Fustolo was examined about his response to Question 1 on the SOFA, which requires debtors to "[s]tate the *gross* amount of income the debtor has received from employment, trade, or profession, or from operation of the debtor's business from the beginning of this calendar year to the date the case was commenced.  State also the gross amounts received during the two years immediately preceding the calendar year." (emphasis supplied).  In response to Question 1, the Debtor disclosed the following:

| AMOUNT | SOURCE |
|---|---|
| Current Year (2013) | Unknown (ytd) |
| $0.00 | |
| Previous Year 1 (2012): | |
| $45,029.00 | James J. Fox & Co. (gross) |
| $-15,200.00 | 23 Park Vale Avenue (net) |
| $-7,480.00 | National Tax Institute/CPE Meetings Inc. (net) |
| $-6,580.00 | Terrace Hall Partners LLC (net) |
| $200,435.00 | Lectures/writing (gross) |
| | |
| Previous Year 2 (2011) | |
| $-15,423,518.00 | Joint loss from all activities including NOL |

---

[22] Fustolo did not define or explain what he meant by "trial balances."   According to *Black's Law Dictionary*, a trial balance is defined as:

> In bookkeeping, a listing of debit and credit balances of all ledger accounts. The listing is generally taken at the end of an accounting period to check as to whether all entries have been made in both debit and credit accounts, though such listing need not prove accuracy of accounts if an error has been made in both the debit and credit entry.

> A listing of account balances; all accounts with debit balances are totaled separately from accounts with credit balances. The two totals should be equal.  Trial balances are taken as a partial check of the arithmetic accuracy of the entries previously made.

*Black's Law Dictionary*, 1348-49 (5th ed. 1979).

In response to Question 2 on the SOFA regarding the amount of gross income received other than from employment or operation of a business, the Debtor disclosed the following:

| AMOUNT | SOURCE |
|---|---|
| Current Year (2013) | |
| $0.00 | Unknown (ytd) |
| | |
| Previous Year (2012) | |
| $12,687.00 | Atlas Garden Supply (net) |
| $239,991.00 | Capital Gain |
| $-16,519.00 | Loss from sale of business property |
| $91,424.00 | Rental income from condos (gross) |
| $417.00 | Director's fees (net) |

When asked why he included net income as opposed to gross income as required on both his original and amended SOFAs, which are identical with respect to Questions 1 and 2, Fustolo responded: "I don't know what the instructions say." He added: "I submitted the numbers off the tax return," adding "I followed the advice of my counsel, so I don't know what they defined as gross amount of income."

Fustolo testified that he had no ledgers for the seminar business, or indeed, as noted above, any of the business entities listed on Schedule B, to show revenues. He prepared only trial balances, observing that to ascertain revenues and profits one would have to look at bank statements. In other words, according to Fustolo, there was no way to tell how the businesses were doing at any point in time until a tax return was prepared the following year. Fustolo testified that he produced no electronic records to Patriot for the entities he listed on Schedule B, including the 32 Park Vale Avenue Trust.

Fustolo testified that he had no evidence to contradict an exhibit prepared by Patriot's expert witness, Anne M. Eberhardt ("Eberhardt"), showing that $119,158.30 in cash had been deposited into either his wife's bank accounts or their joint accounts between May 7, 2012 and May 6, 2013.[23]  He referenced a deposit of $12,060.00 into the Citizens Bank account ending in 2999 which he stated was an account held by 135-137 Salem Street LLC, although he admitted that he and his wife would be the only parties depositing money into any of the accounts.  He also admitted that he had no documents that would enable him to trace the source of cash deposits into the accounts he shared with his wife or her accounts.[24]   Nevertheless, based on certain dollar amounts, he testified that he could deduce the source of some funds.  For example, he testified that a deposit of $10,000.00 was a draw from James J. Fox & Company, adding that that was not a recurring deposit.  Similarly, he testified that a cash deposit of $2,900.00 was attributable to his wife's rental property located at 135-137 Salem Street, Boston, Massachusetts, but he indicated that the deposit amount also did not recur monthly.

---

[23] Train calculated that a total of $310,413.15 in cash was deposited into accounts belonging to the Fustolos, individually or jointly, for the 2012 calendar year. Extrapolating from the two reports for the period between May 2012 and December 2012, Eberhardt determined that $99,867.00 in cash deposits were made into the couple's personal accounts from which the total sum of $13,060.00 must be subtracted, as that amount was deposited into an account ending in 2999 at Citizens Bank which was in the name of 135-137 Salem Street LLC.  For the same period, Train, in Exhibit 5 to her report, determined that the total sum of $275,958.00 was deposited into the couple's accounts, including an account at Belmont Savings Bank ending in 1750 in the name of Steven C. Fustolo.

[24] These transfers occurred while Patriot was attempting to collect its judgment.

Fustolo was unable to identify sources of the cash deposits into his accounts but he testified that certain withdrawals related to payments for health insurance premiums to Blue Cross/Blue Shield in the form of cashier's checks. He indicated that he used cashier's checks because he was "running tight on cash." Fustolo did not produce any documents or other evidence to support that claim, merely suggesting that cashier's checks could be confused with cash withdrawals. He testified that if a record of deposits and withdrawals was unnecessary for preparation of tax returns, "it wasn't relevant."[25]

Eberhardt testified about postpetition inflows of revenues, defined and discussed in more detail below, attributable to the seminar business between May 8, 2013 and December 9, 2015. She determined those inflows totaled $1.97 million, in contrast to prepetition inflows between May 7, 2012 and May 6, 2013 of $360,325.56. Fustolo admitted that there were such transactions. In addition, he admitted that it would not surprise him if there were cash deposits into his wife's or their joint accounts postpetition between May 7, 2013 and December 17, 2015 in the amount of approximately $306,000.00 (Plaintiff's Exhibit 24), as well as $55,000.00 into his accounts postpetition between May

---

[25] He explained:

> [T]he reason why a lot of cash was deposited, when I put cash is [sic] I'd cash a check, I'd put it in my bank account, Elisa's bank account or mine, because I needed collected funds. A lot of time that money was put in right before the 15th of the month because I had a mortgage and I didn't want to bounce a Blue Cross check. That's why. I mean, I -- if you look at the cash balances, it's not like I had $25,000 in those accounts. There's $1,000, $2,000, $3,000. So, you know, it was a difficult time for us. So what happened is there's certain items that I -- when I knew they had to be collected --I could not lose my insurance -- I would get cashier's checks from them [sic].

18, 2013 and December 22, 2015 (*see* Plaintiff's Exhibit 25).  The Debtor admitted that he

had no books or records to account for these cash transactions, particularly where he did

not have tax returns or reconciliations for 2014 or 2015.  Similarly, he testified that he had

no books or records, other than bank statements, to account for cash withdrawn from his

wife's account between June 6, 2013 and December 28, 2015 (approximately $64,000.00)

and from his accounts between August 16, 2013 and December 22, 2015 (approximately

$59,000.00) (*see* Plaintiff's Exhibits 26 and 27).

### b. Gemstones

In January 2013, prior to the filing of the involuntary petition, Fustolo was

involved, through a joint venture that was part of the 32 Park Vale Avenue Trust, in the

purchase of uncut gemstones.  He testified that he had a 35% interest in the gemstones,

his father had a 40% interest, and Martin Nahigian had a 25% interest.   Although the

gems cost $100,000.00, Fustolo was not aware of what type of gemstones he purchased

(e.g., diamonds, sapphires, etc.).  On January 23, 2013, Fustolo caused a wire transfer of

$9,000.00 to be made from a Citizens Bank account ending in 2980 in the name of the 32

Park Vale Avenue Trust to Paras Ram Somir ("Somir") as part of the consideration for

the uncut gemstones.  Somir did not provide the Debtor with a receipt. On the same day,

Fustolo caused a wire transfer to be made from the 32 Park Vale Avenue Trust's Century

Bank account ending in 5628 in the amount of $48,000.00 payable to an entity known as

the G D Humanitarian Foundation in connection with the purchase of the gemstones.[26]

---

[26] Fustolo did not testify about Somir's relationship to the G D Humanitarian Foundation,
if any, or why $9,000.00 was paid to him.

In addition, on the same day, Fustolo caused a wire transfer to be made from a Belmont

Savings Bank account ending in 1750,[27] which the Debtor stated was an account for the

Steven C. Fustolo 2004 Revocable Trust, in the amount of $42,000.00 payable to G D

Humanitarian Foundation for the purchase of the gemstones.[28]  Fustolo testified that he

had no idea whether the G D Humanitarian Foundation was a foundation or a business,

but that he received a bill of sale or a receipt in the amount of $100,000.00 from it.  Fustolo

admitted that he never sought permission from the Superior Court to make the transfers,

although he testified that the injunction did not apply to the transaction.  He also stated

that he did not have the gemstones appraised and did not receive a certificate of

---

[27] The Defendant's expert witness, as well as Patriot's expert witness, listed this account as belonging to the Debtor.  This account was not listed on the Debtor's original or amended Schedule B.  In his post-trial brief, the Debtor argued that the account belonged to the Steven C. Fustolo 2004 Revocable Trust, but the Debtor did not list such a trust on Schedule B (he listed the Steve C. Fustolo Revocable Trust), and the bank account records reviewed by Eberhardt for the account ending in 1750, which are part of Patriot's exhibits, contain numerous documents, including bank statements, deposit slips, and checks, showing that the account was in the name of "Steven C. Fustolo."  The Court found just one statement for the period between August 18, 2015 and September 15, 2015 in the name of "Steven C. Fustolo Rev Trust 2004."  The Court concludes that there is insufficient evidence that the account ending in 1750 did not belong to Fustolo, individually, prepetition, particularly where the Debtor could easily have changed the name on the account postpetition in 2015, and the Debtor produced no credible explanation for the overwhelming evidence that he was the owner of the account.

[28] The Debtor was unable to identify the sources of cash into his bank accounts. Nevertheless, he attempted to establish that $34,000.00 came from an investor in the gemstones.  He stated: "The -- the joint venture agreement on -- with respect to the stones that relate to that $34,000, the -- I don't know.  Whatever else was supplied -- whatever was supplied to the Trustee and to Mr. Fencer in the 204 [sic] examination."  When asked if he produced any emails to show the source of deposits of cash into his accounts, he answered "No. There wouldn't be any."

authenticity for them.  He added:  "It was my understanding that the -- one of the principals [of the foundation] was doing a private sale of gems. It had nothing to do with the foundation but rather the principal."

Fustolo testified that he put the gemstones in one of two places. "One is initially I held them in my home and, second, one of the joint venture partners, Martin Nahigian, and my wife put them in a safe deposit box when I was traveling. Those are the two places."  Fustolo, however, did not have a safe deposit box, and he later testified that he kept the gemstones under his bed.

c. The Seminar Business

Prior to and after the commencement of the bankruptcy case, the Debtor conducted a seminar business through two corporations, National Tax Institute, Inc. and CPE Meetings Inc.[29]  Fustolo testified that National Tax Institute, Inc. was the operational company and CPE Meetings Inc. was the travel company that organized the location of seminars and handled reservations because the seminars were conducted all over the world.  Fustolo testified that in 2014 he valued those companies at $0 based upon his 2012 tax returns and that he used no information from 2013 to value his interests in the corporations.  Fustolo stated that he had no ledgers for the seminar businesses.  In late December 2013, over six months after the filing of the involuntary petition, Fustolo began

_____

[29] National Tax Institute, Inc. and CPE Meetings Inc. had bank accounts at Belmont Savings Bank, Century Bank, and Citizens Bank.

using a bank account ending in 0834 at Belmont Savings Bank for a postpetition entity called Fustolo CPE, LLC to conduct the seminar business.

Fustolo testified that he spent at least 20 years developing his seminar business through National Tax Institute, Inc. and CPE Meetings Inc., which at one time or another had several employees. The Debtor testified that he shuttered those businesses for a year and a half because of cash flow problems in 2011 and did not reactivate the seminar business until late 2012.[30] Mrs. Fustolo, while not denominated an employee of either National Tax Institute, Inc. or CPE Meetings Inc., frequently traveled with Fustolo to the luxury resorts where the seminars were held.

Fustolo stated that "in 2013 I was registered with NASBA [National Association of State Boards of Accountancy] with multiple brands." He had brochures published for National Tax Institute, Inc. seminars in 2013. He observed that brochures for subsequent years would be similar because "We're selling travel. Yes. There would have been pretty pictures in there and exotic locations and -- yes. The look and feel would be the same. That's what we're selling: palm trees, oceans, cruises." Fustolo could not recall whether he was responsible for copyright information appearing on websites and in brochures for his seminars, stating that he relied on "people who update the website to put the copyright on there if appropriate."

Fustolo was evasive in response to questions about whether he transferred the website content of National Tax Institute, Inc. and CPE Meetings Inc. to Fustolo CPE, LLC

---

[30] Patriot commenced its action against Fustolo and the reach and apply defendants in 2010. The final judgment and permanent injunction entered on April 18, 2012.

in 2013, asking counsel to Patriot "what do you mean by web content?" He added that he

did not recall whether he made such a transfer but, nevertheless, admitted there was

overlap in the content.  He denied that the resort concept promoted by Fustolo CPE, LLC

was the same concept that belonged to CPE Meetings Inc. and National Tax Institute, Inc.,

insisting there was a "different brand" that "was not focused as closely on just tax

professionals."[31]

Fustolo described his seminar business as having a niche market.  Fustolo's later

iteration of the business, "National Tax Institute" or NTI also was registered with NASBA

and the IRS, and had identical telephone and fax numbers as the business operated earlier

---

[31] Despite Fustolo's testimony, the 2013 website and the 2016 brochure contained identical descriptions of the seminar under the caption "PERFECTING THE ART OF RESORT CPE":

> NTI's philosophy has been to create a new concept of CPE -- a dedication to providing the highest level of professional education combined with the uncompromising experience at the world's most celebrated resorts. At NTI, quality is the rule because we cater to the CPA who knows that education experienced in a relaxing, invigorating environment makes perfect business sense.

> NTI's conferences are geared toward CPA's, attorneys and other professionals. NTI clients enjoy the finest, state-of-the-art CPE conferences and programs available in areas that include Europe and Caribbean destinations.

> We combine the worlds of resort travel and education into innovative programs that distinguish NTI as the undisputed leader in first-class resort CPE conference vacations.

> For those professionals who cannot attend our resort conferences, we offer you a wide array of self-study products including the UNLIMITED CPE option.

by National Tax Institute, Inc. and CPE Meetings Inc.  Notably, National Tax Institute, Inc. and CPE Meetings Inc. in 2012 referred to "National Tax Institute" as NTI in promotional materials and a "Compass Rose" logo next to the word "NTI" was used pre- and postpetition and in 2016.

Fustolo was asked to examine screen shots of brochures used by his seminar business in 2012 and 2013.  Those were attached to the Affidavit of Christopher Butler ("Butler"), the Office Manager at the Internet Archive.[32] In his Affidavit, Butler stated that "[t]he Internet Archive is a website that provides access to a digital library of Internet sites and other cultural artifacts in digital form."  Butler also stated that "[t]he Internet Archive has created a service known as the Wayback Machine," which "makes it possible to surf more than 450 billion pages stored in the Internet Archive's web archive."[33]

––––––––––––––––––––

[32] Fustolo's counsel objected to Butler's Affidavit on procedural grounds because it was produced after the deadline for submission of the Joint Pretrial Memorandum.  Patriot's counsel explained the reason for the delay:

> The website -- the attached website records were previously provided to Mr. Nickless well in advance of filing the joint pretrial. He informed me at the moment that the pretrial was due that he was going to object to these web pages on authenticity grounds, so I told him I had to get an affidavit and that's what I produced to him the next day.

The Court overruled Fustolo's objection to the admissibility of Butler's Affidavit, particularly because he stated that he had the Affidavit and documents in advance of the trial with ample time to review them.  Moreover, counsel did not raise hearsay or authentication objections or issues relative to the Internet Archive.

[33] Butler's Affidavit contained the following caveat:

> The date assigned by the internet archives applies to the HTML file but not to the image files linked therein. Thus images that appear on a page may not have been archived on the same date as the HTML file. Likewise, if a

Attached to Butler's affidavit are screen shots of the first page of the website used by National Tax Institute, Inc., www.nti-inc.com, on May 5, 2012, October 7, 2012, October 25, 2012, and November 19, 2012.  These pages are virtually identical, reference "2012/2013 Conference Schedule Coming Soon," and state the following:   "We combine the worlds of resort travel and education into innovative programs that distinguish NTI as the undisputed leader in first-class resort CPE conference vacations."   In addition to the 2012 web pages, there are pages, including screen shots of pages from January 28, 2013, February 8, 2013, June 16, 2013, July 29, 2013, September 7, 2013, and September 20, 2013, several of which were used postpetition after May 6, 2013.  These pages contain the same URL, i.e., www.nti-inc.com, and are virtually identical to the screen shots from 2012, although they contain references to "NTI," instead of National Tax Institute.  The screen shots contain the same photograph of a luxury resort with palm trees and a swimming pool and contain statements about first-class conference vacations, and headings, such as "PERFECTING THE ART OF RESORT CPE."

In addition to those Internet Archive URLs, there were additional screen shots of web pages for various dates between January 28, 2012 and May 24, 2012 and for June 9, 2013, July 30, 2013, September 27, 2013, and October 30, 2013 with information on the "About Page" regarding "NTI," under the header, "National Tax Institute." The "About Page" used both pre- and postpetition, contained the same telephone numbers (888-515-

---

website is designed with "frames," the date assigned by the internet archive applies to the frame set as a whole, and not to the individual pages within each frame.

3674 ext. 1 for conferences and 888-515-3674 ext. 2 for self-study), fax number (888-552-9749), and email addresses (conferences@nticpe.com or selfstudy@nticpe.com).

Fustolo CPE, LLC's website for 2016 contained the same logo and the same heading as that used by National Tax Institute, Inc., "PERFECTING THE ART OF RESORT CPE." On its "About Page," Fustolo CPE, LLC used the same paragraph referencing its status as the "undisputed leader in first-class resort CPE conference vacations." Indeed, the information was identical to what was used in early 2013, including telephone and fax numbers, and conference registration information. The only difference in the materials for 2013 and 2016 was the absence of a direct reference to National Tax Institute; in the 2016 pages there were only references to "NTI." In addition, there was overlap in the identity of speakers; the same speakers were listed in 2013 and 2016, although in 2016 there were two additional speakers listed.

Fustolo denied that the websites and brochures were essentially the same, although he admitted there was overlap in course work and in the identity of the speakers.[34] A comparison of the brochures and websites, however, establishes that the websites and brochures had the same format, sections and text. The websites described the entities identically and promoted the same services and products. The websites and brochures list the same licensing and accrediting information, and the brochures contain lists of many of the same speakers. The marketing materials included some of the same

---

[34] Indeed, the same quotation from a CPA appears in the 2013 brochure and in the 2016 brochure, namely that of "James Douglas, CPA Michigan" who described his attendance at seminars as "14 years in a row and still going strong."

quotes from prior customers, and the websites and brochures have the same registration

form, registration process, contact information, and the same phone and fax numbers.

As noted above, at the very end of 2013, Fustolo began using a bank account for

Fustolo CPE, LLC and using substantially the same web content as that used by National

Tax Institute, Inc. and CPE Meetings Inc.  Fustolo testified that he wound down National

Tax Institute, Inc. and CPE Meetings Inc. because of substantial judgments against them

obtained by resort hotels where the seminars were held.  Although Fustolo challenged

the assertion that Fustolo CPE, LLC used the same web content as National Tax Institute,

Inc. and CPE Meetings Inc., he did not convincingly rebut the obvious similarities.

Moreover, he admitted that he solely owned and controlled all three entities and that he

did not produce any corporate minutes to Patriot.  He also admitted that Fustolo CPE,

LLC did not pay National Tax Institute, Inc. or CPE Meetings Inc. for use of the logo or

for the content of the brochures.  He testified that there were no licensing agreements or

intellectual property agreements between the corporate entities and Fustolo CPE, LLC.

He stated: "Nothing was transferred," and "[t]here were no agreements."  He added: "I

did use the Resort CPE concept in the new brand as I have done for 25 years under seven

or eight different brands."  He also admitted that he never sought permission from the

Chapter 7 trustee to utilize the marketing materials used by National Tax Institute, Inc.

or CPE Meetings Inc. in the latest iteration of his seminar business.  In terms of

compensation, Fustolo testified that "Fustolo CPE, LLC is a one member LLC, so taking

a salary is impossible, so I would take funds out of the entity as needed as draws."

42

Fustolo described himself as the sole owner and decision maker for the three entities involved in his pre- and postpetition seminar business. He admitted that there were no outside directors of the corporations, and he was the sole officer for both corporations and the only member of Fustolo CPE, LLC. At the time he filed his original and amended Schedule B, he ascribed no value to his stock in either National Tax Institute, Inc. or CPE Meetings Inc., and he did not produce copies of corporate meeting minutes to Patriot. He also testified that the two corporations were thinly capitalized and their debts exceeded their assets. In addition, as noted above, Fustolo testified he withdrew monies from the companies when he saw fit. In sum, he took money, not a salary, from the two corporations to repay personal loans or as draws.

### d. The Whistleblower Claims

Fustolo admitted that he produced a draft of a letter about the Whistleblower Claims for Attorney Edmands to edit and send to Attorney Fencer, Patriot's counsel at the time. In the letter, reproduced above, Attorney Edmands stated that Fustolo previously had informed Patriot of his intention to notify the IRS of its tax fraud. When questioned about the identity of the individual at Patriot to whom he reported his intention to notify the IRS of Patriot's alleged tax fraud, Fustolo invoked his rights under the Fifth Amendment to the United States Constitution. When asked about how he informed Patriot's representative of his intentions, he invoked his Fifth Amendment rights again. Fustolo, however, proceeded to testify that he did notify Howe or someone at Patriot that he intended to inform the IRS about Patriot's alleged tax fraud. He further testified that he could not recall the section of the Tax Code that Patriot violated or

specifically how Patriot or Howe committed tax fraud.  He insisted he could not recall the factual basis for his Whistleblower Claims.  He did not testify about how he learned of the purported tax or securities laws violations that formed the basis for his Whistleblower Claims.

Fustolo's Rule 2004 examination took place on August 27, 2014, thirteen days after he filed his amended Schedule B.  He invoked his Fifth Amendment rights at that time, while claiming an inability to respond to other questions. At trial, he also invoked the Fifth Amendment as to his asserted disclosure to Patriot of his intention to report tax fraud to the IRS.  Fustolo stated that he provided Attorney Edmands with a copy of a so-called "Form 211," but did not present him with any evidence of his asserted tax or securities fraud claims against Patriot, stating: "I didn't hire him for that purpose." According to Fustolo, Attorney Edmands did not conduct an independent investigation about the Whistleblower Claims.  Fustolo also testified that he amended Schedule B to add the Whistleblower Claims on the advice of his counsel.  When asked, both at his Rule 2004 examination and at trial, Fustolo did not state any facts to support his Whistleblower Claims even though in the letter sent to Patriot by Attorney Edmands there was a representation that Fustolo had informed Patriot of his intention to notify the IRS of its alleged tax fraud.  Fustolo simply referenced the forms he filed with the IRS and SEC, adding "whatever was in the original filing were the facts."  He invoked the Fifth Amendment, or, alternatively, stated he could not recall, when asked what those facts were or about when and to whom at Patriot he disclosed his claims.  In addition, he admitted that he never produced copies of what he filed with the IRS or SEC, testifying:

"One of the lawyers that I consulted with back prior to filing. He advised me not to keep a copy." Fustolo testified that he could not remember the name of the lawyer, adding that he did not retain that attorney and never obtained any written documentation from that attorney regarding the advice he provided.[35]

Fustolo further testified as follows: "My testimony is that I supplied documents to Mr. Fencer related to the whistleblower [claims] but I'm just not sure what they were. There were piles of documents." Although Fustolo testified he filed the Whistleblower Claims in May of 2014, several months later at his Rule 2004 examination he testified that "All the information on that claim is in there. I have to have that information in front of me to refresh my memory." He also responded to a question as to what provision in the Dodd-Frank Act Patriot allegedly violated by stating "I haven't looked at that in an awful long time, Mr. Fencer." At trial, Fustolo testified that the purpose of the letter was "to memorialize the fact that I believed there was a violation of Dodd-Frank and other statutes against me and violating the anti-retaliation statutes of Dodd-Frank 922 [sic]."[36]

With respect to the Form 211, the IRS sent Fustolo a letter on July 21, 2014 in which it stated: "We received your Form 211 with the information you furnished and have assigned the above claim number(s). We will evaluate the information you provided to

---

[35] Fustolo's memory was significantly better when he testified about his attempts to obtain refinancing for the Revere Beach Property in 2008 and 2009. He was able to recall the names of attorneys and the nature of discussions he had with them, as well as his interactions with representatives of Patriot.

[36] This appears to be a reference to 15 U.S.C. § 78u-6, captioned "Securities whistleblower incentives and protection," added by Pub.L. 111-203, Title IX, § 922(a), July 21, 2010, 124 Stat. 1841.

determine if an investigation is warranted and an award is appropriate." On October 20,

2015, the IRS sent him another letter stating "We considered the additional information

you provided and determined your claim still does not meet our criteria for an award.

Our determination remains the same despite the information contained in your latest

letter."

On May 22, 2014, the SEC acknowledged receipt of "the information that you

submitted under the SEC's Whistleblower Program." Fustolo testified that he spoke with

Jane Norberg, the Deputy Chief, Office of the Whistleblower, on March 11, 2015, stating

that she called him to inform him that the SEC would not pursue his claim. He further

testified that he did not say anything about the claim during the call.

e. Invocation of the Fifth Amendment

In addition to Fustolo's invocation of his Fifth Amendment rights noted above, at

trial, Fustolo was asked a series of questions about several so-called "Milestone" entities.

He invoked his Fifth Amendment privilege in response to whether he had membership

interests in those entities, and whether those entities had bank accounts into or from

which he deposited or withdrew cash, although his expert, Train, in Exhibit 4 to her

report, listed two bank accounts at Century Bank in the names of Milestone International

Group LLC and Second Milestone LLC. In addition, he invoked his Fifth Amendment

privilege when asked if those entities were created to shield income from his seminar

business and to evade creditors.

Fustolo also was asked about his testimony that AOL deleted his emails and

whether, despite this Court's December 31st Order to produce the emails for *in camera*

46

inspection, he withheld the production of those emails based upon his assertion of his Fifth Amendment privilege.  He admitted that following his deposition he submitted an errata sheet pursuant to which he changed his answers to questions 33 times, asserting his Fifth Amendment rights when he had not previously done so, and, alternatively, providing answers when he had previously asserted the privilege.  Fustolo also refused to answer questions about a so-called Carbonite account, which backs up material on computers, again invoking the Fifth Amendment.

The Debtor testified that he never intentionally destroyed or concealed books and records.  He also testified that he did not falsify any records.  In addition, he testified that it was his belief that there was a potential whistleblower recovery, stating:  "[At] [t]he time they were filed I had reasonable belief that there was a possible violation of tax law and SEC statute. [sic]"  Nevertheless, he admitted invoking his Fifth Amendment privilege during his deposition when asked if he destroyed documents, specifically electronic versions of trial balances, cash disbursements, and  expenditures for CPE Meetings Inc., although at trial he testified that he invoked the Fifth Amendment in error, asserting confusion about when he was alleged to have destroyed records.

f. Tax Returns

Fustolo also testified about the receipt of so-called 1099s (i.e., IRS Form 1099-MISC) in 2012 relating to royalties.  He indicated that his royalty income was reported on Schedule C, Profit or Loss from Business (Sole Proprietorship), as part of  his joint 2012 income tax return relating to "Consulting/teaching" and on Schedule E, Supplemental Income and Loss.  He reported royalty income of $16,800.00 on Schedule C and

47

$183,635.00 on Schedule E.[37]   With respect to CPE Meetings Inc. and National Tax Institute, Inc., Fustolo reported a loss of $6,137.00 for CPE Meetings Inc. and a loss of $1,343.00 for National Tax Institute, Inc.[38]   With respect to the 2013 return, Fustolo testified that the signed and dated version of the return was sent to the IRS, but he did not have a signed and dated copy.

5. The Testimony of the Chapter 7 Trustee

Harold B. Murphy, Esq., the Chapter 7 Trustee of the Debtor's bankruptcy estate (the "Trustee"), testified that he conducted an initial meeting of creditors pursuant to 11 U.S.C. § 341(a) and, thereafter, conducted two additional examinations.   He requested that the Debtor supply him with documents pertaining to the various entities he listed on Schedule B.   The Trustee testified that he determined that most of the entities in which Fustolo held an interest had no value to the bankruptcy estate with certain exceptions. Moreover, with respect to Fustolo's seminar business and receipt of royalty income, the Trustee stated:

> We have an open issue with Mr. Fustolo regarding amounts due to him for work performed prior to the filing for revenues associated with materials that were produced pre-filing that have resulted in revenues coming in post-filing and the estate may have an interest in those revenues.

---

[37] The unsigned 2013 return reflected income for consulting/teaching of $23,339.00 on Schedule C and royalty income of $243,218.00 on Schedule E.

[38] The unsigned 2013 return reflected a profit of $6,422.00 for National Tax Institute, Inc. and a profit of $7,464.00 for CPE Meetings Inc.

In addition, the Trustee testified that he filed a complaint, which he subsequently amended against Mrs. Fustolo and the Debtor (Adv. P. No. 14-1222).  In his amended complaint, filed on December 16, 2014, he averred the following:

> The facts that the Trustee has learned reveal that the Debtor and Elisa employed multiple bank accounts and safe deposit boxes in Elisa's name as part of an elaborate and intentional scheme to conceal the debtor's income and assets from creditors and the Trustee.

> [D]uring the four years prior to the filing of an involuntary petition against him, the Debtor transferred more than $1 million to Elisa by way of deposits into her accounts at Century Bank and Citizens Bank. Another feature of the Debtor's and Elisa's scheme to conceal assets involved their substantial dealings in cash while keeping no records and omitting the disclosure of the existence of certain deposit accounts and no less than three safe deposit boxes in two separate banks.

In addition to affirming his belief in the accuracy of the allegations he made, the Trustee expressed his view that there were inadequate records to substantiate the extraordinary use of cash by the Debtor and his spouse.  Accordingly, he filed an Emergency Ex-Parte Motion for a Temporary Restraining Order and Preliminary Injunction and a Motion for Issuance of Writs of Attachment of Real Estate.  After a hearing, this Court determined in part the following:

> 1) the Debtor placed his income outside the reach of his creditors for a number of years by transferring all of his income to his wife and directing that his income be deposited in his wife's bank accounts; 2) a number of badges of fraud are present during the pertinent time period of the Plaintiff's Complaint; 3) the transfers to the Debtor's spouse also benefitted the Debtor to the extent the transfers to his spouse's bank account were made on account of necessities and reasonable living expenses; . . . [and] . . . . 4) the Plaintiff has demonstrated a likelihood of success on the merits of his Complaint.[39]

---

[39] The Trustee's Complaint did not contain any counts against the Debtor under 11 U.S.C. § 727.  The Trustee filed his complaint on November 20, 2014, after Patriot had filed the

The Trustee also testified that he was in possession of the gemstones listed by the Debtor

on Schedule B, that he was having difficulty obtaining an appraisal for them, and that it

did not appear to him that the gemstones were valuable.

As noted above, the Trustee testified that "the vast majority" of the interests of the

Debtor in the entities listed on Schedule B had no value to the bankruptcy estate.   When

the Trustee was questioned about the Debtor's income from royalty payments and

income from his seminar business, the following colloquies took place:

> Q. As far as the speaking seminars that Mr. Fustolo conducted did you
> make a determination whether that had any value ongoing?
> A. Well, it's -- I think that the personal services that -- that are rendered
> post-bankruptcy whether he be a lawyer or an accountant or a tax advisor
> those would be outside of the estate, in my opinion, so I don't necessarily
> took [sic] a view that his earnings post-bankruptcy as opposed to royalties
> or materials [sic]. And you have to try to separate those out.

> ***

> Q. And with respect to the royalties, are those royalties that were in --
> received by Mr. Fustolo during what I'm going to call the gap period
> between the date of the filing of the involuntary petition and the end of
> 2013?
> A. The -- my claim as to the royalties include not only those that were paid
> in the gap period but also some that were  paid post-conversion or post --
> entry of the order for relief.

---

instant adversary proceeding, i.e., on September 13, 2014.  The Court takes judicial notice
that the Trustee, the Fustolos, Costanzo Fustolo, and Steven Robinson executed a
Stipulation of Settlement with respect to the adversary proceeding commenced by the
Trustee which provided for the payment of approximately $385,000.00 to the Trustee.
The Court approved the compromise on November 2, 2016.  Steven Robinson was listed
as the holder of an unliquidated secured claim, as well as the holder of a first and second
mortgage and a "Pledge of Equity in membership interest in Terrace Hall Partner's LLC"
on Schedule D, and Costanzo Fustolo was listed as the holder of an unsecured nonpriority
claim in the unliquidated sum of $900,000.00 relating to "Loans" on Schedule F.

***

Q. And it was not to seek recovery of any income that Mr. Fustolo received
from conducting seminars in various locations throughout the northeast
and -- not the northeast, throughout the United States and the world,
correct?

A. That's correct. Again, I didn't take -- I haven't taken a view that his
services is estate property [sic].

### 6. The Testimony of Attorney Michael Fencer

Former counsel to the Plaintiff, Attorney Michael Fencer, testified about Patriot's

efforts to obtain discovery in this adversary proceeding.  In particular, he testified about

the filing of the Motion to Compel on behalf of the Plaintiffs due to Fustolo's failure to

comply with discovery requests which this Court granted.[40]  In addition, he testified that

he did not recall obtaining any documents regarding Affinity or any possible financial

arrangements to satisfy the Debtor's obligation to Patriot.  He further testified that Patriot,

during his representation of it, did not receive any documents showing how Fustolo

utilized the cash he obtained from his various entities and businesses.

Attorney Fencer also testified that he received an unsigned tax return for Fustolo

and his spouse for the 2013 tax year, admitting that he did not confirm whether the return,

in fact, was filed with the IRS.  He also indicated that many records obtained through

---

[40] The Court takes judicial notice that, on February 20, 2015, it entered the following order:

> For the reasons stated on the record, the motion is granted. The Court
> directs the Debtor to provide all documents requested by the Plaintiffs by
> March 23, 2015. The Court directs the Debtor to reimburse the Plaintiffs for
> the cost of pursuing their motion. The Plaintiffs shall file an affidavit of their
> legal fees and expenses.

discovery from Fustolo contained disclaimers as to their completeness or accuracy. Attorney Fencer stated that he did not receive documents that, in his view, would have established the separate legal identity of the entities listed by the Debtor on Schedule B arising out of the "complicated corporate structures where incorporators or corporate managers would like the law to respect the separate legal identity of the individual entities."

### 7. The Testimony of the Parties' Expert Witnesses

#### i. Summary of Bank Accounts Analyzed by the Parties' Experts

The following tables summarize and compare the bank accounts owned by the Fustolos and the Debtor's business entities that were evaluated by the parties' experts. Although not a debtor, the experts for both the Plaintiff and the Defendant analyzed transactions involving bank accounts in Mrs. Fustolo's name in addition to the Fustolos' joint bank accounts and those owned solely by the Debtor or his business entities. Consideration of Mrs. Fustolo's bank accounts was required to understand the numerous transactions among Fustolo's personal and business accounts, particularly where the couple filed joint tax returns.

The first table, in column one, contains a listing of the personal bank accounts evaluated by the Debtor's expert witness, Train.  Train did not distinguish between accounts opened or used by the Fustolos, individually or jointly, during the pre- and postpetition periods.  The four remaining columns contain a listing of the pre- and postpetiton accounts evaluated by the Plaintiff's expert, Eberhardt.  She distinguished between accounts used pre- and postpetition by the Debtor and those owned individually

by Mrs. Fustolo and those she jointly owned with the Debtor for both cash deposits and cash withdrawals.   The "+" sign next to an account indicates a bank account listed by the Debtor on Schedule B.   An asterisk indicates an account in the name of an entity other than the Debtor that Eberhardt included in her analysis of the Fustolos' personal accounts.

The second table, in column one, contains Train's list of all the bank accounts she determined were used for the Debtor's numerous business entities through 2013.   The remaining two columns contain only the Debtor's seminar business accounts into which there were inflows, as defined by Eberhard in her report, both pre- and postpetition.

[Space Intentionally Left Blank]

**Table 1:  Personal Bank Accounts Owned by the Fustolos Individually and Jointly**

| Train/Personal Bank Accounts | Eberhardt/ Mrs. Fustolo's Prepetition Accounts | Eberhardt/ Mr. Fustolo's Prepetition Accounts | Eberhardt/ Mrs. Fustolo's Postpetition Accounts | Eberhardt/ Mr. Fustolo's Postpetition Accounts |
|---|---|---|---|---|
| BofA 9490+ Joint | 9490 | | 9490 | |
| BofA 9376 Elisa Fustolo | 9376 | | 9376 | |
| BofA 3923+ Joint | 3923 | | 3923 | |
| BofA 1461+ | | | | |
| Century 8433 Elisa Fustolo | 8433 | | 8433 | |
| Citizens 1492 Steve Fustolo [sic] | | | | 1492 |
| Citizens 5484 Elisa Fustolo | 5484 | | 5484 | |
| Belmont 1750 Steven C. Fustolo | | 1750 | | 1750 |
| Belmont 9827 Steven C. Fustolo | | | | 9827 |
| | Citizens 2999* 135-137 Salem Street LLC | | 2999 | |
| | | Century 5628* 32 Park Vale Avenue  Trust" | | 5628 |
| | | Citizens 2980* Park Vale Avenue Trust [sic] | | 2980 |
| | | | Winchester 5565 Elisa Fustolo | |
| | | | Northern     Bank 5901 Elisa Fustolo | |
| | | | Santander     5840 Elisa Fustolo | |
| | | | | Citizens 6153* Park Vale Avenue Trust [sic] |

**Table 2: Business Bank Accounts**

| Train/Business Accounts | Eberhardt/Prepetition Seminar Business Accounts | Eberhardt/Postpetition Seminar Business Accounts |
|---|---|---|
| Century 5628 | | |
| Century 5520 | | |
| Century 5636<br>National Tax Institute, Inc. | 5636 | 5636 |
| Century 8210 | | |
| Century 3843 | | |
| Century 5601 | | |
| Belmont 0494 | | |
| Belmont 0834<br>Fustolo CPE, LLC | | 0834 |
| Belmont 6492<br>NTI LLC | 6492 | 6492 |
| Belmont 6502<br>CPE Meetings Inc. | 6502 | 6502 |
| Citizens 2999 | | |
| Citizens 5125 | | |
| Citizens 5133<br>CPE Meetings Inc. | 5133 | 5133 |
| Citizens 5875 | | |
| Citizens 2980 | | |
| Citizens 0888 | | |
| Citizens 2964<br>National Tax Institute, Inc. | 2964 | 2964 |
| Citizens 2875<br>National Tax Institute, Inc. | 2875 | 2875 |
| Citizens 5486 | | |
| Citizens 8219<br>CPE Meetings Inc. | 8219 | 8219 |
| Citizens 5344 | | |
| Citizens 5443 | | |
| Citizens 5141<br>CPE Meetings Inc. | | |
| Citizens 6153<br>Park Vale Avenue Trust [sic] | | |
| Citizens 1188 | | |
| Citizens 5494 | | |
| Citizens 5427 | | |
| Citizens 5451 | | |
| Citizens 6153 | | |
| Citizens 1354 | | |
| | | Brookline 2703 and 2711<br>Fustolo CPE, LLC |

ii. Testimony of Anne Eberhardt

Eberhardt, Senior Director at Gavin/Solmonese, testified on behalf of Patriot, in her capacity as a financial fraud investigator, a profession that requires an examination of books and records, accounting systems, and bank statements to ascertain whether financial fraud has occurred.  Eberhardt indicated that Gavin/Solmonese is a "financial advisory firm that offers assistance to companies in distress and to creditor committees," as well as "financial advisory . . . services for forensics and litigation and valuation services."  Prior to her role at Gavin/Solmonese, Eberhardt was a senior manager at Grant Thorton, a global accounting firm, for approximately 15 years.  Eberhardt has an MBA and specializes in the study of statistics, as well as advanced data analyses of large databases.  She is both a certified fraud examiner and a certified anti-money laundering specialist.  With respect to her certification as an anti-money laundering specialist, she explained that she was trained "to observe patterns of financial activity and to identify patterns of potential fraud in the financial services industry."  Eberhardt testified that she has performed funds tracing analyses by tracing flows of funds between entities over different periods of time.

Eberhardt testified about what Patriot asked her to do in advance of her testimony as an expert witness.  She explained:

> I was asked to collect the bank statements and look at the transactions on them and place them into a schedule. I also was asked to validate the transactions. I also in my schedule did a reconciliation for every transaction against every account to be sure that the numbers were adequately tabulated in the spreadsheets. I was also asked to classify the transactions based on several different ways of describing the data.

She testified that she reviewed bank statements for 44 accounts and approximately 9,000

transactions.  She stated:

> [W]e looked at the transactions and the bank statements and compiled them
> into a worksheet or into a spreadsheet -- an electronic spreadsheet. We
> validated all of those transactions to be sure that they reconciled to the bank
> accounts -- to the bank statements so the balances were correct throughout.
> We then classified each of the transactions according to the descriptions that
> were contained in the bank statements or in the financial documentation
> accompanying the bank statements, such as deposit slips or check copies.
>
> We also classified the transactions according to time period. We divided the
> transactions into two periods of time. The first period of time would have
> been the 12 months prior to the petition date of May 6, 2013, and the second
> period of time would have been the transactions that happened from May
> 7th, 2013, through the end of December, 2015. And then on top of all of that
> we classified each of the transactions according to the different entities they
> belonged to. So we grouped the accounts of Mr. Fustolo together. We
> grouped the accounts of the real estate entities together and we grouped
> the accounts of the seminar business together . . .

Eberhardt explained that she grouped the joint bank accounts held by Fustolo and Mrs.

Fustolo together with Mrs. Fustolo's accounts.[41]  She added that she "was asked to review

the inflows to the seminar business accounts both for the prepetition period of one year

and for the period post-petition."  She explained that "inflows" are transactions that

increase the balance of the account.  With respect to the Fustolos' personal accounts, she

examined cash transactions, as well as expenses that were in excess of ordinary

---

[41] As noted above, on Schedule I, the Debtor disclosed that Mrs. Fustolo earned $414.00
per month ($792.00 in salary, less rental losses from ownership of a condominium unit
located at 135-137 Salem Street, Boston, Massachusetts) based upon the couple's 2012 tax
return, although on Schedule B, Fustolo listed the 32 Park Vale Avenue Trust as the 100%
owner of 135-137 Salem Street LLC. Fustolo testified that Mrs. Fustolo earned
approximately $12,000.00 per year from her work as a psychotherapist.  On the couple's
2012 tax return, she reported earnings of $9,500.00.  It is undisputed that at all relevant
times she was paid by check for her work as a psychotherapist.

household expenditures. She admitted that cash transactions could include cashier's checks and bank checks, but stated that if she had evidence of either, she did not include the amounts in her analysis.

Eberhardt testified about the Debtor's seminar business and the multiple accounts he used with respect to that business. She indicated that she "looked at the bank statements and identified – or selected those transactions that were increases to the account, then copied those increases into the account into a spreadsheet, and then . . . tallied the spreadsheet and came up with a total." Specifically, she prepared a three-page document captioned "Pre-petition Inflows to the Seminar Business," to which she attached the bank statements used for the compilation. Eberhardt's charts indicated that prepetition inflows to the Debtor's seminar business for accounts ending in 5636, 6492, 6502, 5133, 2964, 2875, and 8219 totaled $360,325.56 between May 7, 2012 and May 6, 2013, i.e., the one-year period before the filing of the involuntary petition; postpetition inflows to those accounts totaled $1,971,754.06 for the period from May 8, 2013 through December 9, 2015. Between between May 8, 2013 and December 26, 2013 the postpetition inflows exceeded $462,000.00. Eberhardt testified that it was her belief that this money involved credit card deposits. In compiling the same information for postpetition inflows to Fustolo's seminar businesses, she examined the same accounts, as well as three additional accounts ending in 0834, 2703, and 2711. Notably, the Debtor utilized the bank accounts ending in 5636, 6492, 6502, 5133, 2964, 2875, and 8219 prepetition, and he continued to use those same accounts postpetition even after he opened an account at Belmont Savings

Bank (the account ending in 0834), on or around December 11, 2013, for Fustolo CPE, LLC.

Eberhardt performed the same analysis for accounts she considered to be joint accounts or accounts in Mrs. Fustolo's name, including accounts ending in 9490, 9376, 3923, 8433, 5484, and 2999. The prepetition cash deposits into those accounts between May 7, 2012 and May 6, 2013 totaled $119,158.30. If deposits into the Citizens Bank account ending in 2999 are excluded, the cash deposits total $106,098.30 for that period. The postpetition cash inflows for those accounts, as well as accounts ending in 5565, 5901, and 5840, totaled $305,921.83 for the period between May 7, 2013 and December 17, 2015. The cash withdrawals for the period between June 6, 2013 and December 28, 2015 totaled $63,939.13.

Eberhardt performed the same analysis for accounts she considered to be Fustolo's personal accounts, namely bank accounts ending in 1750, 2980, and 5628. She calculated that the prepetition cash deposits for the period between July 10, 2012 and April 23, 2013 totaled $49,035.00.[42] In addition, Eberhardt examined prepetition cash withdrawals from those accounts which totaled $40,629.89 between May 16, 2012 and May 4, 2013. If the

---

[42] Eberhart included in her analysis an account ending in 5628 at Century Bank, as well as a cash deposit into that account on January 22, 2013 in the sum of $34,000. The Defendant's expert indicated that this bank account was in the name of the 32 Park Vale Avenue Trust and the bank records attached to Eberhardt's report corroborate that observation. Nevertheless, as discussed above, one day later, on January 23, 2013, the Debtor wire transferred from his Belmont Savings Bank account ending in 1750 the sum of $42,000.00 to the G D Humanitarian Foundation for the purchase of gemstones.

deposits with respect to accounts that were not in the Debtor's name are excluded, the total is $32,652.63.

For the postpetition period between May 18, 2013 and December 22, 2015, the cash inflows into accounts ending in 1492, 5628, 2980, 1750, 6153, and 9827, all of which Eberhardt considered to be Fustolo's personal accounts, totaled $55,667.39. The postpetition cash withdrawals from those accounts for the period between August 16, 2013 and December 22, 2015 totaled $59,244.32.

For the prepetition period, Eberhardt was unable to ascertain the source of all cash deposits into the Fustolos' personal accounts and Fustolo could not testify about the source of the deposits. Eberhardt testified that "[d]uring the prepetition period, the unidentifiable amounts totaled about half of the $440,000 inflows into the Fustolos' accounts."[43] She defined "unidentifiable inflows" as

> transactions that looked a lot like the cash transactions in that they had a description like deposit or a counter-credit or something similar to what a cash deposit looked like, but there was no underlying support to conclude that it was cash. It was a fairly large amount and so I wasn't certain that I could classify it as cash and I left it as an unknown source.

She explained, using an example, as follows: "[d]uring the prepetition period if there was an outflow that was a large amount greater than $4,000, which was my threshold that said withdrawal, I didn't want to necessarily assume it was cash if I didn't have any supporting documentation, so I called that unknown. That would be a withdrawal."  In

---

[43] In her report she stated: "Approximately $222,700, or about 50 percent of those inflows [$440,000.00] were either from cash deposits ($119,200 from Ms. Fustolo's accounts and $49,000 from Mr. Fustolo's accounts) or from unknown sources ($42,000 from Ms. Fustolo's accounts and $12,500 from Mr. Fustolo's accounts)."

her report, she set forth unknown inflow transactions, totaling approximately $54,500.00
with respect to the Fustolos' accounts (i.e., $42,000.00 for the Fustolos' joint accounts and
$12,500.00 for Fustolo's accounts).

Eberhardt also testified that she was unable to ascertain the couple's financial
condition from their personal bank statements for the prepetition period owing to the
absence of adequate books and records to determine the sources of funds into their
accounts.  She added that they had no accounting system in place, such as QuickBooks,
and that there were no receipts or invoices.  She stated that she would have expected
"some sort of accounting package, some sort of accounting software package," as "books
and records are the foundation of any business. They help a business person run their
business.  They help them know what's coming, what's going out. They help them
prepare tax returns. They help -- they help them understand if they're making money or
if they're losing money."  In sum, given the number of accounts and the movement of
funds among the accounts, Eberhardt testified that she would have expected more
records to have been kept by Fustolo.

Eberhardt also testified that she did not review the Fustolos' joint tax returns for
2012 or 2013.  Nevertheless, she concluded, based upon her analysis of their bank
accounts, that the Fustolos made postpetition payments unrelated to ordinary household
expenditures, including approximately $93,000.00 in payments on account of credit cards,
which were all in Mrs. Fustolo's name, as well as $21,400.00 in prepetition payments to
the Woodland Golf Club.

Eberhardt also was unable to categorize outflow transactions totaling approximately $39,000.00 between May 6, 2012 and May 6, 2013 because of insufficient information. For the postpetition period, the unexplained inflow transactions totaled $188,000.00 for Mrs. Fustolo's accounts and the joint accounts, and $159,000.00 for Fustolo's accounts. The unexplained postpetition outflow transactions totaled approximately $47,000.00 and $177,000.00, respectively. In addition, in her report, Eberhardt identified $118,000.00 in checks made payable to Fustolo from his seminar business, but she was unable to determine whether the checks had been cashed or whether they were deposited. She also was unable to identify check deposits corresponding to the accounts and dates of the checks, suggesting to her that there may have been additional accounts that were not disclosed or that checks were cashed for currency.

### iii. Testimony of Kimberley A. Train

The Defendant's expert witness, Train, testified that she was employed at DiCicco, Gulman & Company, LLP, was a certified public accountant, and was accredited in business valuations. In addition, she stated that she has a MA in finance from the Carroll School of Management at Boston College and had spent her career engaged in forensic accounting. She indicated that in this adversary proceeding she "was asked to assess whether or not the bank records comported with . . . [the Debtor's] . . . his personal financial -- his personal tax returns that were filed on behalf of Mr. and Mrs. Fustolo for

calendar years 2012 and 2013."[44]  She testified that she reviewed multiple documents

including bank statements for business and personal accounts, as well as the Fustolos'

joint tax returns for 2012 and 2013, IRS Form 1099s, and IRS Form K-1s.  Train testified

that she reviewed bank account records with respect to withdrawal activity, for the year

prior to the filing of the involuntary petition on May 6, 2013, as well as for the time period

from May 7, 2013 through December 31, 2013.  Her written report, like that of the

Plaintiff's expert witness, Eberhardt, was admitted into evidence.

Train testified that Fustolo's income from his publications and other writings was

reported to the IRS pursuant to Form 1099s for inclusion on his tax returns, while his

income from his incorporated seminar businesses was reported on his personal income

tax return as well.  Train testified that she determined Fustolo's gross income as follows:

> I added up for each of the personal bank accounts the number -- I added up
> each of the individual deposits that were made into the nine personal bank
> accounts [belonging to both Fustolo and his spouse], as well as certain
> deposits that were made into certain business accounts and came up with a
> total deposit amount for both 2012, as well as 2013.

Train, as did Eberhardt, excluded any transfers from one account to another to avoid

duplication. She testified that she "compared the income and distributions that were

reported on Mr. and Mrs. Fustolo's Form 1040, their personal return, and compared it to

the summations of the deposits" that she could create from the couple's various bank

statements.  Thus, she tabulated gross income in the total amount of $418,484.84 from the

---

[44] Train testified that she formally was engaged by the Debtor on May 16, 2016, four days before the submission of her report.

income tax return for 2012 and income in the total amount of $431,767.00 from the tax
return for 2013.[45]   She included only cash deposited into the business accounts
($62,202.43) and excluded business deposits if they were included on other tax returns
for those businesses, such as bank card deposits for CPE Meetings Inc.   She then
compared the gross income figures to information gleaned from the statements for the
nine bank accounts that the couple had in 2012 and 2013.   She testified that she did not
verify the accuracy of, or audit, the 2012 and 2013 tax returns.

Train testified that she was able to account for 94.1% of the deposits into the
Fustolos' nine bank accounts when compared with their 2012 personal income tax return,
although she admitted that she was unable to account for some deposits.   She compared
deposits of $310,413.15 into personal accounts, to which she added $62,202.43 from
business accounts, and adjusted that total for deposits made in 2013 that were attributable
to 2012 income in the sum of $20,970.72, for a grand total of $393,586.30, which she

---

[45] Train determined the following sources and amounts of gross income from the 2012
and 2013 joint tax returns from Schedule C (Consulting/Teaching), Schedule E (Royalties
and Rent), Schedule K-1 (Distributions) and Line 21 (Other Income).  The Debtor's gross
income for 2012, derived from the statements attached to Schedule I, is included for
reference.

|  | 2012 Income | 2013 Income | Schedule I |
|---|---|---|---|
| Consulting/Teaching | $ 16,800.00 | $ 23,399.00 | $200,435.00 |
| Directorship | $  5,000.00 | $  5,000.00 | $   5,000.00 |
| Royalties | $183,635.84 | $243,218.00 |  |
| 135 Salem Street - Rents | $ 33,275.00 | $ 20,125.00 | $ 56,400.00 |
| 115 Salem Street - Rents | $91,424.00 | $ 70,275.00 | $119,024.00 |
| James J. Fox & Company LLP - Distribution | $ 55,600.00 | $ 35,000.00 | $ 45,029.00 |
| Atlas Garden Supply LLC - Distribution | $ 13,250.00 | $  14,750.00 | $ 12,687.00 |
| Miscellaneous - Other | $ 19,500.00 | $  20,000.00 | $246,309.00 |
|  | $418,484.84 | $431.767.00 | $684,884.00 |

64

calculated was $24,898.54 or 5.9% less than the Fustolos' reported income of $418,484.84 in 2012.

Similarly, Train was able to reconcile gross income and deposits with a certainty of 91% for 2013.  For 2013, she reconciled total income of of $431,767.00 with personal bank deposits of $468,426.67, plus business bank account deposits of $113,352.00, less adjustments for duplication of $191,477.00, deposits of $20,970.72 for 2012 income deposited in 2013, plus $23,966.84 in deposits that occurred in 2014 that related to 2013 income.  Thus, she compared total deposits, as adjusted, of $393,297.79 to the Fustolos' reported gross income for 2013 of $431,767.00, concluding that there was a difference of $38,469.21 or 8.9%.

Train concluded that, during the period between May 7, 2012 and May 6, 2013, $449,518.47 was disbursed from the nine bank accounts held by the Fustolos.  Cash withdrawals for which there was no documentation accounted for $29,981.00 or 6.7% of the total disbursements.   From May 7, 2013 through December 31, 2013, total disbursements in the sum of $285,891.68 were made from the couple's bank accounts. Cash withdrawals for which there was no documentation accounted for $10,886.99 or 3.8% of total disbursements.  With respect to the $29,281.00 in unaccounted for cash withdrawals, Train admitted that she could not account for that sum, stating "If I  . . . [were] . . . able to achieve 100 percent accuracy on the deposit analysis then, yes, I still would not be able to tell you how that $29,000 was ultimately -- what was the ultimate dispensation of that $29,000 in 2012 that was withdrawn from the bank accounts." She also testified:  "I don't know the ultimate disposition of that $29,000. I don't know how

that money was ultimately spent by either Mr. or Mrs. Fustolo. But in my experience when I've seen some individuals or businesses try to hide money it tends to not get deposited into the bank in the first place."

Train did not evaluate, verify, or test the accuracy of the records for either National Tax Institute, Inc. or CPE Meetings Inc. that were provided to her for 2012 or 2013. She testified that she did not see any invoices, contracts, ledgers, accounts receivable reports, loan documentation, or expense reports for his businesses, including those two corporations. She added that she had not seen a "native version" of spreadsheets for those corporations or electronic versions of trial balances or tax returns for those two entities and "did not endeavor to validate the accuracy of those documents."

Train further testified that Fustolo took rents from his real estate companies and deposited them into bank accounts for different business entities to meet their business needs. For example, Train observed that Fustolo deposited rental checks into an account at Century Bank ending in 5520 owned by Fustolo Development Company, adding that the rental checks were "monies related to a business that flow[ed] through onto his personal tax return." She also noted that there were instances where income attributable to one of Fustolo's businesses was deposited into accounts belonging to other businesses. For example, Exhibit 10 to her report contains seven instances where funds were transferred from an account in the name of CPE Meetings Inc. to the Debtor's personal account ending in 1750, totaling $37,000.00.

Train included in her report transfers of funds among Fustolo's business and personal accounts, including a $16,000.00 transfer from the 32 Park Vale Avenue Trust's

Century Bank account ending in 5628 to Fustolo's personal account at Belmont Savings Bank ending in 1750; four transfers totaling $26,500.00 from Fustolo's personal account at Belmont Savings Bank ending in 1750 to Mrs. Fustolo's personal accounts ending in 8433 and 5484; and seven transfers totaling $37,000.00 from CPE Meetings Inc.'s Belmont Savings Bank account ending in 6502 to Fustolo's personal account at Belmont Savings Bank ending in 1750.

Train testified that understanding Mrs. Fustolo's financial condition was necessary to understanding the Debtor's financial condition. She opined that more than bank statements or tax returns would be needed to fully understand the financial condition of Fustolo's businesses, although she expressed no opinion as to whether the Debtor's record keeping was sufficient. In her Report, she opined the following:

> Financial records can range from simplistic to complex. They can be manual or electronic, whether that be on a spreadsheet or on accounting software. Records can include items such as copies of checks, records of electronic fund transfers, bank statements, invoices, contracts, ledgers, worksheets and spreadsheets. The level of sophistication required by a financial reporting system is dependent upon the individual facts and circumstances of the subject business. In order to determine the level of sophistication required, it is necessary to understand the objectives and goals of the subject business. For example, a company may use the cash method of accounting. At year end, the company could accumulate the monies received and monies paid via the bank statements in order to prepare either the company's financial statements and/or tax return.

## IV. DISCUSSION

### A. Introduction

Patriot seeks denial of the Debtor's discharge pursuant to 11 U.S.C. § 727(a)(2)(A) and (B), 727(a)(3), (a)(4), and (a)(5). It also seeks to except its debt from the Debtor's

discharge pursuant to 11 U.S.C. § 523(a)(2)(A).  The Court shall examine each count of

Patriot's Complaint *seriatim*, setting forth the applicable law, the positions of the parties,

and the Court's ruling.  As the First Circuit observed in Razzaboni v. Schifano (In re

Schifano), 378 F.3d 60 (1st Cir. 2004), "we have noted that the very purpose of certain

sections of the law, like [§ 727(a)(2)], is to make certain that those who seek the shelter of

the bankruptcy code do not play fast and loose with their assets or with the reality of their

affairs." Id. 66 (citations omitted). *See also* Bank One v. Kallstrom (In re Kallstrom), 298

B.R. 753, 758 (B.A.P. 10th Cir. 2003) ("Because of the importance of the discharge in

bankruptcy, the grounds for denying a discharge as set forth in subsections (1) through

(10) of § 727(a), are narrowly construed."); Kaplan v. Salvador (In re Salvador), 570 B.R.

460 (Bankr. D. Mass. 2017), *aff'd,* 277 F.Supp.3d 154 (D. Mass. 2017) (same).  Not

infrequently in adversary proceedings involving objections to the debtor's discharge,

"[t]he intent issue will turn on the credibility and demeanor of the debtor."  Groman v.

Watman (In re Watman), 301 F.3d 3, 8 (1st Cir. 2002) ("Watman I").

In this regard, it is worthwhile to consider the credibility of Fustolo because his

testimony about a variety of topics, most importantly his record keeping and accounting

for cash deposits and withdrawals from personal and business bank accounts, has a

bearing on his entitlement to a discharge.  In view of Fustolo's three decade career as a

CPA, lecturer, author, businessman, and real estate investor, the Court would have

expected, just like Eberhardt testified that she would have expected, the Debtor to have

organized financial records or a system or systems in place to account for his various

sources of income and expenses associated with his various endeavors and intertwined

68

corporations, trusts, and limited liability companies. The Court infers from the Debtor's

failure to fully comply with discovery orders to produce records, coupled with his

invocation of the Fifth Amendment, that, had he complied with his responsibilities to

produce discoverable materials, his records would have revealed information adverse to

his interest in obtaining a Chapter 7 discharge. *See* In re Correra, 589 B.R. 76 (Bankr. N.D.

Tex. 2018). In that case, the court stated:

> [T]here is a more general "adverse inference" concept in case law that the
> court believes applies here—separate and apart from the possibility of there
> being an adverse interest that can be drawn from an assertion of a Fifth
> Amendment privilege. Specifically, it has been held, more generally, that
> "[f]ailure of a party to provide evidence peculiarly available to that party
> supports the inference that the truth would be damaging."

Id. at 130-31 (footnote omitted)).

The Debtor did not properly answer SOFA Questions 1 and 2. He did not state his

gross income received from all sources as required by those questions. Instead, he stated

both net and gross income from various sources in contravention of the requirements of

the SOFA and his disclosure duties of as a debtor. Fustolo's response that he did not

know what the instructions required was unconvincing and incredible. The Debtor, as a

sophisticated businessman and CPA, must know the difference between net and gross

income and, thus, responded untruthfully to Questions 1 and 2, deliberately obscuring

his gross income.

Fustolo's demeanor during the trial was calculated. When asked about matters

relating to his loan from Patriot, his memory of details was excellent as he was able to

recall specific incidents from 2008 and 2009. When asked about other matters, such as

the Whistleblower Claims, however, he testified that he was unable to recall the statutory

basis for the claims or the name of the attorney who instructed him to destroy Form 211.

His insistence that trial balances and bank statements were sufficient financial records

was incredible in view of the complexity and interrelatedness of the numerous business

entities he owned and controlled, the substantial dealings in cash, the 46 bank accounts

belonging to the Debtor, Mrs. Fustolo, and other entities identified by his expert Train,

and the movement of monies among his business and personal accounts.  The absence of

financial documents to record income and track disbursements was significant and

disturbing, particularly when juxtaposed against his years of practice as an accountant

who holds himself out as an award winning author of accounting books.  In sum, the

Court does not find Fustolo to have been a credible witness, particularly in view of the

Court's observations of his caviling demeanor and previous ruling that he lied about the

destruction of his AOL emails. *See* The Patriot Grp., LLC v. Fustolo (In re Fustolo), No.

14-1193, 2015 WL 9595421, *4 (Bankr. D. Mass. Dec. 31, 2015).

    B. 11 U.S.C. § 727(a)(2)(A)

        1. Applicable Law under § 727(a)(2)(A)

With respect to Count I under 11 U.S.C. § 727(a)(2)(A), which precludes the entry

of a discharge if the debtor, with intent to hinder, delay, or defraud a creditor, has

transferred, removed, or concealed property of the estate within one year before the date

of the filing of the petition, a plaintiff must establish the following: "(1) transfer or

concealment of property (2) that belonged to the debtor (3) less than a year before the

bankruptcy petition (4) with actual intent to hinder, delay, or defraud a creditor." *See*

Marrama v. Citizens Bank of Massachusetts (In re Marrama), 445 F.3d 518, 522 (1st Cir.

2006); In re Schifano, 378 F.3d at 66-67.  As the United States Court of Appeals for the First

Circuit observed in Marrama,

> Because a debtor rarely gives direct evidence of fraudulent intent, we have
> recognized that, even on summary judgment, intent to defraud a creditor
> can be proved by circumstantial evidence. *See* In re Varrasso, 37 F.3d 760,
> 764 (1st Cir. 1994). In weighing evidence of fraudulent intent courts should
> look to the following "objective indicia":
>
>> (1) insider relationships between the parties; (2) the retention
>> of possession, benefit or use of the property in question; (3)
>> the lack or inadequacy of consideration for the transfer; (4) the
>> financial condition of the [debtor] both before and after the
>> transaction at issue; (5) the existence or cumulative effect of
>> the pattern or series of transactions or course of conduct after
>> the incurring of the debt, onset of financial difficulties, or
>> pendency or threat of suits by creditors; (6) the general
>> chronology of the events and transactions under inquiry; and
>> (7) an attempt by the debtor to keep the transfer a secret.

In re Marrama, 445 F.3d at 522 (quoting Watman I, 301 F.3d at 8 (internal citations

omitted); *see also* Kaplan v. Salvador (In re Salvador), 570 B.R. 460, 473 (Bankr. D. Mass.

2017), *aff'd*, 277 F. Supp.3d 514 (D. Mass. 2017).

        2. Positions of the Parties

            a. Patriot

    Patriot points to the Debtor's numerous prepetition transfers of cash to Mrs.

Fustolo, between May 7, 2012 and May 6, 2013, totaling $119,158.30, based upon

Eberhardt's Report.[46]   According to Patriot, Mrs. Fustolo's bank account statements

---

[46] In re report, Train calculated total cash deposits in the sum of $310,413.15 into the nine
personal bank accounts owned by the Fustolos for 2012 and $468,426.67 for 2013. In
addition, she calculated withdrawals totaling $449,518.87 for the period from May 6, 2012

reflect at least 140 separate cash transactions during the prepetition period.  In its view, it established the Debtor's fraudulent intent because the transfers were made to an "insider," the funds were used for extraordinary expenses, Mrs. Fustolo was not paid in cash for her work, the transfers reduced Fustolo's assets and impaired his ability to pay creditors, the transfers occurred while Patriot was attempting to collect its judgment, and Fustolo produced no documentation to show the source or use of the cash.  It rejects Fustolo's "threadbare and uncorroborated explanation that the cash transfers were for household expenses," pointing to the absence of documentation, as well as the use of at least $21,400.00 to pay for membership at the Woodland Golf Club and another $54,000.00 to pay Mrs. Fustolo's credit card bills.

Patriot also contends that the transfers totaling approximately $100,000.00 of the Debtor's property to purchase gemstones fall within the scope of § 727(a)(2)(A).  Patriot notes that Fustolo submitted no evidence as to the value of the gemstones and did not even know what kind of gemstones he acquired.  Moreover, according to Patriot, he introduced no documentation relating to the transactions,[47] did not have the gemstones appraised or certified as to their authenticity, purchased them when he was experiencing

---

through May 6, 2013, including cash withdrawals of $37,673.26.   In the one year prepetition period, she noted Woodland Golf Club payments of $21,400.00 and a "Transfer from G D. Humanitarian [sic]" in the sum of $42,000.00.  For the postpetition period from May 7, 2013 through December 31, 2013, she calculated withdrawals of $285,891.68 from nine personal bank accounts, including cash withdrawals of $10,886.99.
[47] The Debtor used his personal bank account ending in 1750 at Belmont Savings Bank to transfer $42,000 to the G D Humanitarian Fund.

financial difficulty, and then hid them under his bed or put them in his wife's safe deposit box.

### b. The Debtor

The Debtor contends that he regularly provided Mrs. Fustolo with funds from his income to pay household bills and other household expenses.  In addition, he contends that the gemstones were acquired by the 32 Park Vale Avenue Trust and two other individuals and that the 32 Park Vale Avenue Trust's interest in the gemstones was listed on Schedule B.  He also contends that the funds to purchase the gemstones came from the bank accounts of the 32 Park Vale Avenue Trust and the Steven C. Fustolo 2004 Revocable Trust, not his personal accounts and that the beneficiary of the Steven C. Fustolo 2004 Revocable Trust is the 32 Park Vale Avenue Trust.  He also contends that Patriot introduced no evidence that the 32 Park Vale Avenue Trust and the Steven C. Fustolo 2004 Revocable Trust were the alter egos of Fustolo or that said entities should be "collapsed" or disregarded.  He opposes denial of his discharge for having made fraudulent transfers within the meaning of 11 U.S.C. § 727(a)(2)(A).

### 3. Analysis

The Court concludes that the Debtor's discharge should be denied under 11 U.S.C. § 727(a)(2)(A) because the Debtor transferred cash in the amount of $42,000.00 from his personal bank account at Belmont Savings Bank ending in 1750 to the G D Humanitarian Foundation with the intent to hinder, delay and defraud a creditor. The Court reaches this conclusion for several reasons based upon the overwhelming weight of the evidence. In the first place, the account at Belmont Savings Bank ending in 1750 (*see* Plaintiff's

Exhibit 13) was in the name of the Debtor.   The name on the account is "Steven C.
Fustolo," not the "Steven C. Fustolo 2004 Revocable Trust," as asserted by the Debtor in
his post-trial brief.   More importantly, the Debtor's expert witness identified the Belmont
Savings Bank account ending in 1750 as the Debtor's personal bank account both in her
report and in her testimony.   Coupled with Eberhardt's report and bank records attached
as part of Patriot's exhibits, Patriot proved that the Debtor, individually, owned the
account ending in 1750.   The Debtor, contradicting his expert, represented that the
account ending in 1750 belonged to a revocable trust owned by the 32 Park Vale Avenue
Trust in which he had a 100% interest at the time he transferred $42,000.00 to the G D
Humanitarian Foundation.   In view of the findings of his own expert witness, the
numerous bank statements, deposit and withdrawal slips, and a check from Belmont
Savings Bank bearing his name, it was incumbent upon him to produce evidence in
support of his position in view of the documents submitted by Patriot in conjunction with
Eberhardt's report, which he failed to do.   His testimony alone was insufficient.[48]

There was ample indicia of fraudulent intent associated with the Debtor's
suspicious acquisition of the gemstones with funds from his personal bank account.   The
Debtor's failure to list the Belmont Savings Bank account ending in 1750 on Schedule B,
coupled with his incredible testimony that he was unaware of what types of gemstones
he purchased from a humanitarian organization, that he was unaware from whom he

---

[48] *See* note 27, *supra.*

obtained a bill of sale,[49] and that he had no appraisal for the gemstones or a certificate as

to their authenticity, compel the conclusion that the Debtor was acting with fraudulent

intent to put at least $42,000.00 beyond the reach of his creditors within one year of the

filing of the petition.

The Debtor contends that Patriot failed to produce evidence that the gemstones

were not worth approximately $100,000.00 or that he attempted to conceal their

acquisition.  Those arguments do not withstand scrutiny.  In the first place, the Debtor,

in his Schedules executed under penalty of perjury, stated that the value of the uncut

gemstones was "[u]nknown."  The Trustee also testified that he was having difficulty

obtaining an appraisal of the gemstones, and he stated his belief that they had little value.

Moreover, while the Debtor did not attempt to conceal the gemstones, he did not list the

bank account ending in 1750 from which he transferred the sum of $42,000.00 to the G D

Humanitarian Foundation on either his original or amended Schedule B, and he either

hid the gemstones under his bed or put them in a safe deposit box that did not belong to

him.  The Court concludes that the burden shifted to the Debtor to establish by way of

competent evidence that money from his bank account was not the source of the funds

and that the value of the gemstones was greater than the amount of money he transferred

to acquire an interest in them.  The Debtor did not satisfy that burden.[50]

---

[49] The Debtor testified he was unable to recall whether he made an independent
investigation of the G D Humanitarian Foundation.

[50] The Court shall not address Patriot's contention that the cash deposits of $119,158.30 to
Mrs. Fustolo's accounts within one year of the filing of the involuntary petition were
transfers made by the Debtor with actual intent to hinder, delay or defraud a creditor, or

C. <u>11 U.S.C. § 727(a)(2)(B)</u>

1. Applicable Law

To warrant denial of discharge under § 727(a)(2)(B), a plaintiff must establish that the debtor, with intent to hinder, delay and defraud a creditor, transferred property of the estate after the filing of the petition. Patriot's count under § 727(a)(2)(B) is predicated upon proof that the contents of the websites and brochures belonging to National Tax Institute, Inc. and CPE Meetings Inc., as well as good will, were assets of the Debtor and that, upon the filing of the bankruptcy petition, those assets became property of his bankruptcy estate which he then transferred to Fustolo CPE, LLC with intent to hinder, delay, and defraud creditors. Thus, in the first instance, Patriot had to produce evidence from which this Court could determine that the assets of the two corporations, which revolved around promoting the "Art of Resort CPE," were in fact the Debtor's property that became property of his bankruptcy estate, and then establish that there was a transfer of that property after the petition date.[51] In this regard, a court must examine the nature of the property transferred and whether, in fact, there was a transfer of that property.

_____

the Debtor's contention that the cash deposits of $119,158.30 into Mrs. Fustolo's accounts were for necessary household expenses, particularly when the Court has adjusted Train's exhibit 5 to her report to reflect deposits during the one-year prepetition period spanning 2012 and 2013 to correspond to Eberhardt's analysis. When only Mrs. Fustolo's personal bank accounts are considered, cash in excess of $212,000.00 was deposited among her three accounts (i.e., the account endings in 9376, 8433 and 5484) between May of 2012 and April of 2013. Because the Debtor could not identify sources of cash, the Court shall address these cash deposits below in the context of 11 U.S.C. § 727(a)(5).

[51] "Property" may include good will, copyrighted texts, and business relationships. *See* <u>Butler v. Anderson (In re C.R. Stone Concrete Contractors, Inc.)</u>, 462 B.R. 6, 23 (Bankr. D. Mass. 2011).

In <u>Watman v. Groman (In re Watman)</u>, 458 F.3d 26 (1st Cir. 2006) ("<u>Watman II</u>"),

the United States Court of Appeals for the First Circuit observed:

> The bankruptcy court was not required to calculate the precise value of the assets . . . in order to determine whether those assets were "property" capable of being transferred in this context. The question of whether those assets were "property" capable of being transferred depends on whether they are "'*susceptible* of having value.'" <u>Watman I</u>, 301 F.3d at 12 (emphasis added) (quoting <u>Robinson v. Watts Detective Agency</u>, 685 F.2d 729, 734 (1st Cir. 1982)); *see also* <u>Robinson</u>, 685 F.2d at 734 (explaining that the term "property" in the context of transfers is defined generally as "anything of value—anything which has debt paying or debt securing power"); <u>Glosband v. Watts Detective Agency, Inc.</u>, 21 B.R. 963, 971 (D. Mass. 1981) (holding that the term "property" in the context of transfers should be interpreted "'most generously' to incorporate anything of value which but for the transfer might have been preserved for the trustee to the ultimate benefit of the bankrupt's creditors" (quoting <u>Segal v. Rochelle</u>, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966)). Once the bankruptcy court determined that the assets . . . had some value, it did not have to calculate the precise value.

<u>Watman II</u>, 458 F.3d at 33 (emphasis in original).[52]  The First Circuit also observed that

"bankruptcy law defines 'transfer' broadly to include a transfer of possession, custody,

or control even if there is no transfer of legal title." <u>Id.</u> at 32 (citing <u>Watman I</u>, 301 F.3d at

10).  The court added "the bankruptcy court should have determined whether 'assets

---

[52] In <u>Watman I</u>, the First Circuit vacated the bankruptcy court's judgment for the debtor that had been affirmed by the bankruptcy appellate panel and remanded for further proceedings.  Groman sued Watman seeking the denial of his discharge under 11 U.S.C. § 727(a)(2), and § 727(a)(7).  The First Circuit noted that "Section 727(a)(2) applies to this case because of the terms of § 727(a)(7), which prohibits a debtor from committing an act proscribed under § 727(a)(2) in connection with the bankruptcy case 'concerning an insider.'" 301 F.3d at 7.  On remand, the bankruptcy court entered partial judgment in favor of debtor, and partial judgment in favor of judgment creditor, and the debtor appealed. The bankruptcy appellate panel vacated and remanded. On remand, the bankruptcy court again entered partial judgment in favor of debtor, and partial judgment in favor of judgment creditor, and the debtor again appealed. The district court affirmed, as did the First Circuit in <u>Watman II.</u>

such as . . . employees, patient files, office space, goodwill and overall going concern

value were (a) properly considered property . . . such that they would have been included

in the estate for the benefit of creditors; and (b) if so, whether they were transferred [to

the debtor or a new entity]. Id. (citing Watman I, 301 F.3d at 11–12 (footnote omitted)).

As this Court observed in Butler v. Candlewood Road Partners, LLC (In re

Raymond), 529 B.R. 455 (Bankr. D. Mass. 2015), "[t]he doctrines of veil piercing, reverse

veil piercing and alter ego are interrelated and litigants often use the terms

interchangeably." Id. at 471. Nevertheless, veil piercing and alter ego can be

distinguished. See U.S. Trustee v. Zhang (In re Zhang), 463 B.R. 66, 81 (Bankr. S.D. Ohio

2012). "The former asks a court to hold A vicariously liable for B's debts, while the latter

asserts that A and B are the same entity and therefore liability is direct." Id. (citing IUUA

Local 600 v. Aguirre, 410 F.3d 297, 302 (6th Cir. 2005)).[53]

As noted above, in the circumstances of this case, Patriot is not attempting to

obtain satisfaction of its judgment from the assets of National Tax Institute, Inc., CPE

Meetings Inc., or Fustolo CPE, LLC. Rather, it seeks a determination that the assets of

---

[53] In In re Zhang, the court observed:

> In determining whether individual debtors have concealed or transferred
> property in violation of § 727(a)(2) . . . courts have frequently applied or
> borrowed from alter ego and reverse veil piercing theories. These courts
> have recognized that in the context of Bankruptcy Code § 727(a)(2) . . .
> corporate distinctions may be disregarded under alter ego and reverse veil
> piercing theories and the assets of those entities, particularly bank accounts,
> be treated as the assets of the debtor when the facts warrant the application
> of those theories.

463 B.R. at 79.

National Tax Institute, Inc., CPE Meetings Inc. were the Debtor's assets that became estate

property upon the filing of the bankruptcy petition, as well as a determination that the

Debtor transferred those assets postpetition to Fustolo CPE, LLC with fraudulent intent,

thus warranting denial of his discharge.   According to the court in <u>Pisculli v. T.S. Haulers,</u>

<u>Inc. (In re Pisculli)</u>, 426 B.R. 52 (E.D.N.Y. 2010), *aff'd*, 408 F.App'x 477 (2d Cir. 2011),

> Although Section 727(a)(2)(B) only applies to "property of the estate," a
> court may pierce the corporate veil of a business and treat its assets as the
> debtor's individual property, and, thus, property of the debtor's estate,
> under an alter ego theory. *See, e.g.* <u>In re Riley</u>, 351 B.R. 662, 671 (Bankr. E.D.
> Wis. 2006); <u>In re Bonham</u>, 224 B.R. 114, 116 (Bankr. D. Alaska 1998) (holding
> that courts have the authority to deny a discharge to an individual debtor
> under Section 727(a)(2)(A) based upon transfers of property of corporations
> found to be the debtor's alter ego); *see also* <u>In re Rodriguez</u>, 2008 WL
> 3200215, at *7 (recognizing authority that an individual debtor causing his
> wholly-owned corporation to transfer property can provide a basis for a
> denial of discharge under Section 727(a)(2)(A), but finding no evidence in
> that case that at the time of the transfer at issue the debtor was in fact a
> shareholder of the corporation or that corporate formalities were
> disregarded). In New York, "a plaintiff seeking to pierce the corporate veil
> must show that 'complete domination' was exercised over a corporation
> with respect to 'the transaction attacked,' and 'that such domination was
> used to commit a fraud or wrong against the plaintiff which resulted in
> plaintiff's injury.'" <u>Williams v. Lovell Safety Management Co.</u>, LLC, 71
> A.D.3d 671, 896 N.Y.S.2d 150, 151 (2d Dept. 2010) (quoting <u>Matter of Morris</u>
> <u>v. New York State Dept. of Taxation & Fin.</u>, 82 N.Y.2d 135, 141, 603 N.Y.S.2d
> 807, 623 N.E.2d 1157 (1993)). In addition, "the corporate veil will be pierced
> to achieve equity, even absent fraud, [w]hen a corporation has been so
> dominated by an individual or another corporation and its separate entity
> so ignored that it primarily transacts the dominator's business instead of its
> own and can be called the other's alter ego." <u>Id.</u> (internal quotations and
> citations omitted).

<u>In re Pisculli</u>, 426 B.R. at 60–61.

    In <u>Watman II</u>, the First Circuit affirmed the decisions of the lower courts denying

the debtor a discharge under 11 U.S.C. § 727(a)(2).  The facts set forth in the decision are

informative of the issues presented here.   Watman, a dentist, had entered into an

agreement to acquire a dental practice, "Childrens Dental," from his partner, Groman,

who was retiring. Watman agreed to make monthly payments to Groman over several

years.  Because Watman was unable to make payments, Groman sued him and Childrens

Dental in state court for the balance owed and obtained a judgment.  While a motion to

appoint a receiver was pending, Watman wrote checks for Childrens Dental's anticipated

expenses, and, on advice of counsel, resigned his position at Childrens Dental.  Shortly

thereafter, he commenced a personal bankruptcy case and caused a Chapter 11 petition

to be filed on behalf of Children's Dental.  According to the First Circuit,

> At the time that these petitions were filed, Watman was the sole officer and
> director of Childrens Dental. At the time of filing, Childrens Dental had
> cash in bank accounts in the amount of approximately $30,000 and accounts
> receivable of about $69,000. These assets were disclosed in the bankruptcy
> schedules and turned over to the bankruptcy trustee. On or about March
> 25, 1999, Watman informed Lowell Doctors Park, from whom Childrens
> Dental was renting its office space, that Childrens Dental would be
> terminating its occupancy of the premises.
>
> From March 24, 1999 through March 31, 1999, Watman operated a dental
> practice under his own name at the office space that had been occupied by
> Childrens Dental at 75 Arcand Drive, in Lowell, Massachusetts (75 Arcand
> Drive location), using the same furniture and equipment that Childrens
> Dental had used. Watman offered the employees of Childrens Dental
> positions in his practice on the same terms as Childrens Dental was
> employing them. Then, on March 31, 1999, Lowell Dentistry for Children,
> P.C. ("Lowell Dentistry") was incorporated and began operations out of the
> same 75 Arcand Drive location. The corporate documentation to form
> Lowell Dentistry had been prepared in January 1999 by the law firm of
> Devine, Millimet & Branch. Childrens Dental paid the cost of these services
> from a retainer that it had paid to that firm. Watman became, and continues
> to be, the president, sole shareholder and director of Lowell Dentistry. Most
> of Childrens Dental's 3000 patients became patients of Lowell Dentistry
> when Childrens Dental ceased operating.

Watman II, 458 F.3d at 29-30 (footnote omitted).  In affirming, the First Circuit rejected

Watman's challenges to the bankruptcy court's findings, stating:

> On remand, the bankruptcy court concluded that Childrens Dental's
> "space, patient records, employees, and good will" were property of
> Childrens Dental and that they were transferred to Lowell Dentistry. The
> bankruptcy court noted that Watman "also used Childrens Dental's funds
> to prepay expenses that he knew he or a new corporation would incur."
> The bankruptcy court found that the only property not transferred and thus
> "remaining in [Childrens Dental's] estate for liquidation by its Chapter 7
> Trustee consisted of accounts receivable, an obsolete computer that Lowell
> Dentistry originally used then stopped using at some point, furnishings,
> decorations, and a box of dental supplies of unknown value." The
> bankruptcy court concluded that Watman's actions thus harmed Childrens
> Dental's creditors.
>
> Watman challenges these findings on two interrelated grounds. First, he
> argues that the bankruptcy court erred by failing to calculate the specific
> value of these assets. Second, he argues that the bankruptcy court's finding
> that Childrens Dental's assets had some value was clearly erroneous. Both
> of these arguments are specious.

458 B.R. at 232-33.[54]  As noted above, for purposes of § 727(a)(2), the First Circuit defines

both "property" and "transfer" broadly. Watman I, 301 F.3d at 10 (citing 11 U.S.C. §

101(54)(D) (defining "transfer" as . . . "any mode, direct or indirect, absolute or

conditional, voluntary or involuntary, of disposing of or parting with  - . . . property; or.

. .  an interest in property.")).  While recognizing that "'[t]he shifting of assets by the

debtor to a corporation wholly controlled by him is another badge of fraud,'" see Watman

I, 301 F.3d 8 (quoting Salomon v. Kaiser (In re Kaiser ), 722 F.2d 1574, 1583 (2d Cir.1983)),

the First Circuit determined the following:

---

[54] The case is distinguishable from the instant case in that Childrens Dental, an insider of
the debtor, also commenced a bankruptcy case, thereby implicating 11 U.S.C. § 727(a)(7).

The court noted that Watman "took virtually all of [Childrens Dental's] assets, tangible and intangible, and transferred them to his new corporation," yet paid no consideration for the transfer. The bankruptcy court found that Watman's actions resulted in the diminution and possibly the complete elimination of the value of Childrens Dental as a whole. The court rejected Watman's testimony and the testimony of his attorney that Watman created Lowell Dentistry to "preserve the value" of Childrens Dental (on the theory that Lowell Dentistry could purportedly make payments to Childrens Dental) as "not credible," given the lack of any memorialization of such an arrangement. Instead, the court found that Watman created Lowell Dentistry "to get out from under his and [Childrens Dental's] obligation to Groman." The court recognized that "Watman's actions were not done in secret," but concluded that the fact "[t]hat they were not secretive, however, is not sufficient to overcome the conclusion that they were intended to hinder, delay and defraud Groman."

458 F.3d at 34-35.  Although the court in Watman II did not address alter ego or veil piercing doctrines, it recognized Watman's pervasive control and manipulation of corporate assets for his personal benefit supported the bankruptcy court's determination that his discharge should be denied under § 727(a)(2).

Massachusetts courts employ the alter ego doctrine to determine whether a principal of a corporation is its alter ego using the My Bread Baking Co. factors.  For example, the Massachusetts Supreme Judicial Court in Attorney General v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373 (2000), stated the following:

The doctrine of corporate disregard is an equitable tool that authorizes courts, in rare situations, to ignore corporate formalities, where such disregard is necessary to provide a meaningful remedy for injuries and to avoid injustice. See My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614, 620, 233 N.E.2d 748 (1968). In certain situations, the doctrine may also properly be used to carry out legislative intent and to avoid evasion of statutes. See Packard Clothes Inc. v. Director of the Div. of Employment Sec., supra. See also C.A. Peairs, Jr., Business Corporations § 646, at 565 (2d ed.1971) ("corporate entity will be disregarded when necessary to . . . consummate the objective of a statute or other overriding public policy which would be frustrated by observance of the entity").

82

M.C.K., Inc., 432 Mass. at 380, 736 N.E.2d at 380-81.  The court concluded:

> . . . the facts demonstrated pervasive control of MCK and Reifer by Konig; confused intermingling of activity and assets among MCK, Reifer, and other Konig-controlled corporations; the existence of a common enterprise; the siphoning of corporate assets for the benefit of Konig and Konig-controlled and Konig-related entities; thin capitalization; failure to observe corporate formalities; and substantial disregard of corporate identities.

Id.

### 2. Positions of the Parties

#### a. Patriot

To support Count II, Patriot relies upon Fustolo's sole ownership and control of CPE Meetings Inc. and National Tax Institute, Inc. for the proposition that their assets were, in fact, both his personal property prepetition and property of the bankruptcy estate and that he transferred that property postpetition to Fustolo CPE, LLC.  It maintains that the twelve factors used by the courts in My Bread Baking Co. v. Cumberland Farms, Inc., 353 Mass. 614 (1968), and Pepsi-Cola Metro. Bottling Co., Inc. v. Checkers, Inc., 754 F.2d 10, 15 (1st Cir. 1985), are present in the instant case and enable this Court to conclude that Fustolo was the alter ego of the two corporate entities and, thus, transferred his assets, namely the copyrighted text, good will, and business relationships of National Tax Institute, Inc. and CPE Meetings Inc., to another entity, Fustolo CPE, LLC that were property of the bankruptcy estate to defraud it and other creditors.  Citing Goya Foods, Inc. v. Unanue, 233 F.3d 38, 44 (1st Cir. 2000), and Morley v. Ontos, Inc. (In re Ontos, Inc.), 478 F.3d 427, 432 (1st Cir. 2007), *cert. denied,* 552 U.S. 823

(2007), it concludes that corporations created to hide assets or to leave creditors to collect from an empty shell laden with liabilities warrants application of the alter ego doctrine.

Specifically, Patriot references the factors set forth in <u>My Bread Baking Co.</u> in support of its position that Fustolo was the alter ego of National Tax Institute, Inc. and CPE Meetings Inc. Thus, it makes the following arguments:

1) There was common ownership and pervasive control because Fustolo was the 100% owner, sole officer, director, and manager of CPE Meetings Inc. and National Tax Institute, Inc. and controlled both businesses, as well as their operations and their bank accounts.

2) There was confused intermingling and siphoning of the assets of the two corporations as Fustolo, prepetition, deposited funds into his wife's accounts from the bank accounts of those businesses.  It adds that Fustolo did not maintain any records of his company's expenses and used his wife's credit cards to pay purported company expenses, with no records or reconciliations.  Patriot also points to Fustolo's own expert's evidence of intermingling of assets by and among Fustolo, National Tax Institute, Inc. and his other businesses, and the absence of corporate accounting records (manual or electronic). Finally, Patriot notes that Eberhardt and Train both acknowledged significant unexplained and undocumented cash transactions involving Fustolo's accounts (including $41,000.00 in cash withdrawals), some of which came from his seminar business.

3) National Tax Institute, Inc. and CPE Meetings Inc. were thinly capitalized and insolvent and Fustolo admitted that there were no outside investors or paid-in capital for

the two corporations.  In addition, Fustolo testified about the existence of a significant

judgments against the two corporations, and he valued both entities at $0 on his original

and amended Schedule B.

4) Fustolo did not cause the corporations to observe corporate formalities or keep

corporate records.

5) Fustolo used his businesses to promote fraud. Patriot notes that National Tax

Institute, Inc. did not pay dividends; rather Fustolo took money from that and other

companies when he saw fit, ignoring the April 2012 Superior Court permanent injunction

that limited the expenses of National Tax Institute, Inc. and the other reach and apply

defendants to $7,000.00 per month and required Fustolo to document expenses to Patriot.

Patriot also argues that the preponderance of the evidence establishes that Fustolo

and National Tax Institute, Inc. were inextricably intertwined as Fustolo operated that

corporation prepetition in all practical respects as a sole proprietorship and respected no

corporate formalities.  It further contends that the personal services exception set forth in

11 U.S.C. § 541(a)(6) is unavailing, citing Fitzsimmons v. Walsh (In re Fitzsimmons), 725

F.2d 1208 (9th Cir. 1984) (in the context of a Chapter 11 case filed by an attorney, the court

held that "§ 541(a)(6) excepts from the proceeds of the estate only those earnings

generated by services personally performed by the individual debtor . . .[who] . . . is thus

entitled to monies generated by his law practice only to the extent that they are

attributable to personal services that he himself performs. To the extent that the law

practice's earnings are attributable not to [the debtor's] personal services but to the

business' invested capital, accounts receivable, good will, employment contracts with the

firm's staff, client relationships, fee agreements, or the like, the earnings of the law practice accrue to the estate.").

Patriot further argues that the postpetition transfer of the assets of National Tax Institute, Inc. to Fustolo CPE, LLC was a transfer of property of the bankruptcy estate. In its view, that property was comprised of "(a) copyrighted text; (b) a copyrighted website; (c) a copyrighted brochure; (d) a long-established business concept ("resort CPE"); (e) goodwill and business relationships with vendors, resorts, and speakers; and (f) the ability to generate revenue independent of Fustolo personally."[55]  It maintains that Fustolo transferred that property with intent to hinder, delay, and defraud his creditors.

Patriot relies upon the Affidavit of Christopher Butler to authenticate the screen images obtained via the Internet Archive and its Wayback Machine, and a comparison of the content of brochures and websites from 2012 and 2013 and 2016.  Because National Tax Institute, Inc. and CPE Meetings Inc. continued to operate postpetition, generating significant revenues (i.e., $1.97 million between May 8, 2013 and the end of 2015), Patriot contends that that transfer was fraudulent, referencing numerous badges of fraud, including the absence of any consideration for the transfer.

### b. The Debtor

The Debtor, pointing to the failure of any party to seek the appointment of a trustee during the "gap period" or to seek an injunction restraining his use of any income during

---

[55] It further describes the property as follows:  "valuable property, including its proven business structure and model, niche concept, reputation (goodwill), customer base, copyrighted web content, licenses with regulatory agencies, relationships with speakers, vendors, and resorts, and other property."

the gap period, complains that Patriot did not allege in the Complaint or the Joint Pretrial

Memorandum that Fustolo CPE, LLC was an extension or alter ego of National Tax

Institute, Inc. or CPE Meetings, Inc.  Indeed, he states: "Fustolo did not agree to try a

count seeking piercing of the corporate or entity veil" and "Patriot did not allege in the

complaint or pre-trial memorandum that Fustolo CPE, LLC was an extension or alter ego

of National Tax Institute, Inc. or CPE Meetings Inc. that was created to receive a transfer

of estate assets to defraud creditors."  He asserts that he has generated, and continues to

generate, income from written courses and materials that he prepares each year and

supplies to continuing education providers and that, in 2013, he had no employees

working for him in the seminar business, although his wife traveled with him.  He also

contends that the Trustee did not consider "income generated by Fustolo in the conduct

of seminars to be estate property and is not pursuing recovery of funds generated by the

seminar business," adding that the Trustee considered the common stock of the two

entities to have no value.[56]  He argues: "[e]ven if Fustolo CPE LLC was an extension of

NTI [National Tax Institute, Inc.] and CPE [Meetings Inc.], there could not have been a

transfer of value because NTI and CPE had no value at the petition date."

The Debtor emphasizes that he was required to and did rewrite his materials in

the summer and fall of 2013 to comply with new standards, such that the CPE materials

could not be sold by providers after January 1, 2014.  He asserts that Patriot failed to

submit "a calculation of the amount of royalties accounts receivable that is [sic] an estate

---

[56] The Trustee's testimony regarding the Debtor's seminar business is reproduced above.

asset," insisting that Fustolo CPE, LLC was "a new and different seminar business than

that previously conducted." He argues:

> Patriot introduced no evidence alleging that 32 Park Vale Avenue Trust and
> the Steven C. Fustolo 2004 Revocable Trust were the alter egos or [sic]
> Fustolo or that said entities should be collapsed and neither the complaint
> nor the Pre-Trail [sic] Memorandum contained those allegations.
>
> . . . Fustolo did not agree to try any allegations involving the alter ego or
> collapse of any of his entities.
>
> . . . Wayback information is not reliable based on the statements and
> disclaimers found in the affidavit of Christopher Butler.
>
> . . . Butler's Affidavt [sic] stated that dates assigned by WayBack Machine
> does not apply to eh [sic] image files that are linked andn [sic] that
> documetns [sic] may not be archived on the same date as the file. . . .
>
> . . . Kim Hopkins, who is an internal paralegal working for Patriot and not
> an expert, was bit [sic] qualified to determine the reliability of Wayback by
> using [sic] . . .
>
> . . . Patriot presented purported archived web pages of NTI that were
> inconsistent as to content, dates, and elements, making the [sic] unreliable.

### 3. Analysis

In the first instance, the Court unequivocally rejects the Debtor's assertion that he

did not agree to try a count seeking to pierce the corporate or entity veils and also rejects

his waiver argument with respect to the absence of motions seeking either the

appointment of a trustee or an injunction during the gap period.  While the Debtor,

through mistake or inadvertence, may not have foreseen evidence submitted by Patriot

pertinent to issues under § 727(a)(2)(B) prior to the submission of the Joint Pretrial

Memorandum, he should not have been surprised or unprepared to address that

evidence.  Indeed, as noted in footnote 2, the Court in its December 31, 2015 decision,

2015 WL 9595421, at *2, an order entered well before the beginning of the trial on May 23,

2016, specifically addressed Patriot's assertions relative to the fraudulent transfer of non-

royalty property of the estate.  Moreover, the Court takes judicial notice that in the Joint

Pretrial Memorandum, executed by counsel to the Plaintiff and the Defendant, Patriot

identified the following issue for trial:

> Whether Fustolo's seminar business, rental income, and other property from which Fustolo derived revenue during the post-petition period constitutes property of the estate. *See* In re Fitzsimmons, 725 F.2d 1208 (9th Cir. 1984) (personal services exemption does not apply to new company formed to continue business of pre-petition business the ownership of which is property of the estate); In re Prince, 85 F.3d 314 (7th Cir, 1996) (same); In re Moyer, 421 B.R. 587 (S. D. Ga. 2007) ("plain reading of the [Section 541(a)(6)] provides for a narrow exception for earnings derived from post-petition services, not profits from business.").

Accordingly, Fustolo's argument that he did not agree to a trial of an alter ego or veil

piercing claim in the context of this Count is frivolous.  Similarly, the absence of evidence

relative to the 32 Park Vale Avenue Trust and the Steven C. Fustolo 2004 Revocable Trust

is irrelevant to Patriot's claim under § 727(a)(2)(B) as National Tax Institute, Inc. and CPE

Meetings Inc. were not owned by the 32 Park Vale Avenue Trust.  The Debtor was the

alter ego of National Tax Institute, Inc. and CPE Meetings Inc., not the 32 Park Vale

Avenue Trust or the Steven C. Fustolo 2004 Revocable Trust, which is not specifically

listed on either the original or amended Schedule B.  There are only two ways that the

Debtor's interests in National Tax Institute, Inc. and CPE Meetings Inc. could constitute

property of the estate:  1) if the Debtor were the alter ego of the two entities such that the

assets of those businesses were in fact his and became property of his bankruptcy estate

upon the filing of the involuntary petition; and 2) if the property interests belonging to

the corporations were not solely the result of the Debtor's personal services. The Court

concludes, based upon a preponderance of the evidence, that the assets of those two

corporations were, in fact, assets of the Debtor because of the Debtor's pervasive control

over those entities and because of the intermingling of funds among those entities and

the Debtor's personal accounts, a fact noted by his own expert witness[57] and, indeed, by

him on Schedule J.   Thus, the assets of the two corporations became property of his

bankruptcy estate.

The Court concludes that Fustolo exercised pervasive control over the two

corporations, which he admitted were thinly capitalized. Moreover, he did not keep

adequate records, such as ledgers, receipts, or other documents for either corporation,

except for trial balances which he used to prepare tax returns. The Debtor did not

produce articles of incorporation for the two corporations, any corporate minutes or other

evidence that corporate formalities were observed to rebut Patriot's evidence.   In

addition, the Debtor admitted that he withdrew monies from the companies when he saw

fit. He did not produce records of disbursements or produce evidence of any loans he

made to the corporations that would justify transfers of money to him.

With respect to the issue of commingling of funds, the Court notes that the

Debtor's Schedule J reflects the transfer of monthly income in the sum of $700.00 to CPE

Meetings Inc. for "Internet and email costs." In addition, Train documented transfers

---

[57] She observed in her report:  "I understand from Mr. Fustolo that the cash deposited
into the business accounts were sourced from funds that would have otherwise been
deposited into one of the nine personal bank accounts."

totaling $37,000.00 from an account in the name of CPE Meetings Inc. to an account in the Debtor's name. (*See* Exhibit 10 to her report)  As noted above, the Debtor testified that when he took money from his corporations he did so either as loan repayments or draws. Although he disclosed on his original and amended Schedule B sizeable shareholder loans of over $1.4 million to National Tax Institute, Inc. and CPE Meetings Inc., he failed to produce any documentation for loans made to the corporations.

National Tax Institute, Inc. and CPE Meetings Inc. generated substantial cash, although the Debtor reported "nonpassive losses from Schedule K-1" for those entities on a Schedule E to his joint 2012 federal income tax return, and he reported profits on a Form 8582 ("Passive Activity Loss Limitation") of approximately $14,000 for them in 2013.  The Debtor, however, testified that he kept no books and records relating to income and losses, limiting the documentation he kept to "trial balances" that he created to prepare income tax returns.

Despite the Debtor's testimony to the contrary, this Court concludes that the Debtor utilized the property of National Tax Institute, Inc. and CPE Meetings Inc., namely its niche concept, the content of the website and brochures, including format, and descriptions regarding topics, speakers, registration, and phone numbers, as well as goodwill both pre- and postpetition, and then transferred that property, which had become property of the bankruptcy estate to Fustolo CPE, LLC postpetition.   While the Internet Archive and its Wayback Machine archive might not be flawless, if screenshots are properly authenticated, their use is permissible.  *See* United States v. Gasperini, 894 F.3d 482, 489-90 (2d Cir. 2018); Marten Transport Ltd. v. Platform Advertising, Inc., No.

14-2464-JWL, 2016 WL 1718862, 100 Fed. R. Evid. Serv. 363 (D. Kan. April 29, 2016)
(permitting authentication of screenshots).  The overwhelming weight of the evidence
compels the conclusion that the new "NTI" was the same as the old "NTI."  The Debtor's
testimony about "rebranding" the concept of "Resort CPE" to include non-tax
professionals was unavailing in light of the striking similarities between the pre-and
postpetition marketing materials appearing on the web and in brochures, including the
Compass Rose logo which preceded "NTI" in promotional materials.

As noted by the First Circuit in Watman I, "property" is defined broadly.  301 F.3d
at 8.  Moreover, this Court is not required to calculate the precise value of the assets
transferred.  *See* Watman II, 458 F.3d at 33.  While National Tax Institute, Inc. and CPE
Meetings Inc. may have had no value owing to the magnitude of judgments against them,
and the income losses ascribed to them by the Debtor on his 2012 and 2013 tax returns,
the discrete assets Fustolo caused to be transferred did have value under the test
articulated by the court in Watman II.  It defies logic that Fustolo would continue to
highlight "Perfecting the Art of Resort CPE" if that concept had no value or ability to
generate interest and registrations for the CPE programs offered.  In addition, the Court
has ample evidence to infer that the assets had value to the Fustolos as both Fustolo and
his spouse were afforded the opportunity to travel to numerous and various luxury resort
destinations as part of the seminar businesses, which generated income of approximately
$1.97 million between May 8, 2013 and December 9, 2015 according to Eberhardt.

The Court also concludes that it is not bound by the testimony of the Trustee as to
whether the Debtor's seminar businesses involved postpetition services which are

excepted from property of the estate under 11 U.S.C. § 541(a)(6).  First, the Trustee's testimony was equivocal.  Secondly, his answer was in response to questions that did not specifically reference National Tax Institute, Inc. or CPE Meetings Inc.  Moreover, the Trustee, in his complaint, asserted that the Debtor and his spouse "employed multiple bank accounts and safe deposit boxes in Elisa's name as part of an elaborate and intentional scheme to conceal the debtor's income and assets from creditors and the Trustee."  Accordingly, the Debtor cannot rely upon the testimony of the Trustee to establish that any income he received from the two corporate entities was solely for personal services, particularly where the Debtor admitted that he could not identify the sources of the cash that was deposited into his bank accounts, Mrs. Fustolo's bank accounts, or their joint bank accounts.  Unlike the Debtor's royalty income from the preparation of educational materials for various publishers in the field of taxation for which he received 1099s, National Tax Institute, Inc. and CPE Meetings Inc. had assets and operations incident to the niche business of resort CPE, including telephone numbers for registrations and self-study courses, a stable of speakers, and presumably a valuable customer list as evidenced by James Douglas's testimonial, "14 years in a row and still going strong."  *See generally* In re Fitzsimmons, 725 F.2d 1210-13.

Finally, the Court concludes that several badges of fraud exist establishing that the Debtor transferred the business model to a new entity in an attempt to defraud creditors. First, the timing of the first deposit into an account in the name of Fustolo CPE, LLC occurred on December 11, 2013, less than one week before the entry of the order for relief, when the Debtor deposited $1,000.00 into a postpetition bank account at Belmont Savings

93

Bank ending in 0834. Although the Debtor continued to cause cash to be deposited postpetition into accounts that existed prepetition for the seminar business, he caused the cash deposits to transition to the postpetition bank account at Belmont Savings Bank ending in 0834 and eventually to two new postpetition bank accounts at the Brookline Savings Bank (accounts ending in 2703 and 2711) after December 11, 2013. In addition, Fustolo paid no consideration to National Tax Institute, Inc. or CPE Meetings Inc. for the property he transferred pospetition to Fustolo CPE, LLC, and he failed to produce evidence, such as a contract or bill of sale transferring the assets, thus highlighting his pervasive control and the commingling of assets which characterized the transaction. This is one of those rare cases where a determination that Fustolo was the alter ego of the two corporate entities engaged in the seminar business is warranted. *See* Pisculli v. T.S. Haulers, Inc. (In re Pisculli), 462 B.R. 52 (E.D.N.Y. 2010), *aff'd*, 408 F.App'x 477 (2d Cir. 2011); Attorney General v. M.C.K., Inc., 432 Mass. 546, 736 N.E.2d 373 (2000). Accordingly, the Debtor is not entitled to a discharge under § 727(a)(2)(B).

D. 11 U.S.C. § 727(a)(3)

1. Applicable Law

Section 727(a)(3) provides that the court shall grant the debtor a discharge, unless "the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case[.]" 11 U.S.C. §

94

727(a)(3). As this Court observed in <u>Lassman v. Mahfouz (In re Mahfouz)</u>, 529 B.R. 431

(Bankr. D. Mass. 2015),

> Section 727(a)(3) involves a shift in the burden of proof. "The initial burden
> is on the party objecting to discharge to prove two things: (i) that the debtor
> 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any
> recorded information;' and (ii) that the recorded information was
> information 'from which the debtor's financial condition or business
> transactions might be ascertained.'" <u>Lassman v. Keefe (In re Keefe)</u>, 380 B.R.
> 116, 120 (Bankr. D. Mass. 2007). Once the objecting party has met its initial
> burden, the burden then shifts to the debtor to establish either that the
> debtor maintained adequate books and records from which his financial
> condition can be ascertained or that the failure to keep adequate books and
> records can be justified under the circumstances. <u>Cohen Steel Supply, Inc.
> v. Fagnant (In re Fagnant)</u>, No. 03–10496–JMD, 2005 WL 1244866, at *3
> (Bankr. D. N.H. Apr. 14, 2005) (citations omitted), <i>aff'd</i>, 337 B.R. 729 (B.A.P.
> 1st Cir. 2006). Intent to conceal a debtor's financial condition is not a
> necessary element to support an objection to discharge for failure to keep
> books and records. <u>Thaler v. Erdheim (In re Erdheim)</u>, 197 B.R. 23, 29
> (Bankr. E.D.N.Y. 1996).

<u>In re Mahfouz</u>, 529 B.R. at 445.  This Court, citing <u>Harrington v. Simmons (In re Simmons)</u>,

525 B.R. 543 (B.A.P. 1st Cir. 2015), <i>aff'd</i>, 810 F.3d 852 (1st Cir. 2016), also noted:

> "The purpose of § 727(a)(3) is to give creditors, the trustee and the
> bankruptcy court complete and accurate information concerning the
> debtor's affairs and to ensure that dependable information is provided so
> that the debtor's financial history may be traced." <u>Canha v. Gubellini (In re
> Gubellini)</u>, No. 09–016, 2009 WL 8466789, at *4 (B.A.P. 1st Cir. Nov. 23, 2009)
> (footnote omitted)(citing, 958 F.2d 1226, 1230 (3d Cir.1992)). The standard
> for disclosure of records for purposes of § 727(a)(3) is one of
> "reasonableness in the particular circumstances." <u>Razzaboni v. Schifano (In
> re Schifano)</u>, 378 F.3d 60, 68 (1st Cir.2004) (internal quotations and citations
> omitted). "[A]n impeccable system of bookkeeping" is not required;
> however, "the records must sufficiently identify the transactions [so] that
> intelligent inquiry can be made of them." <u>Id.</u> at 69 (internal quotations and
> citations omitted). The inquiry into the reasonableness of records may
> include several relevant factors such as "the education, experience, and
> sophistication of the debtor; the volume of the debtor's business; the
> complexity of the debtor's business; the amount of credit extended to the
> debtor or his business; and any other circumstances that should be

considered in the interest of justice." Id. at 70 n.3 (internal quotations and citations omitted).

In re Mahfouz, 529 B.R. at 446 (citing In re Simmons, 525 B.R. at 547).  *See also* Krohn v. Frommann (In re Frommann), 153 B.R. 113, 117 (Bankr. E.D.N.Y. 1993) ("A court should not be required to speculate as to any loss of assets that have been in the debtor's possession, nor should the trustee or creditors be required to reconstruct the debtor's affairs.").  In addition, according to this Court in Northeast Cmty. Bank v. Manfredonia (In re Manfredonia), 561 B.R. 1 (Bankr. D. Mass. 2016),

> [A] debtor must have records which sufficiently identify transactions to permit inquiry about the debtor's financial status and to ascertain a complete and accurate picture of the debtor's financial affairs, including a debtor's business as well as personal finances and activities. *See* Razzaboni v. Schifano (In re Schifano), 378 B.R. 60, 69–70 (1st Cir. 2004). *Sophisticated business persons are generally held to a higher level of accountability for record keeping than less experienced debtors. See* Meridian Bank v. Alten, 958 F.2d 1226, 1231 (3d Cir. 1992).
>
> A number of courts have denied a debtor's discharge under this section where the debtor's only records are bank account records and tax returns. *See, e.g.,* Hunt v. Steffensen (In re Steffensen), 534 B.R. 180, 199 (Bankr. D. Colo. 2015), *aff'd,* __ B.R. __, Case No. 2:15-cv-525-RJS-PMW, 2016 WL 5874972 (D. Utah Oct. 7, 2016) (voluminous bank account records, tax returns and bills were nonetheless inadequate to explain finances and loan transactions); Sullivan v. Kickel (In re Kickel), 357 B.R. 490, 494 (Bankr. N.D. Ill. 2006) (canceled checks, bank statements and checking account ledgers inadequate); Gilbert v. Goldstein (In re Goldstein), 123 B.R. 514, 524–25 (Bankr. E.D. Pa. 1991) (copies of tax returns inadequate). "A debtor's records are not satisfactory if a trustee, creditor or the court would have to undertake a time consuming and detailed analysis of bank statements, canceled checks, receipts, and the like in order to determine the debtor's financial condition." In re Steffensen, 534 B.R. at 203. Moreover, *a debtor's record keeping oriented toward allowing him to complete tax returns may still be inadequate for the purposes of § 727(a)(3).* Id. at 205.

In re Manfredonia, 561 B.R. at 18–19 (emphasis supplied).

2. Positions of the Parties

a. Patriot

Patriot emphasizes that Fustolo was a highly sophisticated businessman, the owner of 39 businesses, and a professional tax advisor and CPA with numerous active business bank accounts. It also complains that Fustolo's "complex web" of companies and bank accounts made it difficult for it to determine Fustolo's financial condition and his business transactions.

Patriot further argues that the Debtor failed to keep and preserve financial records to explain cash deposits and withdrawals and hundreds of thousands of dollars that he funneled through his numerous accounts. Indeed, it observes that the Debtor's expert recognized that funds were commingled among personal and business accounts. It points out that the Debtor produced no documentary information or business records of any kind to explain his financial condition, only referencing IRS Code Section 170, which applies to charitable gifts, to improperly justify his sole reliance on tax returns and bank statements and his position that he was under no obligation to keep or maintain other records. Patriot also notes that the 2013 tax return was unsigned and undated and was entitled, as a consequence, to little or no weight.

Patriot emphasizes Train's testimony and her inability to explain what happened to the cash Fustolo and his spouse withdrew from their accounts prepetition, as well as the significant number of transactions reflected on the bank statements that could not be explained without additional records. It also points to Attorney Fencer's testimony that financial records produced by Fustolo in discovery contained disclaimers as to their

97

completeness and/or accuracy, adding that he did not receive documents from Fustolo

that in his view would have established the separate legal identity of the entities listed on

Schedule B.

> b. The Debtor

The Debtor, recognizing an issue as to the adequacy of his books and records,

states that "[a] debtor can prevail even if a failure to preserve records was unjustified

under the circumstances, as required by discharge exception [sic], if the failure to

preserve records did not affect the trustee's administration of the bankruptcy estate,"

citing Schaumburg Bank & Trust Co., N.A. v. Hartford (In re Hartford), 525 B.R. 895

(Bankr. N.D. Ill. 2015).[58]  He contends that, to the extent he failed to produce books and

records, it did not affect the Trustee's administration of his Chapter 7 estate.

---

[58] The Hartford decision is inapposite.  In Hartford, the court stated:

> Section 727(a)(3) puts an affirmative duty on a debtor to produce books and
> records that accurately document its financial affairs. Scott, 172 F.3d at 969–
> 70; Juzwiak, 89 F.3d at 427–28; Bodenstein v. Wasserman (In re
> Wasserman), 332 B.R. 325, 332 (Bankr. N.D. Ill. 2005) (Schmetterer, J.). This
> provision is designed to provide creditors and trustees with enough
> information to ascertain the debtor's financial condition with substantial
> completeness and accuracy *without the need to resort to post hoc forensic*
> *investigation to assemble the debtor's financial transactions from chaos.* Juzwiak,
> 89 F.3d at 427–28 (quotations omitted).

525 B.R. at 909 (emphasis supplied).  In Hartford, the court determined "the only evidence
the court has been provided in this regard, if accepted, establishes that any failure to
preserve the company's books and records was the responsibility of the trustee, not the
Debtor. It establishes that the books and records were at the premises at a time they had
become the trustee's responsibility, and then later went missing."  Id. at 910-11.

The Debtor also maintains that "Patriot did not prove that the native versions were important in lieu of the paper versions submitted to the Plaintiff and the PDF versions supplied to Mr. Fencer, then attorney for the Trustee and Plaintiff, and that the lack of native versions adversely impacted Trustee's ability to administer the estate."  He also contends that "Patriot did not prove that after Fustolo supplied Mr. Fencer paper versions of various requested documents, that Mr. Fencer, on behalf of the Trustee, requested from Fustolo native electronic versions of the documents in order to administer the estate."

3. Analysis

The Court concludes that the Debtor failed to keep and preserve adequate books and records.  The expert testimony and reports, as evidenced by the Court's summaries of their contents, instead of shedding light on the Debtor's financial affairs, merely highlights their complexity and the large number of unexplained cash transactions. Neither expert examined the Debtor's Schedules and SOFA and attempted to explain how or from what sources the Debtor would have been able to lend certain of his business entities over $9 million or why the Debtor's statements of gross income attached to Schedule I appear unrelated to the income reported on his 2012 and 2013 tax returns, which returns may or may not have been accurate.  Moreover, the experts used different time periods and methodologies, reflecting the different purposes for which they were hired.  The reports themselves, however, raise as many questions as they answer.

There is no dispute that the Debtor's laptop was lost in 2014 and that this Court entered an order on May 18, 2016, as modified on June 22, 2016,[59] precluding the Debtor from introducing either written or electronic documents that were not produced to Patriot prior to his deposition.  The Debtor maintains that he, in fact, provided documents to the Trustee and Patriot's former counsel, claiming that he maintained adequate books and records.  The Court rejects the Debtor's intimation that the records provided to the Trustee or Attorney Fencer, which were not introduced at trial, are germane to the issue of whether the Debtor kept or preserved adequate records from which his financial condition and that of his businesses could be ascertained.  In addition, the Trustee's decision not to seek denial of the Debtor's discharge under § 727(a)(3) is not a factual or legal defense to Patriot's count under § 727(a)(3) either, particularly where Patriot filed its Complaint against Fustolo before the Trustee filed his complaint against the Debtor and Mrs. Fustolo several months later.

The Debtor was required to produce documents in discovery to Patriot.  He failed to do so in a timely and proper manner, and this Court entered the May 18, 2016 order, reproduced above, as a result.  Even though Attorney Fencer testified that he turned over all documents he obtained from the Debtor to Patriot's current counsel, documents that he testified were laced with qualifications as to completeness and accuracy, the only inferences that can be drawn from a failure to comply with discovery orders in this adversary proceeding are that the documents did not exist, or that they would reveal

---

[59] *See* note 4, *supra.*

information that would be more prejudicial to the Debtor's defense in this action than any discovery sanctions that this Court could and did impose.

Ascertaining the Debtor's financial condition and business transactions posed an intractable problem owing to the complexity of the ownership structure of his various business entities and the movement of money among them and between business and personal accounts. Evidence admitted at trial with respect to his financial affairs was limited to bank account statements, two tax returns, one of which was undated and unsigned, his testimony, and the testimony of two expert witnesses. The Debtor and his wife had numerous bank accounts. Patriot's expert witness and the Debtor's expert witness did not agree on the precise number of bank accounts that belonged to the Fustolos, individually or jointly, and the Debtor's businesses. For example, Eberhardt examined 10 bank accounts relating to the Debtor's seminar business, including three which were opened postpetition; six bank accounts ostensibly belonging to Fustolo, although two were opened postpetition (accounts ending in 9827 and 1492) and three that were in the name of the "Parkvale Avenue Trust," or the 32 Parkvale Avenue Trust, an entity which was listed on Schedule B (i.e., accounts ending in 5628, 2980 and 6153, although the Citizens Bank account ending in 6153 according to Train belonged to "Parkvale Avenue Trust (DBA Ocean GP LLC)"); and nine bank accounts belonging to Mrs. Fustolo or accounts she shared with Fustolo, three of which were opened postpetition. As noted, Eberhardt included three accounts in her report as belonging to Fustolo when the accounts were in the name of the 32 Park Vale Avenue Trust or Park Vale Avenue Trust (i.e., accounts ending in 5628, 2980 and 6153).

Train identified nine bank accounts belonging to the Fustolos, either individually or jointly, including one that Eberhardt determined was opened postpetition (Belmont Savings Bank account ending in 9827) and one that Eberhardt did not include, namely a Bank of America account ending in 1461, which the Debtor listed on Schedule B. Train also reviewed other bank accounts that may have been opened postpetition. Train did not consider two postpetition accounts at Brookline Savings Bank (accounts ending in 2703 and 2711) that Fustolo began to use and used extensively after December 5, 2014, although her analysis ceased at the end of December 31, 2013.

In her report, Eberhardt states that she is a Certified Fraud Examiner and a Certified Anti-Money Laundering Specialist. Train, in her report, states that she is a CPA with an Accreditation in Business Valuation and has a MA in Finance, specializing in forensic accounting. Both are well qualified professionals. Their reports, however, are both flawed. Eberhardt included accounts belonging to entities other than Fustolo when she concluded that he deposited cash into personal accounts in the sum of $49,035.00. Train relied upon the joint tax returns filed by the Debtor and his spouse, one of which was unsigned and undated. In other words, she presumed that the tax returns filed by the Fustolos accurately reported their income. Moreover, despite her efforts, Train could not entirely reconcile the deposits into the couple's bank accounts with their tax returns, and she could not document $29,981.00 in cash deposits that were made during the prepetition period between May 7, 2012 and May 6, 2013. Moreover, her computations of Fustolo's gross income for 2012 and 2013 cannot be reconciled with the gross income

that can be computed from the statements of gross income that he attached to Schedule I.

The Debtor is a sophisticated businessman and CPA, yet he was unable to adequately explain the sources of cash deposited into his wife's bank accounts.  He cynically rejected the need for contemporaneously kept records, insisting that trial balances prepared in conjunction with tax returns were sufficient.  Owing to the flaws in his testimony and that of his expert witness, Debtor's financial condition remains amorphous, opaque, and unexplained.  *See* In re Hartford, 525 B.R. at 909 ("This provision is designed to provide creditors and trustees with enough information to ascertain the debtor's financial condition with substantial completeness and accuracy *without the need to resort to post hoc forensic investigation to assemble the debtor's financial transactions from chaos*.").  In short, even the *post hoc* forensic reports pursuant to which two experts only examined bank records and tax returns were insufficient to explicate the Debtor's financial condition and business transactions.

The Debtor's expert calculated his gross income for calendar year 2012 in the amount of $418,484.84.[60]  Assuming the accuracy of her computations, the Debtor had income of approximately $34,870.00 per month.  In addition, in 2013, Train determined that the Debtor made even more money, i.e., $431,767.00.  Moreover, the Debtor's seminar business, namely National Tax Institute, Inc. and CPE Meetings Inc., and later Fustolo CPE, LLC, generated significant income according to Eberhardt.  The Debtor, however,

---

[60] See note 43, *supra.*

on Schedule I (not on his SOFA in response to Question 1), which he filed on January 17, 2014, under penalty of perjury, reported gross income, based on the 2012 tax return, of $684,884.00, an amount $266,400.00 greater than the amount Train calculated. Notably, Fustolo stated that "[a]ll earned income is based upon the 2012 Tax Return." Moreover, Train determined that from May 7, 2013 through December 31, 2013, there were disbursements of $285,891.68 from the couple's bank accounts, and cash withdrawals for which there was no documentation accounted for $10,886.99 or 3.8% of total disbursements. Thus, the couple's monthly disbursements for eight months were approximately $35,700.00, a sum greatly exceeding the monthly expenses of $20,322.00 the Debtor reported on Schedule J. Based upon the foregoing, the burden shifted to the Debtor to cogently explain these discrepancies. He utterly failed to satisfy that burden, thus warranting denial of his discharge under §727(a)(3), a conclusion the Court reaches without even considering how the Debtor was able to make over $9 million in "shareholder loans" to various business entities, or why the Debtor maintained such an elaborate structure for those entities, including ownership by the Park Vale Avenue Trust of 26 entities, including the Steve C. Fustolo Revocable Trust and a 35% interest in a joint venture.

As noted above, the Debtor relies upon the decision in In re Hartford, 525 B.R. 895 (Bankr. N.D. Ill. 2015). Despite the "post hoc" forensic investigations of Eberhardt and Train, however, this Court concludes that the bank statements and tax returns are insufficient to ascertain and understand the Debtor's financial condition, see In re Manfredonia, 561 B.R. at 18–19. The Debtor failed to submit, or was barred from

submitting as a result of failure to comply with discovery orders, evidence from which a creditor could ascertain that condition.   The Debtor cannot now complain about, or benefit from, his violations of discovery orders. In sum, the Debtor either lied on Schedules I and J, or he and his expert interpreted the 2012 tax return quite differently. As a result of the foregoing anomalies, the Court concludes that Patriot submitted substantial evidence to shift the burden to the Debtor to establish that he kept and preserved adequate books and records from which his financial condition and business transactions might be ascertained.  *See* In re Mahfouz, 529 B.R. at 445.  The Debtor did not satisfy that burden.   He neither credibly justified the lack of records nor satisfactorily explained the sources of the cash transactions and the movements of money among his personal and business accounts. Accordingly, Patriot is entitled to judgment on Count III.

     E. 11 U.S.C. § 727(a)(4)

       1. Applicable Law

The parameters of § 727(a)(4) are set forth in the frequently cited decision of Boroff v. Tully (In re Tully), 818 F.2d 106 (1st Cir. 1987), in which the United States Court of Appeals for the First Circuit stated:

> Under § 727(a)(4)(A), the debtor can be refused his discharge only if he (i) knowingly and fraudulently made a false oath, (ii) relating to a material fact. The burden of proof rests with the trustee, In re Shebel, 54 B.R. 199, 202 (Bankr. D. Vt. 1985), but "once it reasonably appears that the oath is false, the burden falls upon the bankrupt to come forward with evidence that he has not committed the offense charged." Matter of Mascolo, 505 F.2d 274, 276 (1st Cir. 1974).

The statute, by its very nature, invokes competing considerations. On the one hand, bankruptcy is an essentially equitable remedy. As the Court has said, it is an "overriding consideration that equitable principles govern the exercise of bankruptcy jurisdiction." Bank of Marin v. England, 385 U.S. 99, 103, 87 S.Ct. 274, 277, 17 L.Ed.2d 197 (1966). In that vein, the statutory right to a discharge should ordinarily be construed liberally in favor of the debtor.  Matter of Vickers, 577 F.2d 683, 687 (10th Cir.1978); In re Leichter, 197 F.2d 955, 959 (3d Cir.1952), cert. denied, 344 U.S. 914, 73 S.Ct. 336, 97 L.Ed. 705 (1953); Roberts v. W.P. Ford & Son, Inc., 169 F.2d 151, 152 (4th Cir.1948). "The reasons for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural." Dilworth v. Boothe, 69 F.2d 621, 624 (5th Cir. 1934).

In re Tully, 818 F.2d at 110.[61]

> 2. Positions of the Parties

> a. Patriot

With respect to Count V under § 727(a)(4), Patriot, citing Cmty. Bank of Homewood-Flossmoor v. Bailey (In re Bailey), 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992),

---

[61] The court added:

On the other hand, the very purpose of certain sections of the law, like 11 U.S.C. § 727(a)(4)(A), is to make certain that those who seek the shelter of the bankruptcy code do not play fast and loose with their assets or with the reality of their affairs. The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction. As we have stated, "[t]he successful functioning of the bankruptcy act hinges both upon the bankrupt's veracity and his willingness to make a full disclosure." Mascolo, 505 F.2d at 278. Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight. See In re Tabibian, 289 F.2d 793, 797 (2d Cir. 1961); In re Shebel, 54 B.R. at 202. The bankruptcy judge must be deft and evenhanded in calibrating these scales. And, we are fully satisfied that such a balance was struck in the case at bar.

818 F.2d at 110.

maintains that the Debtor's listing on amended Schedule B of a "[p]otential whistleblower recovery," was a false oath as the Whistleblower Claims were "concocted out of whole cloth." Patriot maintains that the evidence established that the Debtor's Whistleblower Claims were false, that the Debtor proffered no independent evidence that he did not make a false oath, that he did not even raise the existence of the claims in this case until Attorney Edmand's May 9, 2014 letter to Attorney Fencer, and that he only amended Schedule B on the advice of counsel to list the "[p]ossible whistleblower recovery." Patriot contends that "even if Fustolo told his attorneys that he allegedly made or had a claim, that fact does not make the claim any less fabricated, let alone possible." It adds that advice of counsel is not a valid defense, citing Irish Bank Resolution Corp. Ltd. v. Drumm (In re Drumm), 524 B.R. 329, 396 (Bankr. D. Mass. 2015), aff'd, No. 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015) (advice of counsel does not preclude denial of discharge for false oath where Debtor would know the truth of the matter because clients lie to their attorneys). Patriot also argues that the timing of filing of amended Schedule B preceded the flurry of negative internet articles and that "the circumstantial evidence is overwhelming that Fustolo fabricated the 'possible whistleblower recovery' to support his campaign against Patriot and Howe as leverage in the bankruptcy proceeding." Patriot also urges this Court to draw a negative inference as to the validity of the whistleblower recovery from Fustolo's invocation of his Fifth Amendment privilege, citing Metz v. Dilley (In re Dilley), 339 B.R. 1, 7 (B.A.P. 1st Cir. 2006).

b. The Debtor

The Debtor emphasizes that he filed Whistleblower Claims with the IRS and SEC and received acknowledgements; that he had a reasonable belief that there were possible violations, that he did not retain a copy of Form 211 or the Whistleblower Claims based upon advice of counsel, and that his listing of a "[p]ossible whistleblower recovery" was for the reward and not the claims themselves.

### 3. Analysis

The issue posed by Count V is whether the Debtor knowingly and fraudulently made a false oath on his amended Schedule B, which requires the listing of "all personal property of the debtor of whatever kind," by including as personal property a "[p]ossible whistleblower recovery" as "a contingent and unliquidated claim." The Court concludes that Patriot produced overwhelming circumstantial evidence that the "[p]ossible whistleblower recovery" was a false claim. The Debtor either invoked his Fifth Amendment privilege or was unable to recall salient facts about the Whistleblower Claims, including the identity of the individual at Patriot to whom he reported the claims. His selective memory about the Whistleblower Claims, including the evidence upon which the claims were based and the statutory bases for the claims, stood in contrast to his remarkably clear memory about the origins of his loans with Patriot years earlier. In addition, his testimony that he employed Attorney Edmands for the sole purpose of writing the May 2014 letter which he personally drafted provides evidence of his fraudulent intent, particularly as he did not request Attorney Edmands to evaluate the merits of the claims. His testimony that he was advised not to keep copies of his submissions to the IRS and SEC by an attorney whose name he could not recall and did

Case 14-01193   Doc 390   Filed 02/04/19   Entered 02/04/19 13:24:48   Desc Main
                    Document     Page 109 of 116

not engage also was suspicious. The weight of the evidence compels the conclusion that

the Whistleblower Claims were fabricated for an improper purpose. To the extent that

the burden shifted to the Debtor to substantiate the Whistleblower Claims, his demeanor

and invocation of the Fifth Amendment was such that he did not rebut the falsity of the

"[p]ossible whistleblower recovery" listed on Schedule B. As the Court observed in In re

Dilley,

> The Fifth Amendment right against self-incrimination can be invoked 'in
> any proceeding, civil or criminal, administrative or judicial, investigatory
> or adjudicatory[.]' Kastigar v. United States, 406 U.S. 441, 444, 92 S.Ct. 1653,
> 32 L.Ed.2d 212 (1972). The right protects against disclosures 'which the
> witness reasonably believes could be used in a criminal prosecution or
> could lead to other evidence that might be so used.' Id. at 444–45, 406 U.S.
> 441, 92 S.Ct. 1653, 32 L.Ed.2d 212." In re Gi Yeong Nam, 245 B.R. 216, 224
> (Bankr. E.D. Pa. 2000). But the Fifth Amendment privilege does not compel
> the trier of fact in a civil proceeding to accept the assertion of the Fifth
> Amendment as proof of innocence. "[T]he Fifth Amendment does not
> forbid adverse inferences against parties to civil actions when they refuse
> to testify in response to probative evidence offered against them: the
> Amendment 'does not preclude the inference where the privilege is claimed
> by a party to a Civil cause.' 8 J. Wigmore, Evidence 439 (McNaughton
> rev.1961)." Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 47 L.Ed.2d
> 810 (1976).

In re Dilley, 339 B.R. at 7. Moreover, sophisticated debtors, such as Fustolo, cannot rely

upon an advice of counsel defense in a proceeding under § 727(a)(4). See In re Drumm,

524 B.R. at 396.

The Court observes that cases involving the omission of assets from a debtor's

schedules are legion. The converse is not the case. In other words, in this instance,

although the Court has concluded that Fustolo's claims against Patriot and Howe are

utterly bogus, the inclusion of the claim was not material. As the court observed in Smith

v. Smith (In re Smith), 489 B.R. 875 (Bankr. M.D. Ga. 2013), "[w]hile the issue here is not

an omission, the concept is the same—the estate has no interest in property the debtor

has no interest in, and thus the inclusion does not materially relate to the bankruptcy

case. Moreover, intent to defraud in a Chapter 7 case through claiming to own more

property is difficult to fathom." Id. at 895.  The Court also notes that the omission of the

claims may have triggered a similar count under § 727(a)(4), where the Debtor, in fact,

did file some sort of documents with both the IRS and SEC.

Although the Court concludes that denial of the discharge is unwarranted under

§727(a)(4) regarding the Whistleblower Claims, the Debtor failed to list on Schedule B a

bank account at Belmont Savings Bank ending in 1750 which was held in his name.  In

addition, the gross income he reported on Schedule I and on the SOFA differed markedly

from the income compiled by Train from the Debtor's tax returns.  As Patriot did not rely

upon those representations in support of Count IV, this Court shall enter judgment

against Patriot and in favor of the Debtor on Count IV with the caveat that the Court finds

the Debtor's testimony about the existence of Whistleblower Claims to have been both

incredible and false.

F. 11 U.S.C. § 727(a)(5)

1. Applicable Law

In In re Mahfouz, this Court outlined the law applicable to the denial of a debtor's

discharge under §727(a)(5), stating the following:

Section 727(a)(5) provides that the court shall grant the debtor a discharge,
unless "the debtor has failed to explain satisfactorily . . . any loss of assets
or deficiency of assets to meet the debtor's liabilities[.]" 11 U.S.C. § 727(a)(5).

Section 727(a)(5) also involves a shift in the burden of proof. As explained by the panel in <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803 (B.A.P. 1st Cir. 2005), there are two stages of proof with respect to this section:

> The plaintiff has the initial burden of producing some evidence that the debtor no longer has assets which he previously owned. *See* <u>Ehle v. Brien (In re Brien)</u>, 208 B.R. 255, 258 (B.A.P. 1st Cir. 1997). Once the plaintiff has established the loss of an asset, it is up to the debtor to provide a satisfactory explanation for the loss or deficiency of the asset. <u>Krohn v. Cromer (In re Cromer)</u>, 214 B.R. 86, 95 (Bankr.E.D.N.Y.1997). . . . What constitutes a "satisfactory" explanation for § 727(a)(5) purposes is left to the discretion of the court. *See* <u>Baum v. Earl Millikin, Inc.</u>, 359 F.2d 811, 814 (7th Cir.1966). . . . A debtor's explanation need not be comprehensive, but it must meet two criteria: First, it must be supported by at least some corroboration. *See, e.g.,* <u>Wortman v. Ridley (In re Ridley)</u>, 115 B.R. 731, 737 (Bankr. D. Mass. 1990) (undocumented explanations are not satisfactory for § 727(a)(5) purposes) (citing <u>Chalik v. Moorefield (In re Chalik)</u>, 748 F.2d 616 (11th Cir. 1984); <u>First Tex. Sav. Ass'n v. Reed (In re Reed)</u>, 700 F.2d 986 (5th Cir.1983)). Second, the corroboration must be sufficient to eliminate the need for any speculation as to what happened to all of the assets. <u>Id.</u> A debtor's explanation must consist of more than "a vague or indefinite references, evidence or explanations, or an uncorroborated hodgepodge of financial transactions." <u>Id.</u> (citations omitted). "A jumble of vague, unassorted memoranda, checks, bank statements, and bills" is insufficient. <u>Id.</u> at 738 (citing <u>Jackson v. Menick</u>, 271 F.2d 806, 809 (9th Cir. 1959)). Therefore, discharge will be denied when a debtor makes only a vague evidentiary showing that the missing assets involved have been used to pay unspecified creditors, or where the debtor fails to provide corroborative documentary evidence to confirm his explanation. <u>Id.</u> at 737–38 (citations omitted).

<u>In re Mahfouz</u>, 529 B.R. at 446-47 (citing <u>Aoki</u>, 323 B.R. at 817–18).

2. Positions of the Parties

a. Patriot

Patriot contends that Fustolo withdrew approximately $41,000.00 in cash from his personal accounts between May 16, 2012 and May 4, 2013 and that he cannot account for those withdrawals as he has no records, documentation, or other explanation on an itemized basis.   As this Court observed above, Eberhardt examined prepetition cash withdrawals from Fustolo's account ending in 1750, and from two other accounts which, according to Train, were in the name of the 32 Park Vale Avenue Trust and the Park Vale Avenue Trust, respectively (i.e., accounts ending in 2980, and 5628).  If the deposits into those accounts are excluded, the total of cash for which there is no accounting, using Eberhardt's analytical method, is $32,652.63.   According to Patriot, Train could not account for approximately $29,000.00 in cash withdrawals and neither could the Debtor. Patriot concludes as follows:

> [T]here is no question that Fustolo cannot account for a significant amount of his assets which disappeared during the Prepetition period. Indeed, Fustolo admits that he has no records about how the cash was spent or where it went, and his guesswork testimony concerning possible uses for the cash (which is uncorroborated) is entitled to no evidentiary weight. *See* Dewhurst, 528 B.R. at 547-48 (denying discharge). Under basic § 727(a)(5) principles, therefore, Fustolo must be denied a discharge because of the dissipation of these assets. Aoki, 323 B.R. at 816-17 (failure to explain disposition or dissipation of assets is grounds for denying a debtor a discharge).

b. The Debtor

The Debtor argues that Patriot failed to demonstrate that there was any loss of assets.  He also asserts that there was no evidence to support the conclusion that the

112

purchase of the gemstones resulted in a loss of assets; that cash deposits were used for

purposes other than household bills, and that "Patriot failed to demonstrate that, *except*

*for a de minimis amount of cash withdrawals*, cash disbursements and withdrawals from

Fustolo's personal accounts were accounted for and explained." (emphasis supplied).

The Debtor also argues that Patriot's schedule of cash withdrawals for which there was

no accounting; i.e., $40,629.89, included withdrawals that were not from the Debtor's

accounts.  Fustolo asserts that Patriot failed to allege that the 32 Park Vale Avenue Trust

and the Steven C. Fustolo 2004 Revocable Trust were alter egos of Fustolo or that they

should be collapsed.  Fustolo also contends that his lack of assets was directly attributable

to the failed Revere Beach project in which he invested "four to five million" of his own

money.  In addition, he contends that he satisfactorily explained cash transactions by

reconciling cash deposits with tax returns, including Form 1099s and K-1s, based upon

Train's report, adding that "[t]he Chapter 7 Trustee has not located any assets not listed

on the bankruptcy schedules."

        3. Analysis

      The Court concludes, as did Train, that the Debtor failed to satisfactorily explain

$29,981.00 in disbursements out of total disbursements of $449,518.47 between May 7,

2012 and May 6, 2013.  If Eberhardt's analysis is adjusted to exclude bank accounts

belonging to the 32 Park Vale Avenue Trust, there is no accounting for as much as

$32,652.63.  While the Debtor describes this amount as de minimis, the Court disagrees.

Although de minimis is a relative term, this amount of unaccounted for cash is not

insubstantial under any definition.  In the context of a Debtor who makes his living as a

113

CPA and lecturer on tax and accounting matters, the Debtor engaged in numerous cash transactions and failed to maintain adequate records to account for the loss of assets at his peril. He could not account for significant amounts of cash deposited into his wife's accounts and, as noted above, the discrepancies between Train's determination of Fustolo's gross annual income from his 2012 and 2013 tax returns and what he reported under penalty of perjury on the statements of his gross income attached to Schedules I cannot be ignored.

Fustolo asserts that the account ending in 1750 belonged to the Steven C. Fustolo 2004 Revocable Trust. For the reasons set forth above, the Court rejects that proposed finding. The bank account statements which are among the trial exhibits plainly show the name on the account is "Steven C. Fustolo," and the Debtor's expert included that account in her analysis as being an account belonging to the Debtor, not a trust.

As a CPA and an individual who earns substantial income from promoting his expertise as an accountant and tax adviser, Fustolo must be held to a higher standard than a less sophisticated debtor. Fustolo and his spouse had "substantial dealings in cash while keeping no records," as set forth in the Trustee's complaint. By electing to conduct so many transactions in cash, and by employing so many different bank accounts, the Debtor risked being unable to explain satisfactorily the loss of that cash. Indeed, his forensic accountant could not explain what happened to $29,981.00 in cash as there was no documentation for cash withdrawals in that sum.

The Court also rejects Fustolo's argument that, because the Trustee did not locate any assets not listed on his bankruptcy schedules, he has satisfied his burden under §

114

727(a)(5).  As the court noted in <u>Harrington v. Simmons (In re Simmons)</u>, 810 F.3d 852

(1st Cir. 2016),

> A burden-shifting framework applies: if the party seeking to thwart a discharge shows that the debtor has not accounted for previously owned assets or previously earned income, the burden shifts to the debtor to explain the deficiency. *See* <u>id.</u> The debtor's explanation "must be supported by at least some corroboration," and it "must be sufficient to eliminate the need for any speculation as to what happened to all of the assets." <u>Id.</u> Something more than vague allusions is required. *See* <u>id.</u>
>
> To invoke section 727(a)(5), it is unnecessary to show that the debtor has acted fraudulently or in bad faith. *See* <u>id.</u> Rather, the issue turns on whether a satisfactory explanation is—or is not—forthcoming.

<u>In re Simmons</u>, 810 F.3d at 860 (citing <u>Aoki v. Atto Corp. (In re Aoki)</u>, 323 B.R. 803, 817

(B.A.P. 1st Cir. 2005)].

The Court concludes that Eberhardt's expert testimony shifted the burden to the

Debtor to explain the unaccounted for cash withdrawn prepetition from his bank

accounts.  Neither he nor Train could satisfactorily explain that loss.  As the court in

<u>Simmons</u> observed, "[t]o invoke section 727(a)(5), it is unnecessary to show that the

debtor has acted fraudulently or in bad faith." <u>Id.</u>  Thus, the Debtor's discharge must be

denied under § 727(a)(5).

## V. CONCLUSION

In view of the foregoing, the Court shall enter an order granting a judgment in

favor of Patriot and against the Debtor on Counts I, II, III, and V and a judgment in favor

of the Debtor and against Patriot on Count IV.  In view of the Court's decision to enter an

order denying the Defendant/Debtor a discharge with respect to Counts I, II, III, and V,

consideration of Count VIII, pursuant to which the Plaintiff seeks to except its damages

from discharge under 11 U.S.C. § 523(a)(2)(A), is unnecessary.

By the Court,

Joan N. Feeney
United States Bankruptcy Judge

Dated:  February 4, 2019